**[J-80-2013]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**

| | | |
|---|---|---|
| TERRENCE D. TINCHER AND JUDITH R. TINCHER, | : | No. 17 MAP 2013 |
| | : | |
| Appellees | : | Appeal from the Order of the Superior Court, Dated September 25, 2012, at No. 1472 EDA 2011, Affirming the Judgment of the Chester County Court of Common Pleas, Civil Division, Dated June 1, 2011, at No. 2008-00974-CA |
| v. | : | |
| | : | |
| OMEGA FLEX, INC., | : | |
| | : | |
| Appellant | : | ARGUED: October 15, 2013 |

**OPINION**

**MR. CHIEF JUSTICE CASTILLE**                    **DECIDED: November 19, 2014**

Omega Flex, Inc., appeals the decision of the Superior Court to affirm the judgment on the verdict entered in favor of Terrence D. Tincher and Judith R. Tincher (the "Tinchers") by the Chester County Court of Common Pleas, Civil Division. We reverse the Superior Court decision in part, upon reasoning different from that articulated by the courts below, and we remand to the trial court for further action upon Omega Flex's post-trial motions, consistent with the principles elucidated in this Opinion. We hold that:

> 1.    This Court's decision in <u>Azzarello v. Black Brothers Company</u>, 391 A.2d 1020 (Pa. 1978) is hereby overruled.
>
> 2.    Having considered the common law of Pennsylvania, the provenance of the strict product liability cause of action, the interests and the policy which the strict liability cause of

action vindicates, and alternative standards of proof utilized in sister jurisdictions, we conclude that a plaintiff pursuing a cause upon a theory of strict liability in tort must prove that the product is in a "defective condition." The plaintiff may prove defective condition by showing either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer, or that (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions. The burden of production and persuasion is by a preponderance of the evidence.

3.    Whether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue. Thus, the trial court is relegated to its traditional role of determining issues of law, *e.g.*, on dispositive motions, and articulating the law for the jury, premised upon the governing legal theory, the facts adduced at trial and relevant advocacy by the parties.

4.    To the extent relevant here, we decline to adopt the Restatement (Third) of Torts: Products Liability §§ 1 *et seq.*, albeit appreciation of certain principles contained in that Restatement has certainly informed our consideration of the proper approach to strict liability in Pennsylvania in the post-Azzarello paradigm.


## I.    Background

Around 2:30 a.m. on June 20, 2007, neighbors reported a fire that had erupted at the home of the Tinchers in Downingtown, Pennsylvania. The residence was the central unit of a two-story triplex built in 1998-99, and purchased by the Tinchers in 2005. The fire was eventually extinguished and no persons were harmed. Subsequently, investigators concluded that a lightning strike near the Tinchers' home caused a small puncture in the corrugated stainless steel tubing ("CSST") transporting natural gas to a fireplace located on the first floor of the residence. The CSST installed

in the Tinchers' home was manufactured and sold by Omega Flex as part of a gas transportations system marketed as the TracPipe System. The heat attending the melting of the CSST caused by the lightning strike ignited the natural gas and fueled a fire estimated to have burned for over an hour. The fire caused significant damage to the Tinchers' home and belongings.

After the fire, the Tinchers reported the incident to their insurer, United Services Automobile Association ("USAA"). USAA compensated the Tinchers for their loss up to the limit of their policy and received an assignment of liability claims. The Tinchers suffered an additional out-of-pocket loss because a portion of their claimed loss exceeded the limits of the USAA policy.

In January 2008, the Tinchers filed a complaint against Omega Flex in the Chester County Court of Common Pleas.[1] USAA prosecuted the claims in the name of the Tinchers to obtain reimbursement of the insurance proceeds payout, but the Tinchers retained an interest in the litigation to recover the losses exceeding their insurance coverage. The Tinchers asserted claims premised upon theories of strict liability, negligence, and breach of warranty.

In relevant part, the Tinchers' complaint relies upon the theory of strict liability articulated in Section 402A of the Second Restatement of Torts, but as followed and construed in Pennsylvania. Complaint, 3/18/2008, at ¶¶ 19-25 (citing RESTATEMENT (2D) OF TORTS § 402A). The Tinchers alleged that Omega Flex is liable for damages to their home caused by the placement on the market and sale of the TracPipe System.

---

[1] The Tinchers also named as defendants R & L Plumbing Contractors, Inc., Joseph Rosati Plumbing, Inc., and Joseph R. Rosati, Jr., individually and d/b/a Joseph Rosati Plumbing & Heating. Omega Flex asserted cross-claims against its co-defendants. In October 2010, the Tinchers and Omega Flex voluntarily dismissed with prejudice all claims against these additional parties.

According to the Tinchers, the CSST incorporated into the TracPipe System is defective, and unreasonably dangerous to intended users, because its walls are too thin to withstand the effects of lightning. The Tinchers requested compensatory damages, interest, fees, and costs of litigation. Omega Flex answered the complaint denying the Tinchers' allegations. The matter was assigned to the Honorable Ronald C. Nagle, Senior Judge of the Chester County Court of Common Pleas. The parties proceeded with discovery and the filing of dispositive motions, which the trial court denied.

In September 2010, in anticipation of trial, Omega Flex filed a motion in limine requesting the application of Sections 1 and 2 of the Third Restatement of Torts to the Tinchers' strict liability claim. Omega Flex also proposed jury instructions and findings of fact consistent with the provisions of the Third Restatement. The Tinchers opposed Omega Flex's motion in limine and offered proposed jury instructions and findings of fact consistent with the Second Restatement and Azzarello, supra. The trial court did not resolve Omega Flex's motion before trial. See Notes of Testimony, 8/12/2011, at 17-22.

In October 2010, the parties proceeded to trial before a jury. At trial, the Tinchers offered evidence regarding the events of June 20, 2007, the subsequent investigation into the cause of the fire, the losses sustained by the Tinchers, and USAA's process of adjusting the insurance claim. The parties generally agreed that lightning had caused the fire, although they disagreed as to the sequence of events or the cause of ignition in the area of the fireplace. The Tinchers offered evidence that lightning transferred an electrical charge to parts of the home, including the TracPipe System; the electrical current then sought ground and created different electrical charges in the various metal components of the structure. The Tinchers' expert witnesses testified that a flow of energy between a differently charged TracPipe and another metal component of the

home caused an electrical arc, and the accompanying heat punctured the CSST and ignited the natural gas that the CSST transported. According to the Tinchers' expert, the perforation in the corrugated stainless steel tubing from the Tinchers' home was "characteristic of a lightning strike, not anything else." By comparison, Omega Flex's witnesses testified that lightning measured near the Tinchers' home on the night of the fire did not carry sufficient energy to puncture the CSST. According to these witnesses, once lightning entered the house, lightning-related high voltages -- although with low energy -- broke down the insulation on electrical wires and, if the circuit breakers did not interrupt the current, the electrical current caused the fire. Omega Flex also responded that the conditions of the Tinchers' home after the fire and after the investigation, during which part of the evidence had been removed from its original location, made it impossible to confirm the Tinchers' theory. Finally, Omega Flex offered evidence that an attempt had been made to bond the TracPipe System to the cold water pipe at the Tinchers' residence which, if successful, would have prevented the electrical arc -- and the resulting fire -- from occurring. Witnesses testified that, after the fire, a bonding clamp had been found connected to the CSST and near but disconnected from the cold water pipe. The parties offered competing testimony as to whether the clamp had been attached to the cold water pipe before the fire.

Relevant to their strict liability theory, the Tinchers offered testimony regarding a defect in the TracPipe from experts in electrical engineering and metallurgy, electrical arc physics, and material science -- Mr. Mark Goodson and Dr. Thomas Eager, respectively. These experts opined that CSST is inherently defective because its wall is 1/100 of an inch thick -- the width of four sheets of paper -- and, as a result, the probability is "very high," "close to a hundred percent," that a lightning-generated current will perforate it. By comparison, an alternative natural gas conduit made of black iron

pipe is ten times thicker for a half-inch diameter pipe similar to the CSST present in the Tincher home. According to the witnesses, CSST withstands the transfer of ten times less energy than black iron pipe and, given the same energy, the amount of time to puncture CSST is 1/100 the amount of time required to puncture black iron pipe. Experts estimated that an electric arc is fifty thousand to a million times more likely to perforate CSST than black iron pipe.

The witnesses acknowledged that the energy transferred by any particular lightning strike is difficult to predict and cannot be replicated in a lab, but concluded that the probability was high that CSST would be punctured by occurrences within expected ranges of electrical current. Such results, according to the Tinchers' experts, are observable and predictable with equations developed in the Nineteenth Century. Nevertheless, the experts noted that Omega Flex had not conducted testing on the TracPipe's ability to withstand lightning strikes, although testing for resistance to lightning was necessary and available. Moreover, according to the Tinchers' evidence, the Omega Flex installation guide failed to direct compliance with lightning-related fire protection codes.

The Tinchers' witnesses also testified that Omega Flex recommended grounding the TracPipe system by plugging any natural gas-fueled appliances into three-prong outlets. Additional grounding, although attempted at the Tinchers' residence, was not required by the installation instructions provided by Omega Flex to professionals to whom TracPipe was marketed and sold for installation in consumers' homes. Moreover, according to the Tinchers' experts, the bonding of the TracPipe System at one location would be insufficient to protect the CSST from the effects of lightning. To be effective, the witnesses testified, bonding would be required every ten feet, which the

experts deemed to be an impractical and unfeasible solution. The alternative would be to encase the CSST in black iron pipe. See N.T., 10/13/2010, at 291-98, 357-420.

After the Tinchers rested, Omega Flex moved for a nonsuit, citing the standard of the Second Restatement and Azzarello; Omega Flex expressly assumed that the trial court had denied its request to apply the Third Restatement. N.T., 10/18/2010, at 514-16. The trial court denied the motion for a nonsuit. Id. at 525-26.

Subsequently, Omega Flex introduced the testimony of its own experts relating to the defect in the TracPipe System alleged by the Tinchers. The witnesses were Dr. James Dydo, an expert in metallurgy and mechanical engineering with a focus on fuel gas piping, and Dr. Michael Stringfellow, an expert in physics with a focus on lightning and the protection of structures from lightning. The Omega Flex experts opined that the TracPipe System is not defective or unreasonably dangerous. According to the defense experts, CSST is a technology with significant advantages, including resistance to corrosion, structural shifts, and mechanical ruptures; ease of installation, relocation, and retrofitting; and fewer joints accompanied by decreased susceptibility to natural gas leaks at any required joints. The experts noted that these net benefits are marked advantages over black iron pipe arising from the flexibility of CSST. If CSST's walls were thickened, according to the experts, there would be little practical difference between CSST and black iron pipe.

The defense witnesses also testified that the TracPipe System meets and exceeds all standards for minimum performance governing CSST developed by the American National Standards Institute, a clearinghouse for trade groups. Additionally, the witnesses stated, installation of the TracPipe System conforms with the Fuel Gas Code and the National Electric Code in force in 1998-99. The experts emphasized that these applicable standards did not anticipate intrusion by lightning as a possible safety

concern, suggesting that it was unnecessary for Omega Flex to have foreseen any danger from lightning.

Finally, Omega Flex's experts agreed that the installation instructions for the TracPipe System did not require installation of a bonding clamp. The witnesses also noted, however, that a disconnected clamp was consistent with Omega Flex's assessment of the circumstances surrounding the fire. The experts offered that the attempt to bond the TracPipe System to the cold water pipe was inadequate and that a successful attempt would have likely averted the resulting fire. Id. at 657-712.

After resting its defense, Omega Flex offered a motion for a directed verdict premised upon Second Restatement principles and Azzarello. Omega Flex argued that proof of the overall risks and benefits of the TracPipe System, and of any reasonable alternative designs, showed that TracPipe was not unreasonably dangerous. The trial court denied the motion for a directed verdict. Both parties then offered closing arguments on their respective theories of the case. Subsequently, the trial court instructed the jury with respect to the Tinchers' strict liability claim as follows:

> The contention of the [Tinchers] in this case is that there is a defect in this product, this TracPipe. To state a products liability claim, essentially it's strict liability, a plaintiff must prove, first, that the product was defective. Second, that if [sic] a defect existed when it left the hands of the defendant, that is, left the process by which it was produced at the defendant['s] plant. And three, that the defect caused the harm.

> A product is defective when it is not safe for its intended purpose. That is, it leaves the suppliers' control lacking any element necessary to make it safe for its intended use. The inquiry is whether or not there is a defect, not whether the defendant['s] conduct was negligent. In strict liability there is no consideration of negligence. It is simply, was the product defective or wasn't it defective.

*     *     *     *

Defective design. The manufactur[er] of a product is really a guarantor of its safety. When we talk about strict liability, the product must be provided with every element necessary to make it safe for its intended use. And without any conditions that make[] it unsafe for its intended use. If you find that the product in this case, the TracPipe, at the time it left the defendant['s] control, lacked any elements necessary to make it safe for its intended use, or contained any condition that made it unsafe for its intended use, and there was an alternative more practical design, more safer [sic] design, then the product is considered defective and the defendant is liable for the harm, if you find that defect caused the harm[,] was the proximate cause of the harm to the plaintiffs.

Now, ladies and gentlemen, a product is not defective merely because it is possible to be injured while using the product. The imposition of strict liability is not meant to transform manufacturers into insurers of all injuries that are potentially possible and [sic] at the hands of a product. A manufacturer of a product may be a guarantor of the product['s] safety, but under no circumstances is the manufacturer an insurer of the safety of the product. The law does not force the manufacturer to become the insurer of the product under all conditions and uses. A manufacturer is not required to make an already safe product safer, or to utilize the safest of all designs. The manufacturer is not required to produce or design a product incorporating only features representing the ultimate in safety design. To prevail on a design defect theory, plaintiffs must prove that the product is defective and that at the time it left the control of the manufacturer it lacked the feature necessary to make it safe for its intended use, or contained a feature that made it unsafe for its intended use.

In other words, you may not find that the TracPipe product is defective merely because it could have been made safer. Instead, you may only render a verdict for the plaintiff if you conclude and are convinced that the TracPipe is in fact defective and was so when it left the hands of the

manufacturer and that defect was the proximate cause of the [Tinchers'] loss.

As I said before, and I instruct you that in order to establish strict liability for putting a defective product in the stream of commerce, the plaintiffs are not required to prove that the defendant was negligent. Negligence and strict liability are two separate concepts. I'll get to negligence in a second. And no consideration should be given to negligence when considering strict liability for a defective product. It's two different concepts. I understand it's not the easiest thing to keep in mind. I'm trying to point out there is a difference between strict liability for putting a defective product that was defective when it was designed and made in this stream of commerce that causes harm to someone else, an intended user, not just any user, but an intend[ed] user of that product.

Obviously, ladies and gentlemen, if this product was manufactured and, obviously, the -- with all of the testimony in this case and the steps that were taken during the design and manufacturing process, Omega Flex knew it was going to be used for its intended purposes, to carry gas[,] natural gas, the manufacturer supplying the pipe guaranteed it would be safe for its intend[ed] use. That is what strict liability means. So if something that is intended to be safe for the use intended to be made of it is not, and it's proven that it's not, and that proof has to come from the plaintiff, and that defect is the proximate cause of what happens, there is a lot of testimony in this case about that, then that is what strict liability means. It does not have anything to do with negligence in that aspect of the case. That is why the risk of loss, or if there is, or if you find there is a defect in strict liability, the risk of loss is placed upon the supplier or manufacturer that put that product in this stream of commerce. The risk of loss for injuries resulting from the defective product is best warned [sic] by the person who manufactured it, principally because they are the ones that put it in the stream of commerce and said it would work for its intended purpose.

N.T., 10/19/2010, at 794-98. Additionally, the trial court defined "proximate cause," and instructed the jury with respect to damages. Id. at 802-07. After the trial court concluded its instructions on the law, counsel for Omega Flex noted for the record that Omega Flex had proposed instructions based upon the Third Restatement with respect to the strict liability claim and that any Second Restatement instructions it proposed were offered in the alternative. The trial court responded that it had declined to instruct the jury in accordance with Third Restatement principles because Pennsylvania appellate courts, and the Supreme Court especially, had not adopted the Third Restatement.

Subsequently, the jury returned to the courtroom with several questions. Relevant here, the trial court answered the jury by repeating definitions for the terms "defect" and "defective design" as offered in the original instructions.

On October 20, 2010, the jury returned a verdict in favor of the Tinchers on the products liability claim, and awarded compensatory damages totaling $958,895.85. Damages were divided as follows: $406,532.90 (building); $988.83 (additional property and structures); $503,945.58 (contents); and $47,428.64 (alternate living expenses). The trial court added $69,336.05 in delay damages, and entered judgment on the verdict.[2] In November 2010, Omega Flex filed a motion for post-trial relief and supporting brief requesting, among other things, a new trial premised upon trial court errors in denying its motion in limine and in failing to instruct the jury on the law as articulated in the Third Restatement. Additionally, Omega Flex sought judgment notwithstanding the verdict on the theory that the evidence introduced at trial was insufficient to prove a claim of strict liability under Third Restatement principles.

---

[2] The jury also returned a verdict in favor of Omega Flex on the negligence claim. There are no claims before this Court related to this part of the verdict.

Relating to the motion for judgment notwithstanding the verdict, Omega Flex argued that the evidence introduced at trial was insufficient as a matter of law to prove a strict liability claim under the Third Restatement. In overlapping claims of error, Omega Flex also asserted that the Tinchers had not met their burden of proof under the so-called "fireworthiness" doctrine, which, as Omega Flex explained in its supporting brief, was a Third-Restatement-like approach similar to the more familiar "crashworthiness" exception to the Second Restatement. Appellant's Brief in Support of Motion for Post-Trial Relief 3/3/2011, at 9-27 (citing Pa. Dep't of Gen. Serves. v. U.S. Mineral Prods. Co., 898 A.2d 590 (Pa. 2006) ("General Services") and Gaudio v. Ford Motor Co., 976 A.2d 524 (Pa. Super. 2009)). With respect to the motion for a new trial, Omega Flex alleged that the trial court erred in denying its motion in limine seeking to conduct the trial in accordance with Third Restatement principles, and in failing to issue a jury charge premised upon the Third Restatement or the fireworthiness / crashworthiness doctrine.

In the brief supporting the post-trial motion, Omega Flex distilled what were several Third Restatement and fireworthiness doctrine claims into two main arguments. First, according to Omega Flex, judgment notwithstanding the verdict or a new trial were appropriate under the Second Restatement because lightning protection, the safe conduction of electricity, or even a foreseeable event such as the fire are not intended uses of the TracPipe System. In the alternative, Omega Flex argued that, once the Tinchers offered evidence that lightning was a "foreseeable" event, the dispute paradigm changed from a typical Second Restatement design defect case to a fireworthiness / crashworthiness case, which required the trial court to issue a jury instruction that the Tinchers had the burden to prove the existence of an alternative safer design similar to the burden articulated by the Third Restatement.

Second, Omega Flex argued that a new trial was appropriate because the trial court failed to charge the jury on the Third Restatement, which in its view stated the relevant principle of law applicable to the circumstances alleged by the Tinchers. Omega Flex argued that application of the Third Restatement was supported by responsive opinions authored and joined by several Justices of this Court and the decision of the U.S. Court of Appeals for the Third Circuit in Berrier v. Simplicity Mfg., 563 F.3d 38 (3d Cir. 2009). Appellant's Brief in Support of Motion for Post-Trial Relief 3/3/2011, at 36 (citing also Phillips v. Cricket Lighters, 841 A.2d 1000, 1020 (Pa. 2003) (Saylor, J., concurring, joined by Castille and Eakin, JJ.)). Returning to its fireworthiness doctrine theory, Omega Flex emphasized that the trial court's Azzarello-based instructions on the Second Restatement confused the jury: first, by mentioning, without explaining, the relevance of evidence of a proposed alternative design, *i.e.*, the black pipe system; second, by failing to guide the jury on the burden of proof relating to the alternative design; and, third, by failing to explain how the jury should consider the role of lightning in assessing liability. Additionally, Omega Flex argued that the failure to charge the jury, and relatedly the absence from the verdict sheet, of foreseeability-based principles and elements related to the existence of a safer alternative design, erroneously lessened the Tinchers' burden of proof. Id. at 31-40.

In response, the Tinchers asserted that the "fireworthiness" instruction requested by Omega Flex had no applicability to the Tinchers' circumstances. The Tinchers explained that the decision in General Services was distinguishable on the facts: in General Services, the product released harmful chemicals when exposed to a fire caused by unrelated events; because the fire was not an intended use of the product, this Court held that strict liability principles were inapplicable. By comparison, the Tinchers noted that the allegations in this matter were that the defect in CSST even

when employed for its intended use, *i.e.*, carrying natural gas, caused the fire; these allegations implicated a manufacturer's strict liability for the alleged defect. The Tinchers then argued that the evidence offered at trial was sufficient to support the trial court's gateway decision related to the risk-utility analysis as well as the jury's ultimate verdict. The Tinchers also responded that the Third Restatement was not applicable in Pennsylvania and that, until this Court adopts the Third Restatement, the governing law remains the Second Restatement. Moreover, the Tinchers asserted that the Third Circuit's prediction that this Court would eventually adopt the Third Restatement is premature and unwarranted, citing the Superior Court decisions in Gaudio, supra, and French v. Commonwealth Associates, 980 A.2d 623 (Pa. Super. 2009). Appellees' Brief in Opposition to Motion for Post-Trial Relief, 3/9/2011, at 2-15. At oral argument on the post-trial motion, the parties offered similar arguments focusing on the fireworthiness doctrine. Omega Flex noted that the case was appropriate for application of the Third Restatement and emphasized the claims of jury confusion, but agreed not to press arguments relating to the adoption of the Third Restatement at the trial court level. N.T., 3/11/2011, at 9-10; 39-43. The trial court denied the motion. On June 2, 2011, the trial court entered judgment on the verdict, in the amount of $1,028,231.90.

Omega Flex appealed the judgment to the Superior Court. The trial court ordered Omega Flex to file a concise statement of errors complained of on appeal. Order, 6/17/2011 (*per curiam*) (citing Pa.R.A.P. 1925(b)). In its Rule 1925(b) statement, Omega Flex raised related claims of error, in relevant part, that the evidence introduced at trial was insufficient to prove claims of strict liability under the Second and Third Restatements; and that the jury should have been charged and offered a verdict form premised upon the Third Restatement or the related theory of fireworthiness / crashworthiness.

In the post-trial relief and Rule 1925(a) opinions, the trial court rejected Omega Flex's arguments. The trial court found no error in declining to apply and instruct the jury on the Third Restatement, reasoning that this Court had yet to adopt that iteration of tort law to replace the Second Restatement. The trial court noted that, while Omega Flex "may have the right to advance on appeal to our Supreme Court that it should adopt the [Third Restatement], under current law, [the Tinchers] bore no burden to prove a safer alternate design existed in accordance with the latter standard." Trial Court Op., 8/5/2011, at 11.

In addition, the trial court explained that a "fireworthiness" instruction -- as an extension of the "crashworthiness" doctrine, requiring "a more rigorous standard of proof than the usual [Second Restatement] claim," was not appropriate either, because TracPipe had been employed for its intended use. According to the trial court, the Tinchers' case did not relate to how the TracPipe performed during the fire, as in General Services; rather, the defect in the TracPipe they pursued was the proximate cause of the Tinchers' injuries. The trial court held that the trial court rather than the jury properly decided the question of a feasible alternative design, and that the Tinchers had carried their burden of proof.

The parties offered arguments in their briefing to the Superior Court on issues similar to those raised in the post-trial motion and Rule 1925(b) statement. Relating to the Third Restatement, Omega Flex acknowledged that decisions of this Court bound the lower court, but offered that this case would be a fitting vehicle for this Court to revisit strict liability standards. According to Omega Flex, the Third Restatement expressly incorporates foreseeability standards into the strict liability analysis, and requires a plaintiff to establish the existence of a reasonable alternative design for the factfinder. The trial court, Omega Flex argued, following existing decisional law,

instructed the jury inadequately, noting in particular that the Tinchers were not "required to prove the existence of a feasible alternative design to prevail on [their] strict-liability claim." Omega Flex claimed that the trial court erred in denying its motion for judgment notwithstanding the verdict premised upon error in instructing the jury, and requested a new trial on this basis. Appellant's Super. Ct. Brief at 33-36. The Tinchers responded that Omega Flex's arguments relating to the Third Restatement have no legal support. According to the Tinchers, the Second Restatement and its derivative decisional law remains the law in Pennsylvania, and this Court rejected moving to the Third Restatement on several occasions, including after the U.S. Court of Appeals for the Third Circuit predicted its adoption.

In September 2012, the Superior Court affirmed the judgment, among other things holding that the trial court did not err in declining to adopt the Third Restatement. The court also rejected Omega Flex's claim of error premised upon the fireworthiness theory, concluding that although the occurrence of lightning was arguably random and infrequent, lightning is a naturally occurring phenomenon outside the control of the Tinchers, who were using the product for its intended use. As a result, the court held that the Tinchers' claims implicated notions of strict liability, and the Tinchers had carried their burden of proof under the Second Restatement and Azzarello. Moreover, the court concluded that it was obligated to follow Supreme Court precedent, which remained premised upon the Second Restatement, following this Court's then-recent decision in Beard v. Johnson & Johnson, Inc., 41 A.3d 823 (Pa. 2012). The panel explained that the trial court did not err in denying Omega Flex's request to proceed in accordance with the Third Restatement because lower courts have no authority to disapprove Supreme Court precedent.

Omega Flex filed a petition for allowance of appeal, which this Court granted, limited to the following issue:

> Whether this Court should replace the strict liability analysis of Section 402A of the Second Restatement with the analysis of the Third Restatement.

In addition, the parties were directed to brief the question of whether, if the Court were to adopt the Third Restatement, that holding should be applied prospectively or retroactively. Tincher v. Omega Flex, Inc., 64 A.3d 626 (Pa. 2013) (*per curiam*) (citing Bugosh v. I.U. North America, Inc., 971 A.2d 1228, 1242-43 (Pa. 2009) (Saylor, J., dissenting, joined by Castille, C.J.)).

## II. Arguments

Omega Flex suggests an affirmative answer to the question accepted on appeal, and further argues that this Court should disapprove the decision in Azzarello, and abandon the Second Restatement articulation of the law of strict liability in Pennsylvania in favor of the approach in the Third Restatement. The Tinchers agree that Azzarello was wrongly decided but argue in favor of otherwise retaining the principles of liability of the Second Restatement.

Omega Flex begins by noting that Pennsylvania recognized strict liability in 1966. Appellant's Brief at 16 (citing Webb v. Zern, 220 A.2d 853 (Pa. 1966); RESTATEMENT (2D) OF TORTS § 402A). According to Omega Flex, the Second Restatement was "focused" on allegations of manufacturing defects rather than design defects and did not address the latter "meaningfully, if at all." Nevertheless, Omega Flex recounts, Pennsylvania and other jurisdictions have applied the Second Restatement articulation to design defects. Omega Flex states that early applications of the Second Restatement in Pennsylvania called for a cost-benefit analysis to determine whether the

product, as designed, was defective or unreasonably dangerous; this approach "was squarely in the mainstream of American tort law." But, in 1978, according to Omega Flex, the decision in Azzarello altered the legal landscape of products liability in Pennsylvania by divorcing products strict liability from principles of negligence, and by directing the trial court -- rather than the jury -- to make the only determination, upon a lower burden of proof, regarding the defectiveness / dangerousness of the product.

Omega Flex argues that Azzarello is theoretically unsound and unworkable in practice, suggesting that we should disapprove the decision. Initially, Omega Flex claims that a core principle familiar in negligence law -- reasonableness -- inherently infuses strict liability law: a product is defective only if "unreasonably" dangerous. Omega Flex explains that a manufacturer is not the insurer of the consumer for any injury caused by its product and may be held liable only if the product is "defective." As a practical matter, according to Omega Flex, a design is not defective "in the abstract," as a function of the injury caused a particular plaintiff, but as a function of its risks and utilities. Omega Flex emphasizes that any product may cause injury, yet not every product is "defective" as that concept is properly understood in the law of strict liability -- of note are inherently dangerous products such as knives and lighters. On this premise, Omega Flex suggests that the risk-utility calculus is essentially a matter of whether the manufacturer departed from the proper and reasonable standards of care. "To condemn a design for being unreasonably dangerous is inescapably to condemn the designer for having been negligent." Appellant's Brief at 29 (citing James A. Henderson, Jr. and Aaron D. Twerski, ACHIEVING A CONSENSUS ON DEFECTIVE PRODUCT DESIGN, 83 Cornell L. Rev. 867, 919 (1998)). From this perspective, Omega Flex

argues, the conceptual wall of separation between strict liability and negligence initially articulated by Azzarello has "no practical significance."[3]

Omega Flex notes that the Azzarello Court did not purport to depart from the Second Restatement principle that a defective design analysis is an inquiry into the care exercised by the manufacturer; the decision did not require proof of a defect separate from proof that the product was unreasonably dangerous. The difficulty, according to Omega Flex, is that the Court's decision nevertheless prohibited the trial court from submitting to the jury the factual question of whether the product was unreasonably dangerous. Omega Flex notes that, per Azzarello, juries are instructed to determine whether a product is defective unmoored from any inquiry into the product's risks and utilities and the reasonableness of the manufacturer's conduct. Omega Flex suggests that the Azzarello approach creates an illusory separation between a product defect and a manufacturer's conduct, which constitutes a departure from the Second Restatement the Court was purporting to follow.

Additionally, Omega Flex criticizes the Azzarello decision for relegating the risk-utility inquiry to a threshold matter of whether the defect issue may be submitted to the jury, and placing that inquiry into the hands of the trial judge. Omega Flex suggests that the Azzarello decision thereby lowers the burden on the plaintiff to prove that a product

---

[3]     Omega Flex surmises that the conceptual separation and the related idea that the notion of "foreseeability" has no role in a strict liability case framed the parties' dispute as one over whether exposure to lightning was an intended condition of using the TracPipe System. The Superior Court, according to Omega Flex, focused instead on whether the Tinchers could have avoided the harm rather than on the product, necessarily injecting negligence concepts into the strict liability inquiry. Premised upon these descriptions, Omega Flex emphasizes that this case reflects an "overlap" of negligence principles with the proper application of strict liability law. Appellant's Brief at 41.

is unreasonably dangerous (and, as a result, is defective). "The jury does not balance the risk-utility factors, even though the judge has only done so as a threshold matter." Id. at 30-31 (quoting Moyer v. United Dominion Indus., Inc., 473 F.3d 532, 538-39 (3d Cir. 2007)). Omega Flex argues that Azzarello creates an anomalous process: Azzarello requires a risk-utility analysis dispositive of the claim, but prevents the jury-factfinder from reviewing the relevant evidence and, in essence, does not permit either the trial court or the jury to actually decide whether a product is unreasonably dangerous because its risks outweigh its benefits. "[T]rial courts are permitted to decide only whether the evidence is sufficient to submit th[e cost-benefit] issue to the jury, but they are prohibited from actually submitting it." Id. at 31 (quoting John M. Thomas, DEFINING "DESIGN DEFECT" IN PENNSYLVANIA: RECONCILING AZZARELLO AND THE RESTATEMENT (THIRD) OF TORTS, 71 Temp. L. Rev. 217, 232 (1998)).[4] Omega Flex notes that this process is unique to Pennsylvania and is not supported by any reasoned authority cited in Azzarello.

Omega Flex also comments upon the practical implications of Azzarello. According to Omega Flex, the central concept that negligence principles are wholly separate from strict liability principles effectively generated minimalistic and circular instructions for juries "which lack essential guidance concerning the key conception of product defect." Id. at 34 (quoting Schmidt v. Boardman, 11 A.3d 924, 940 (Pa. 2011)). In this case, Omega Flex notes, the trial court offered the standard Azzarello charge, which instructed the jury to decide whether the TracPipe System was defective without

---

[4]     Omega Flex notes that this approach has the collateral effect of rendering laws, regulations, and industry standards irrelevant to the risk-utility inquiry, with deleterious and unpredictable consequences for plaintiffs and defendants. Omega Flex does not develop this assertion and, as a result, we do not address it in any detail.

any reference to whether the product was unreasonably dangerous. Omega Flex argues that, absent a determination of whether the risk was unreasonable, the jury may well have found that any risk -- including a justified risk -- rendered the TracPipe System defective. The Azzarello instruction, Omega Flex claims, does not offer the jury any guidance as to the critical concepts of defect and whether the product is "safe for its intended use." Moreover, Omega Flex argues that the use of the term of art "guarantor" in relation to the product, without any explanation of its meaning, misleads the jury into holding manufacturers absolutely liable for any injuries caused by the product. Omega Flex further offers that the jury's verdict in its favor on the negligence claim here suggests confusion of the jury with respect to the standards applicable to the strict liability claim. The Azzarello instructions, Omega Flex emphasizes, have "profoundly unfair consequences" to a manufacturer against whom design defect claims are made. Id. at 35-38.

Premised upon its criticism, Omega Flex advocates that this Court should disapprove the Azzarello decision. Omega Flex acknowledges the principle of *stare decisis* but argues that the Court is not bound to perpetuate the application of unsound and unworkable precedent. Appellant's Brief at 41-42 (citing, *inter alia*, Stilp v. Commonwealth, 905 A.2d 918, 966-67 (Pa. 2006); Hack v. Hack, 433 A.2d 859, 867 (Pa. 1981)). According to Omega Flex, the Azzarello limitation on the jury's role, and the artificial distinction between negligence and strict liability, have been controversial from the beginning, have no real reasoned support or practical importance, and have remained unique to Pennsylvania. Omega Flex notes that individual Justices of this Court have already suggested that Azzarello should be disapproved. Id. at 44 (citing Bugosh, 971 A.2d at 1234 (Saylor, J., dissenting, joined by Castille, C.J.), Berrier v. Simplicity Manuf., Inc., 959 A.2d 900, 901-02 (Pa. 2008) (Saylor, J., concurring, joined

by Castille, C.J.); Phillips, 841 A.2d at 1012-21 (Saylor, J., concurring, joined by Castille and Eakin, JJ.)).

Next, Omega Flex suggests that, in addition to disapproving Azzarello, the Court should adopt the approach to strict liability reflected in the Third Restatement. Omega Flex recommends the Third Restatement on the grounds that its articulation of the law is specifically intended to address design defects and represents the current mainstream view on the topic. According to Omega Flex, the Third Restatement was drafted by "two prominent product-liability scholars," Professors James Henderson and Aaron Twerski, and was reviewed in a comprehensive process. Appellant's Brief at 45. Omega Flex describes the Third Restatement as requiring, in design defect cases, a balancing of risks and benefits by the finder of fact, upon consideration of a broad range of factors. The critical distinction in approaches, as described by Omega Flex, is that "the plaintiff could not simply criticize the existing design; instead, the plaintiff would be required to prove that the manufacturer could and should have adopted a reasonable alternative design." Id. at 47 (citing RESTATEMENT (3D) OF TORTS: PRODUCTS LIABILITY § 2(b) cmt. d). Omega Flex argues that the Third Restatement approach is already the accepted practice in "crashworthiness" cases (as an exception to Azzarello) and is "neither insurmountable nor unduly onerous," permitting plaintiffs to prevail "regularly" in such cases. Id. (citing Harsh v. Petroll, 887 A.2d 209, 211 (Pa. 2005)). Citing cases from five states, Omega Flex claims that the Third Restatement has been "widely embraced" in other jurisdictions. Id. at 48 (citing Branham v. Ford Motor Co., 701 S.E.2d 5, 16 (S.C. 2010); Wright v. Brooke Grp. Ltd., 652 N.W.2d 159, 169 (Iowa 2002); Williams v. Bennett, 921 So.2d 1269, 1275 (Miss. 2006); Jones v. NordicTrack, Inc., 550 S.E.2d 101, 103 (Ga. 2001); Ruiz-Guzman v. Amvac Chem. Corp., 7 P.3d 795, 800 (Wash. 2000)). According to Omega Flex, the Court has the opportunity in this case "to return

Pennsylvania to the mainstream of American tort law in strict-liability design-defect cases" by embracing the Third Restatement's "closely reasoned and balanced approach." Id. at 48-49 (quoting Phillips and Bugosh, supra). Premised upon these arguments, Omega Flex requests a new trial on the strict liability claim conducted under the Third Restatement approach.

The Tinchers respond that the decision of the Superior Court should be affirmed, and strict liability actions in Pennsylvania should continue to be governed by the Second Restatement.[5] According to the Tinchers, establishing the liability of a manufacturer on

_____

[5] Initially, the Tinchers suggest that the "Court should decline consideration of the issue [on which we granted allowance of appeal], as it is not outcome determinative, and affirm the lower court ruling." According to the Tinchers, the circumstances of this particular case required the Tinchers to offer evidence at trial that was sufficient to meet the requirements of the Second Restatement and Azzarello, as well as the Third Restatement. The Tinchers argue that, as a result, "[l]iability for the defective design of the TracPipe product" -- and the jury's verdict -- "is appropriate under either Restatement standard." The Tinchers claim that a judicial determination of the issue upon which we granted appeal would be an advisory opinion with no legal effect. Appellees' Brief at 11-17.

The suggested approach is unpersuasive. The case was tried as it was tried, which was according to the Second Restatement and Azzarello. This Court granted allowance of appeal to address an issue of law, properly preserved and presented by Omega Flex, regarding the very manner in which the legal theories and options were apportioned between court and jury, and then the issues as posed to the jury. The question of whether the evidence was sufficient to support the jury's verdict is outside the scope of the appeal.

Moreover, even if sufficiency of the evidence were implicated and was disputed on appeal, this Court does not test the sufficiency of the evidence in the abstract: the Court would have to engage the manner in which the Tinchers articulated their claims, the theory of strict liability they pursued and, most importantly, the manner in which the trial court responded and actually instructed the jury on the strict liability claim. A trial court's charge defines the legal universe in which a jury operates for the purposes of the verdict. See Commonwealth v. Graham, 9 A.3d 196, 201-02 & n.9 (Pa. 2010). Yet, in this argument, the Tinchers invite the Court to address whether the principles of the Third Restatement (a theory outside the legal universe of the jury's task here) was an (continued…)

a strict liability theory is a two-step process in Pennsylvania: (1) the trial court determines as a threshold matter whether a product is unreasonably dangerous and, as a result, whether strict liability should be submitted to the jury; and (2) the jury-factfinder decides whether the product at issue lacks any element necessary to make it safe for its intended use -- or, is defective. The determination of whether a product is unreasonably dangerous implicates a balancing of risks and utilities. Appellees' Brief at 19-20 (citing Azzarello, 391 A.2d at 1026).

The Tinchers posit that concepts of negligence have no place in strict liability actions, explaining that strict liability is premised upon a social policy of holding manufacturers responsible for casting a defective product into the stream of commerce. Strict liability, the Tinchers argue, reflects a change in social policy from the principle of *caveat emptor* -- buyer beware -- to the view that a supplier of products is a guarantor of its products' safety. The Tinchers suggest that, in the modern marketplace, the emphasis is on protecting consumers and shifting the risk of loss for injury onto suppliers of products because suppliers are in a better position to absorb or distribute the loss as a cost of doing business. Id. at 21 (quoting Azzarello, supra). According to the Tinchers, twenty-five years after Azzarello, the fundamental reasons for retaining a separation between negligence and strict liability remain, and the Second Restatement strikes the appropriate balance. The Second Restatement, the Tinchers argue, "makes it clear that the imposition of strict liability for a product defect is not affected by the fact

---

(…continued)
appropriate basis for that jury's verdict. It would not be. See Schmidt, 11 A.3d at 944 ("The bare litmus of sufficiency review cannot correct a fundamental error in the instructions to lay jurors concerning just what it is that they are deciding."). Accord Appellant's Reply Brief at 5. Accordingly, we reject the Tinchers' invitation to summarily affirm the decision of the Superior Court on this ground.

that the manufacturer or other supplier has exercised 'all possible care'"; in the Tinchers' view, the compartmentalizing of negligence and strict liability is necessary to ensure that manufacturers are held responsible for their products regardless of fault. Id. at 22 (quoting Phillips, supra).

According to the Tinchers, the decision in Azzarello "represents strict liability in its purest form" because it places the emphasis on scrutinizing the product rather than the manufacturer's conduct. The Tinchers note that a manufacturer's liability is limited to defective products. The Tinchers claim that "defect" is difficult to define: the critical consideration is whether the product is unreasonably dangerous. According to the Tinchers, because the question of unreasonable dangerousness "could easily be confused by a jury as importing concepts of negligence into a strict liability analysis," the Azzarello Court directed that decision to the trial court rather than to the jury. The decision, the Tinchers explain, implicates the balancing of social policies "best performed by the [trial] court in making a determination [of] law" and acting as a gate-keeper to prevent claims regarding certain products from reaching the jury.

The Tinchers argue that the Third Restatement abandons a pure strict liability analysis in favor of negligence principles. According to the Tinchers, the Third Restatement explicitly provides for consideration of "foreseeable risks of harm proposed by the product," which is a negligence standard. The Tinchers suggest that the Third Restatement is not a "natural" and "modest" evolution of strict liability but a "calamitous" displacement of the social policy established by forty-seven years of Second Restatement precedent. The Tinchers argue that "[s]uch a radical departure . . . is not prudent or necessary."

The Tinchers also note that a "clear minority" of states have adopted the Third Restatement: one state -- Iowa – expressly, and several others have adopted single

sections of the Restatement or have used the doctrine as guidance for the formulation of the common law. Appellees' Brief at 28 (citing <u>Wright v. Brooke Group Ltd.</u>, 652 N.W.2d 159 (Iowa 2002)). Other states, according to the Tinchers, have considered and explicitly declined to adopt the Third Restatement. As example, the Tinchers note that the Supreme Court of Illinois rejected the invitation to adopt the Third Restatement on the ground that any change that broadly affects public policy was best left to the legislature. <u>Id.</u> at 29 (citing <u>Mikolajczyk v. Ford Motor Co.</u>, 901 N.E.2d 329, 346 (Ill. 2008)). In Connecticut, the Tinchers state, the Supreme Court explained that the Third Restatement places an undue burden of proof upon plaintiffs that might preclude valid claims: a product may be defective and unreasonably dangerous to the user, although no feasible alternative design may be available, and a jury may infer a defect from the evidence without the necessity of expert testimony. <u>Id.</u> 29-30 (citing <u>Potter v. Chicago Pneumatic Tool Co.</u>, 694 A.2d 1319, 1332 (Conn. 1997); <u>TRW Vehicle Safety Sys., Inc. v. Moore</u>, 936 N.E.2d 201 (Ind. 2010); <u>Halliday v. Sturm, Ruger & Co.</u>, 792 A.2d 1145 (Md. 2002); <u>Vautour v. Body Masters Sports Indus., Inc.</u>, 784 A.2d 1178 (N.H. 2001); <u>Green v. Smith & Nephew AHP, Inc.</u>, 629 N.W.2d 727 (Wis. 2001); <u>Delaney v. Deere & Co.</u>, 999 P.2d 930 (Kan. 2000); <u>Rodriguez v. Suzuki Motor Corp.</u>, 996 S.W.2d 47 (Mo. 1999); <u>Sternhagen v. Dow Co.</u>, 935 P.2d 1139 (Mont. 1997)).

The Tinchers claim that Omega Flex erroneously relies upon cases implicating the "crashworthiness" exception to general products liability theory under the Second Restatement. This exception, according to the Tinchers, is accepted as such in "virtually every [U.S.] jurisdiction" and is typically applied to cases in which an alleged defect did not cause the automobile accident or initial impact, but served to increase the severity of the injury. The Tinchers argue that "crashworthiness" doctrine cases offer no indication that a jurisdiction has embraced the alternative design requirements of the

Third Restatement. Appellees' Brief at 31 (citing Patrick Lavelle, CRASHING INTO PROOF OF A REASONABLE ALTERNATIVE DESIGN; THE FALLACY OF THE RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY, 38 Duq. L. Rev. 1059, 1098-99 (2000)). The Tinchers maintain that any suggestion -- including in the reporters' commentary to Section 2(b) -- that the Third Restatement standards are widely accepted is inaccurate and misleading because it is simply premised upon cases addressing the crashworthiness doctrine exception. Id. at 32 (citing RESTATEMENT (3D) OF TORTS: PRODUCTS LIABILITY § 2(b) cmt. d & nn. II-A, II-C (1997)).

Finally, the Tinchers argue that the Third Restatement would accomplish a "radical departure" from existing public policy because it would impose "an undue hardship on plaintiffs in the pursuit of meritorious claims." According to the Tinchers, the Third Restatement shifts the emphasis from the existing product to speculation of what similar product could have been designed. In the Tinchers' view, the Third Restatement represents "an instrument of tort reform" rather than an articulation of existing law, which will impose a prohibitive cost on plaintiffs and counsel to produce alternative designs in the pursuit of otherwise meritorious claims. Id. at 33-34 (citing Gary Wilson et al, THE FUTURE OF PRODUCTS LIABILITY IN AMERICA, 27 Wm. Mitchell L. Rev. 85, 99-100 (2000); Frank J. Vandall and Joshua F. Vandall, A CALL FOR AN ACCURATE RESTATEMENT (THIRD) OF TORTS: DESIGN DEFECT, 33 U. Mem. L. Rev. 909, 923 (2003)). The Third Restatement, according to the Tinchers, is a boon to manufacturers by placing at a "tremendous disadvantage" injured consumers who would necessarily have to become experts and seek to redesign the product that caused the injury; the cost of this exercise may exceed the benefit of a recovery. Additionally, the Tinchers argue that the attendant costs of representing an injured plaintiff in a Third Restatement jurisdiction would discourage counsel from representing

injured consumers. The Tinchers suggest that application of the Third Restatement would vitiate the public policy upon which products liability law is premised, *i.e.*, of holding manufacturers liable for defects in products placed in the stream of commerce; manufacturers are in a better position to absorb the costs of injuries than are individual consumers.

In an alternative argument, the Tinchers suggest that the Court could disapprove Azzarello but continue to apply the Second Restatement rather than the Third Restatement articulation of the law. The Tinchers note that this resolution of the matter would protect the social policies underlying products liability yet remove any difficulties caused by the decision in Azzarello. See Appellees' Brief at 41 n.16. Ultimately, however, the Tinchers ask the Court to affirm the decision of the Superior Court.

In reply, Omega Flex reiterates its position that the differences between the Second Restatement and the Third Restatement are modest; the difficulty with Pennsylvania's approach to products liability instead results from the application of Azzarello. Omega Flex suggests that the Tinchers do not oppose a disposition of this appeal in which the Court would disapprove Azzarello, although the parties disagree whether the Court should go further and adopt the Third Restatement. With regard to the Third Restatement, Omega Flex argues that the "reasonable alternative design" element of proof does not erect the types of insurmountable barriers to meritorious claims that the Tinchers portray: plaintiffs may adduce proof of existing products (*i.e.*, predecessor products or competitor products) or no expert proof at all if the feasibility of an alternative design is obvious and understandable to lay persons. Appellant's Reply Brief at 20 (citing RESTATEMENT (3D) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f). Omega Flex presents the Third Restatement as a refinement of its predecessor with specific provisions for design defects, whose approach has already been accepted in the form of

numerous exceptions to the general Second Restatement rules. Moreover, Omega Flex claims that, contrary to the Tinchers' representations, adherence to the Second Restatement view has become the minority position. Omega Flex concludes that the case should be retried before a jury properly instructed, and the instruction should be premised upon the Third Restatement.

### III.     Analysis

### A.     The Scope and Standard of Review

As a preliminary matter, we observe that the parties pose and argue a seemingly pristine question of law, little dependent on the facts of record, primarily regarding whether this Court should replace the strict liability analysis of the Second Restatement with the analysis of the Third Restatement. In part, this is a function of how the issues were presented to the lower courts and of the lower courts' recognition that the question of whether to "move" to the Third Restatement has been a matter of debate and speculation in interested legal circles and in federal court cases (as well as in separate opinions in this Court); all recognize that, as a common law matter, the decision of whether to adopt principles from the Third Restatement would ultimately be made by this Court. As a result of this background circumstance, the lower courts offered no principled assessment or practical perspective regarding the core, and strictly legal, positions now presented by the parties to this Court. While the importance of lower courts' analysis of a proposed change in the law as applied to the facts of a particular case and the centrality of such analysis to the development of the common law cannot be understated, we note, nevertheless, that there is no suggestion by either party that the issue so presented was waived. See Scampone v. Highland Park Care Center, LLC, 57 A.3d 582, 604-05 (Pa. 2012) (judicial determinations to be read against facts);

Schmidt, 11 A.3d at 941-42 (listing considerations relevant on appeal to presentation and preservation of challenges to prevailing precedent). Accordingly, we proceed to a review of the merits of the parties' dispute.

Properly framed, then, the question before the Court is whether Omega Flex was entitled to relief, in the form of judgment notwithstanding the verdict or a new trial, premised upon its argument that the jury should have been instructed on the law represented by the Third Restatement. The relevant facts are not in dispute and the issue posed is one of law. Accordingly, our review of the Superior Court's decision is plenary and *de novo*. Walnut Street Assocs., Inc. v. Brokerage Concepts, Inc., 20 A.3d 468, 474-75 (Pa. 2011).

This Court has explained that, "[w]hen a court instructs the jury, the objective is to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict." On appeal, this Court examines jury instructions to determine whether the trial court abused its discretion or offered an inaccurate statement of law controlling the outcome of the case. A jury charge is adequate "unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error." Commonwealth v. Chambers, 980 A.2d 35, 49-50 (Pa. 2009); see also Price v. Guy, 735 A.2d 668, 670 (Pa. 1999). This Court will afford a new trial if an erroneous jury instruction amounted to a fundamental error or the record is insufficient to determine whether the error affected the verdict. See, e.g., Price, 735 A.2d at 672.

Meanwhile, greater relief in the form of a judgment notwithstanding the verdict is appropriate only if the movant is entitled to judgment as a matter of law, *i.e.*, if the evidence presented at trial was such that no two reasonable minds could disagree that the verdict should be in favor of the movant. Degenhardt v. Dillon Co., 669 A.2d 946,

950 (Pa. 1996) (citing Boettger v. Miklich, 633 A.2d 1146, 1148 n.2 (Pa. 1993)). An award of judgment notwithstanding the verdict "is appropriate only if, reading the record in the light most favorable to [the verdict winner], and affording [the verdict winner] the benefit of all reasonable inferences, we would conclude that there is insufficient competent evidence to sustain the verdict." General Services, 898 A.2d at 604.

The parties' present dispute implicates foundational notions in the law of strict liability. To decide the dispute, we necessarily address: (1) what evidence is sufficient under Pennsylvania law to prove a claim of strict liability in tort; (2) the proper role of the trial judge; and (3) the appropriate manner of instructing the jury. As we will explain, these questions can be further complicated by the particulars of the tort, or the product, at issue.

Furthermore, central to the parties' dispute are questions of whether this Court should disapprove the 1978 decision in Azzarello, and whether the Court should abandon the Second Restatement articulation of the strict liability cause of action and, in its place, "adopt" as the law of Pennsylvania the Third Restatement formulation of strict liability in tort. These questions implicate separate foundational principles of *stare decisis* and judicial restraint.

The doctrine of *stare decisis* "commands judicial respect for prior decisions of this Court and the legal rules contained in those decisions." Stilp, 905 A.2d at 954 n.31; see also Kendrick v. District Attorney of Philadelphia County, 916 A.2d 529, 539 (Pa. 2007). The Court honors the *stare decisis* doctrine to ensure "evenhanded, predictable, and consistent development of legal principles, foster[] reliance on judicial decisions, and contribute[] to the actual and perceived integrity of the judicial process." Stilp, 905 A.2d at 954 n.31. But, the Court's general faithfulness to precedent is not sufficient justification to buttress judicial decisions proven wrong in principle or "which are

unsuited to modern experience and which no longer adequately serve the interests of justice." In re Carney, 79 A.3d 490, 505 (Pa. 2013); Ayala v. Philadelphia Bd. of Public Ed., 305 A.2d 877, 888 (Pa. 1973) (quoting Griffith v. United Air Lines, Inc., 203 A.2d 796, 806 (Pa. 1964)). In this sense, we have long recognized that the doctrine of *stare decisis* is not a vehicle for perpetuating error, but "a legal concept which responds to the demands of justice and, thus, permits the orderly growth processes of the law to flourish." Pa. State Ass'n of County Comm'rs v. Commonwealth, 52 A.3d 1213, 1230 (Pa. 2012) (quoting Buckwalter v. Bor. of Phoenixville, 985 A.2d 728, 730-31 (Pa. 2009)). Common law permits adjustment and development in the law, recognizing that precedent is not infallible and judicial honesty demands corrective action in appropriate cases. See Ayala, 305 A.2d at 888 (quoting Olin Mathieson C. Corp. v. White C. Stores, 199 A.2d 266, 268 (Pa. 1964)).

We have recently stressed in multiple cases that the common law "develops incrementally, within the confines of the circumstances of cases as they come before the Court." Scampone, 57 A.3d at 604 (quoting Maloney v. Valley Med. Facilities, Inc., 984 A.2d 478, 489–90 (Pa. 2009)). Causes of action at common law evolve through either directly applicable decisional law or by analogy and distinction. Id.; accord City of Philadelphia v. Cumberland County Bd. of Assessment Appeals, 81 A.3d 24, 54 (Pa. 2013). Among the duties of courts is "to give efficacy to the law . . . and though they cannot make laws, they may mould the forms of the ancient laws to the exigency of the new case." Reed v. Garvin's Executors, 1821 WL 1898 at *7 (Pa. 1821). Notably, its equitable powers afford the Court the authority to modify the common law forms of action to the right involved, rather than limiting the authority to testing the right by the forms of action. See Kase v. Kase, 34 Pa. 128, 1859 WL 8779 at *4 (Pa. 1859). See also PA. CONST. art. V, § 10(c) (Supreme Court has power "to prescribe general rules

governing practice, procedure and the conduct of all courts . . . if such rules are consistent with this Constitution and neither abridge, enlarge nor modify the substantive rights of any litigant. . . ."); e.g., Pa.R.C.P. No. 1001(b) ("There shall be a civil action in which "shall be brought all claims for relief heretofore asserted in (1) the action for assumpsit, (2) the action of trespass, and (3) the action in equity").

Reliance upon the inherent and necessary flexibility of common law rules does not provide, however, the dispositive answer to the question of whether "adoption" of the American Law Institute's new formulation for tort law is appropriate or advisable. This Court has grown more careful over the years when presented with invitations to issue broad-based pronouncements in areas where it is apparent that such pronouncements are better suited to the information-gathering and give-and-take balancing of competing concerns available in the legislative arena. Thus, for example, it is difficult to imagine a modern court simply adopting something so broad-based and legislative in character as an outside organization's Restatement of the Law, even if it is the product of an esteemed organization. That being said, the fact is that, in this particular area of the law, the Court has played a major developmental role; and when an issue is properly joined in a case, we are of course duty-bound to resolution and explication of the matter. And, in this process, while the line of demarcation between advancing or correcting the common law -- or, perhaps, accounting for nuance not advanced, perceived, or predicted in the crucible of prior cases -- and a foray into legislative policy-making is a gray area, some principles governing decision are readily apparent.

The first principle applies generally and involves the policy-making authority of the General Assembly. In considering whether a long-established common law rule is out of step with modern experience, we assume that the General Assembly is aware of

the rule, which, if unchanged by legislation, presumably reflects continued legislative policy. See Everhart v. PMA Ins. Group, 938 A.2d 301, 307 (Pa. 2007). Of course, "[t]here is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night." Hack, 433 A.2d at 868-69. Change is more often gradual because a court seldom is in possession of sufficient information concerning all relevant factors to justify support of a rule of general application inconsistent with the existing common law formulation of the tort. See Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP, 989 A.2d 313, 332-33 (Pa. 2010). "[C]ommon-law decision-making is subject to inherent limitations, as it is grounded in records of individual cases and the advocacy by the parties shaped by those records. Unlike the legislative process, the adjudicatory process is structured to cast a narrow focus on matters framed by litigants before the Court in a highly directed fashion." Id. Consistency with the general rule permits the Court to benefit from the honed sensibilities and accumulated wisdom of the rule's application in a myriad of individual cases.

Two other considerations are specific to the nature and recognized role of a "Restatement" of law in the development of Pennsylvania common law. Restatements of law published by the American Law Institute purport to offer a synthesis of American common law, which articulates the reasoned, mainstream, modern consensus on principles of broad application intended to govern large numbers of cases. Scampone, 57 A.3d at 606; see also Coyle v. Richardson-Merrell, Inc., 584 A.2d 1383, 1385 (Pa.

1991).[6]  Consistent with its adjudicative rather than policy-making role, the Court has "adopted" or deemed sections of a restatement a proper statement of Pennsylvania law if the cause of action and its contours are consistent with the nature of the tort and Pennsylvania's traditional common law formulation.  See, e.g., Scampone, 57 A.3d at 606; Walnut Street Assocs., 20 A.3d at 478-79; Bilt-Rite Contractors, Inc. v. The Architectural Studio, 866 A.2d 270, 285 (Pa. 2005).  In this sense, the adoption of a restatement formulation intended to advance the law cannot be so unmoored from existing common law and produce such a policy shift that it amounts in actuality or public perception to a derogation of legislative authority, and the concomitant suggestion that such authority is reposed in the Judiciary or in the American Law Institute.  Consistent with this principle, the Court must generally show restraint in

---

[6]    The Institute is a non-profit organization of 4000 lawyers, judges, and law professors, established to produce scholarly work to clarify, modernize, and otherwise improve the law.  Among other tasks, the Institute drafts, discusses, revises, and publishes Restatements of the Law.

The parties here, and several commentators, have engaged in a debate over whether the Third Restatement of Torts, Products Liability, does indeed articulate the modern consensus in the area of strict liability.  Some commentators have questioned whether the reporters of the Third Restatement favored an industry viewpoint in their task.  Compare Henderson, 83 Cornell L. Rev. 867 (reporters defend process of drafting Third Restatement) with John F. Vargo, THE EMPEROR'S NEW CLOTHES: THE AMERICAN LAW INSTITUTE ADORNS A "NEW CLOTH" FOR SECTION 402A PRODUCTS LIABILITY DESIGN DEFECTS -- A SURVEY OF THE STATES REVEALS A DIFFERENT WEAVE, 26 U. Mem. L. Rev. 493 (1996) (criticizing drafting process of Third Restatement, surveying law in fifty states, and cataloguing several approaches to strict liability).  As an institution, this Court is not particularly equipped to resolve such disputes, and in light of our disposition, we find it unnecessary to engage the debate.  But see, e.g., Halliday v. Sturm, Ruger & Co., Inc., 792 A.2d 1145, 1159 (Md. 2002) (in light of ongoing controversy, declining to "cast aside" existing jurisprudence in favor of broad application of Third Restatement's risk-utility standard).  The fact of the debate, however, is a reminder of the imperative of judicial modesty in passing upon a request to "adopt" a Restatement wholesale.

altering existing allocations of risk created by long-tenured common law rules and resist the temptation of experimentation with untested social policies, especially where the individual record and the advocacy of the parties in the context of that record offer little more than abstract justifications. Thus, the Court is not in a position to upend risks and expectations premised upon broad-based arguments calling for a judgment about socially acceptable economic incentives; the legislative setting is a preferable forum for such an endeavor. See City of Philadelphia, 81 A.3d at 55; accord Pegram v. Herdrich, 530 U.S. 211, 221-22 (2000) ("[C]omplicated factfinding and . . . debatable social judgment are not wisely required of courts unless for some reason resort cannot be had to the legislative process, with its preferable forum for comprehensive investigations and judgments of social value. . . ."); Kristen David Adams, THE FOLLY OF UNIFORMITY? LESSONS FROM THE RESTATEMENT MOVEMENT, 33 Hofstra L. Rev. 423 (2004) (assessing effect of employing restatement as default common law in Virgin Islands).

Moreover, because the language of a provision of the restatement, even to the extent it was adopted by the Court *verbatim*, has not been vetted through the crucible of the legislative process, a court applying the restatement formulation should betray awareness that the language of an "adopted" restatement provision is not "considered controlling in the manner of a statute." A given restatement section simply states principles of the common law, general rules whose validity depends on the reasoning that supports them. Coyle, 584 A.2d at 1385. As with any other common law rules, the normative principles of an "adopted" section of a restatement are properly tested against the facts of each case. "For one thing, it is very difficult for courts to determine the range of factual circumstances to which a particular rule should apply in light of the often myriad possibilities"; of particular concern is "the possibility that words or phrases or sentences may be taken out of context and treated as doctrines." Maloney, 984 A.2d

at 489–90.  In this regard, we underscore the importance of avoiding formulaic reading of common law principles and "wooden application of abstract principles to circumstances in which different considerations may pertain."  Scampone, 57 A.3d at 605 (citing Maloney, 984 A.2d at 485-86).  Thus, as to any particular claim in a disputed matter, a court should consider whether the application is logical and serves the interests of justice, and whether the general principle has been accepted elsewhere.[7]  "[T]he court always retains the right and the duty to test the reason behind a common law rule in determining the applicability of such rule to the facts before it.  In the face of contrary arguments as to why the rule should not apply in a given case, it is not enough to say merely that the rule as stated contains no exceptions."  Coyle, 584 A.2d at 1385.  Stated otherwise, "[w]here the facts of a case demonstrate that the rule outruns the reason, the court has the power, indeed the obligation, to refuse to apply the rule, a power for the most part unavailable where the rule is legislatively ordained."  Id.

### B.  Strict Liability in Pennsylvania: the Common Law

In the arena of strict liability, this Court does not write on a blank slate; the common law is the starting point of our explication of the conceptual framework for strict

---

[7]  Consideration for whether the general principle has been accepted elsewhere reflects the understanding that the restatement purports to represent the majority view on the subject in the United States.  See Adams, 33 Hofstra L. Rev. at 443-44.  But, questions remain subject to dispute regarding the "essential nature of the modern Restatements" and whether uniformity among jurisdictions is necessary and wise.  See generally Vargo, 26 U. Mem. L. Rev. at 515-36 (describing internal criticism of some that membership of American Law Institute drafting Third Restatement "[wa]s largely comprised of those who represent[ed] corporate interests" and who "fail[ed] to leave the client at the door"); and see Adams, 33 Hofstra L. Rev. at 443-44 (offering argument that "fit" for jurisdiction that shapes common law "is more important than uniformity" among American jurisdictions).

liability in tort in Pennsylvania. The evolution of strict liability jurisprudence has four distinct, relevant periods: early cases addressing the evolution of strict liability and the adoption of the Second Restatement's articulation of the cause of action; the advent of Azzarello; post-Azzarello jurisprudence; and recent judicial expressions addressing the Third Restatement.

At the outset, we note that disputes over liability for personal and economic harm caused by products, although perhaps not articulated in those same terms, likely accompanied the earliest division of labor. Efficiency, specialization, and the evolution of expertise, separately and as precursors to invention and innovation, were significant benefits of this division of labor.[8] But, the same division of labor, especially in its increasingly complex permutations, caused a physical and moral separation between sellers and buyers that inevitably generated disputes. The resolution of these disputes in English and American jurisdictions over the several centuries created a rich body of experience-based common sensibilities and wisdom from which the modern principles

---

[8]       David Hume said of the "partition of employments":

> When every individual person labours a-part, and only for himself, his force is too small to execute any considerable work; his labour being employ'd in supplying all his different necessities, he never attains a perfection in any particular art; and as his force and success are not at all times equal, the least failure in either of these particulars must be attended with inevitable ruin and misery. Society provides a remedy for these three inconveniences. By the conjunction of forces, our power is augmented: By the partition of employments, our ability [in]creases: And by mutual succor we are less expos'd to fortune and accidents. 'Tis by this additional force, ability, and security, that society becomes advantageous.

David Hume, A Treatise of Human Nature (1739).

of the common law of products liability evolved. Review of decisional law illustrates a general trend of gradual expansion of civil liability for harm to persons or property; as it happens, whether a particular development occurred in the context of injury caused by a product or not, the principles of liability were generally articulated in broad terms applicable to products. Compare, e.g., Breckbill v. Lancaster Turnpike Co., 3 U.S. 496, 499 (1799) (action for implied assumpsit (*i.e.*, breach of implied contract) cannot be maintained because corporation can only contract by deed under corporate seal) with Bank of Columbia v. Patterson's Administrators, 7 Cranch 299, 306 (U.S. February 05, 1813) (corporation may, without seal and upon parol, enter into contract, express or implied, for enforcement of which, action may lie); Chestnut Hill & Springhouse Turnpike Co. v. Rutter, 1818 WL 2109 at *7 (Pa. 1818) (corporation, whose employees cause injury while acting under its authority, is liable in tort for employees' negligent or intentional acts; rejecting argument that, because corporation cannot be authorized by law to commit tort, corporation can invest no one with power for that purpose and, as result, is not liable for torts of employees); Appeal of Williams, 47 Pa. 307, 1864 WL 4682 at *2 (Pa. 1864) (Agnew, J.) (common law rule of corporate immunity, premised upon "the quaint aphorism that a corporation has no soul," was legal fiction that gave "place to sound reason and a better morality" of holding corporations liable in tort); Centofanti v. Pennsylvania R. Co., 90 A. 558, 560 (Pa. 1914) (applying remedial statute that addressed absence of common law right of action for injury resulting in death); MacPherson v. Buick Motor Co., 217 N.Y. 382 (N.Y. 1916) (if manufacturer, who sells product for use without inspection by customers, is negligent, where danger is to be foreseen, liability will follow; discarded burden to prove that product was inherently dangerous); Flagiello v. Pennsylvania Hosp., 208 A.2d 193, 208 (Pa. 1965) (discarded judicially-created charitable immunity in tort, *i.e.*, for hospitals); Kassab v. Central Soya,

246 A.2d 848, 853-56 (Pa. 1968) (remote supplier of defective product may be sued for breach of warranty; discarded burden to prove vertical privity); <u>Salvador v. Atlantic Steel Boiler Co.</u>, 319 A.2d 903, 907 (Pa. 1974) (injured user may sue for breach of warranty, even if user is not purchaser, member of purchaser's family or household, or guest in purchaser's house; discarded burden to prove horizontal privity). <u>Accord</u> <u>Commonwealth v. Koczwara</u>, 155 A.2d 825, 828 n.1 (Pa. 1959) (application of absolute vicarious liability for acts of another in criminal case resulting in imprisonment deprives criminal defendant of due process of law; "[D]istinction between *respondeat superior* in tort law and its application to the criminal law is obvious[: i]n tort law, the doctrine is employed for the purpose of settling the incidence of loss upon the party who can best bear such loss[; but, w]e impose penal treatment upon those who injure or menace social interests, partly in order to reform, partly to prevent the continuation of the anti-social activity and partly to deter others.").

By the 1960s, Pennsylvania was among those jurisdictions whose courts had accepted an application of civil liability without proof of negligence in cases of injury caused by food products. <u>See</u> William L. Prosser, THE ASSAULT UPON THE CITADEL (STRICT LIABILITY TO THE CONSUMER), 69 Yale L. J. 1099, 1103-10 (1960) (citing, *inter alia*, <u>Caskie v. Coca-Cola Bottling Co.</u>, 96 A.2d 901 (Pa. 1953) (plaintiff who drank from bottle contaminated with hydrochloric acid established breach of implied warranty of fitness and did not have burden to prove that contamination was due to defendant's negligence or dereliction).[9] <u>See</u> <u>also</u> <u>Catani v. Swift & Co.</u>, 95 A. 931 (Pa. 1915) (where sale of food article is for immediate consumption, there is implied warranty that food is

---

[9]     William L. Prosser was the Dean of the School of Law at the University of California, Berkeley, from 1948 to 1961 and a senior authority in the publication of the case law book "Prosser, Wade and Schwartz's Torts, Cases and Materials."

wholesome and fit for purpose intended, irrespective of seller's knowledge of disease or defects therein; "prima facie case is made out by proof that the meat sold by defendant was diseased and caused the death of plaintiff's husband")).  Redress for injury caused by other products was available in tort (by asserting, *e.g.*, negligence, misrepresentation, or fraud claims) or by asserting breach of warranty claims.  These causes of action, and their attendant respective forms of pleading, remain available to plaintiffs today, forming the greater body of products liability law.  Accord Lance, 85 A.3d at 440 n.8.

By the 1960s, plaintiffs had sought to establish liability of sellers of products primarily via actions in negligence and breach of warranty, on the assumption that these recognized causes of action provided the best approximation of justice in individual cases then available.  Negligence, in tort, spoke to the notion of redress for a legal wrong or direct and forcible injury to the person, land, or chattels of another.  See R.F.V. Heuston, SALMOND ON THE LAW OF TORTS 4 (17th ed. 1977).  Negligence theory also offered the convenience that it did not require proof of knowledge of a particular defect in the product, but simply the failure to exercise due care had the defect been foreseeable.  Meanwhile, a breach of warranty action, sounding in assumpsit, was at its origin an action in tort, which "transformed into an action of contract, becoming afterwards a remedy where there was neither tort nor contract."  James Barr Ames, The History of Assumpsit in 3 SELECT ESSAYS IN ANGLO-AMERICAN LEGAL HISTORY 1, 298 (1909).  The word assumpsit suggested the making of a promise and, originally, the actionable conduct was the breach of an express promise.  The cause of action evolved, however, to encompass the breach of an implied promise, and even of a fictitious promise.  See id. (commenting upon "assumpsit" as illustration of "the flexibility and power of self-development of the Common Law").  "[W]arranty (unlike negligence

which is a tort concept based on fault) is not a concept based on fault or on the failure to exercise reasonable care.  But this does not mean that warranty is necessarily contractual or non-tortious in nature.  Liability in warranty arises where damage is caused by the failure of a product to measure up to express or implied representations on the part of the manufacturer or other supplier.  Accordingly, an injured person is not required to prove negligence in a warranty-products liability case." Putman v. Erie City Mfg. Co., 338 F.2d 911, 913 n.8 (5th Cir. 1964) (quoting Frumer and Friedman § 16A p. 358).  Elements of both the negligence and breach of warranty causes of action, as they had thus developed, foreshadowed the evolution of jurisprudence in the area of strict liability, and increasingly resonated with courts.


### 1.    The Second Restatement and the Early Cases

Early decisional law in Pennsylvania explained the genesis and nature of the strict liability cause of action, with reference to Section 402A of the Second Restatement.  Section 402A of the Second Restatement states:

*§ 402A Special Liability of Seller of Product for Physical Harm to User or Consumer*

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
    (a) the seller is engaged in the business of selling such a product, and
    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although
    (a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product
from or entered into any contractual relation with the seller.

RESTATEMENT (2D) OF TORTS § 402A (1965).

The commentary to the Second Restatement traces the roots of the higher degree of responsibility placed upon sellers of goods to English criminal statutes of the Thirteenth Century that imposed penalties upon persons who supplied "corrupt food and drink." RESTATEMENT (2D) OF TORTS § 402A cmt. b. As these criminal statutes were repealed, judicial decisions referred in *dicta* to the civil liability of sellers to those to whom they sold "corrupt victuals." See Prosser, 69 Yale L.J. at 1104. Early American jurisprudence denominated the special civil responsibility as "warranty," imposed upon the seller of food in favor of the direct purchaser. At the beginning of the Twentieth Century, judicial decisions extended sellers' "strict liability" beyond the direct purchaser to injured consumers. Id. The decisions articulated an exception to the general rule of more direct liability premised upon proof of negligence or privity of contract. "In the beginning, these decisions displayed considerable ingenuity in evolving more or less fictitious theories of liability to fit the case. The various devices included an agency of the intermediate dealer or another to purchase for the consumer, or to sell for the seller; a theoretical assignment of the seller's warranty to the intermediate dealer; a third party beneficiary contract; and an implied representation that the food was fit for consumption because it was placed on the market, as well as numerous others." RESTATEMENT (2D) OF TORTS § 402A cmt. b. Later jurisprudence settled upon a theory of warranty "running with the goods" or made directly to the consumer; the alternative was strict liability in tort. After 1950, jurisdictions extended the rule of strict liability beyond the sale of food for human consumption, to other products intended for intimate bodily use. Finally, in the late 1950s, courts began applying these developed rules of strict liability to the sale of any product. Id.; see also Prosser, 69 Yale L.J. at 1103-14 (stating, *inter alia*, that

Pennsylvania had extended application of a heightened responsibility to sellers of products other than food in <u>Jarnot v. Ford Motor Co.</u>, 156 A.2d 569 (Pa. Super. 1959), premised upon misconstruction of language in earlier cases).

In 1966, this Court took a major step by "adopting" the formulation of Section 402A of the Second Restatement of Torts as the common law of Pennsylvania. In <u>Webb</u>, 220 A.2d 853, the Court vacated the trial court's order to dismiss the case and remanded with instructions for the trial court to permit the plaintiff to amend his complaint to add a cause of action premised upon the theory of strict liability in tort as articulated by the Second Restatement. The plaintiff in <u>Webb</u> had been severely injured when a beer keg exploded and, as a result, filed a complaint "in trespass," asserting an "exclusive control" theory of negligence -- essentially *res ipsa loquitur*, <u>see</u>, <u>e.g.</u>, <u>Loch v. Confair</u>, 93 A.2d 451 (Pa. 1953) -- against the beer distributor, the brewer who had filled the keg, and the manufacturer of the keg. The trial court sustained preliminary objections, reasoning that the plaintiff had not joined in the suit before the expiration of the statute of limitations all parties against whom an inference of negligence could be drawn, *i.e.*, the plaintiff's father, who had purchased the keg, and the plaintiff's brother, who had tapped the keg. On appeal, the Court, in an opinion by Mr. Justice Cohen, offered little explanation of its reasoning for formally adopting the Second Restatement except by reference to the responsive opinions of Messrs. Justice Jones and Roberts in <u>Miller v. Preitz</u>, 221 A.2d 320 (Pa. 1966), filed in a companion decision entered the same day as <u>Webb</u>. The relevant reasoning of the <u>Webb</u> Court in its entirety reads as follows:

> We need not, however, determine whether or not the lower court erred with regard to the law of exclusive control, for there is another and clearer issue which is determinative of this appeal. That issue is the nature and scope of the liability in trespass of one who produces or markets a

defective product for use or consumption. The development of the law in that area is chronicled in the Concurring and Dissenting Opinions of Justices Jones and Roberts to the decision of this Court in Miller v. Preitz, 221 A.2d 320 (Pa. 1966). One will also find there citations to modern case law and commentaries which extend and recommend the extension of the law of strict liability in tort for defective products. The new Restatement of Torts reflects this modern attitude. Section 402A thereof states: [Quoting in full Section 402A of the Second Restatement.]

We hereby adopt the foregoing language as the law of Pennsylvania.

The plaintiff in this litigation, therefore, must be given an opportunity to plead and prove his case. . . .

220 A.2d at 854. Mr. Justice Eagen filed a joining concurring opinion, noting his preference for a limited application of the Second Restatement. Mr. Chief Justice Bell filed a dissenting opinion. See n.10 infra.

The several opinions filed in Miller offer substantially more insight than Webb into the genesis of the strict liability tort in Pennsylvania and the Court's decision to adopt the Second Restatement to define its parameters. The Miller plaintiff was the estate administrator of a deceased infant, who was fatally injured when a vaporizer-humidifier used to relieve congestion in his nose shot boiling water on his body. The plaintiff filed a complaint asserting a breach of the implied warranty of merchantability against the manufacturer, the distributor, and the retail pharmacy that had sold the vaporizer-humidifier to the deceased infant's aunt. The infant had used the product in the aunt's home, next door to his family's home. In relevant part, the trial court sustained preliminary objections to the complaint, on the ground that the implied warranty did not extend to the deceased infant because he had not been in privity of contract with any of the defendants.

The Miller Court reversed the judgment as a matter of law entered in favor of a retailer because the deceased infant, who was harmed by the vaporizer-humidifier sold by the retailer, was "in the buyer's family" and, notwithstanding the infant's lack of privity with the retailer, his representative had met the prerequisites for pursuing a breach of warranty action under the plain language of the Uniform Commercial Code. (By comparison, the Webb plaintiff had pursued an action in tort on a theory of negligence.) Additionally, the Miller Court affirmed the judgment in favor of the manufacturer and of the distributor, reasoning that the Code's provisions did not extend warranty liability to remote sellers in the chain of distribution. Id. at 324 (citing 12A P.S. § 2-318). In both respects, according to the Court, the language of the Uniform Commercial Code was dispositive. The Miller Court viewed abandoning the requirement of privity in warranty actions as unnecessary, noting the expectation that strict liability in tort would vindicate public policy relating to products liability and accomplished a similar result to abandoning privity.

Justice Jones concurred in the decision to reverse the judgment against the retailer, but dissented from the Court's disposition with respect to the manufacturer and distributor of the product. The dissent was premised in part upon the view that, if the Court retained the requirement of privity, the Court should adopt the Second Restatement and thereby relegate all actions in the products liability field to tort. The dissent described the state of the law then existing:

> In the field of product liability, resort for redress for injury arising from a defective product may be had either in tort or assumpsit. In [Loch v. Confair, 63 A.2d 24 (Pa. 1949)], we said "that a person who has effected the purchase of particular goods and sustains injury because of unfitness for an intended purpose may institute an action in assumpsit based upon a breach of implied warranty Or an action in trespass based upon specific averments of

[J-80-2013] - 46

> negligence. In both instances the elements of damage may be identical, viz, the damage naturally and proximately resulting from a breach of implied warranty or a breach of duty. . . . An election of remedies in this regard has, however, never been held by this Court to authorize institution of a contract action based upon averments of negligence. Nor, conversely, has it authorized institution of a negligence action based upon averments of contract. Essential distinctions which exist have been recognized." [63 A.2d at 26]. Thus, while a person injured by a defective product has an election of remedies, however, each remedy has acquired distinct characteristics.

221 A.2d at 329 (Jones, J., concurring and dissenting) (footnote omitted).

Justice Jones then expressed support for the approach of the Second Restatement whose purpose, he stated, was to ensure "that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." Id. at 334.

According to Justice Jones, the judgments that would result from application of the Second Restatement were "not a far cry" from the doctrines of res ipsa loquitur and of exclusive control. The dissent viewed manufacturers and sellers, proximate or remote, of products for consumption by the public as subject "to a special responsibility to any member of the using and consuming public who may be injured by the use and consumption of the product." The dissent reasoned that the public expects such manufacturers and sellers to stand behind their products; therefore, the financial burden of injuries caused by defective products "should fall upon those who make and market the products and the consuming public is entitled to the maximum protection." Id. at 334-35.

In his dissent, Justice Roberts, joined by Mr. Justice Musmanno, would also have reversed the summary judgment entered by the trial court as to all defendants. These

dissenters reasoned that the majority's decision elevated form over substance, and they would have allowed the cause of action in the matter to proceed either in assumpsit, on the basis of a breach of warranty, or in trespass, on the basis of strict liability. In this regard, the dissent suggested that the same results would obtain whether a plaintiff chose to pursue his products liability claim on a breach of warranty theory or under the Second Restatement.

The dissenters remarked that the duty of sellers of products for human consumption "extended beyond the mere avoidance of negligence," and had been characterized as a "special responsibility . . . in the nature of an implied warranty that such products would be fit for human consumption. . . ." The duty had been limited to the immediate buyer; but, the dissent noted, courts "recognized the injustice inherent in such a limitation" and had developed theories of strict liability in defective food cases. At the same time, according to the dissent, the privity requirement was not eliminated as to non-food products, which presented equal dangers. The dissenters questioned the merit of that distinction. From a practical perspective, the dissent also noted that the doctrine of privity did not insulate defendants from liability because an action by a consumer against a seller simply started a chain reaction of indemnity; "[a]ll that is really accomplished by the restriction [of privity] is to expose [the] plaintiff to the risk that the retail seller may not be financially able to make redress and to deprive [the plaintiff] of the opportunity of proceeding directly against the more financially able parties in the distributive chain." 221 A.2d at 336-38.

The dissent then expressed its disapproval of the "conceptual abstractions and niceties of pleading" that had obscured what it believed was essentially a strict liability cause of action and the considerations that supported it, and encouraged the Court to adopt the Second Restatement. In the dissent's view:

The public interest in affording the maximum protection possible under the law to human life, health and safety; the inability of the consumer to protect himself; the seller's implied assurance of the safety of a product on the open market; the superior ability of the manufacturer or seller to distribute the risk of loss; the needless circuity of recovery and the expensive, time consuming, wasteful and often unjust process which insistence upon privity frequently occasions -- all support the extension of the protection of strict liability beyond the food cases to those involving other consumer goods as well.

221 A.2d at 338-39.

Thus, the 6 to 1 Webb decision itself contained no developed majority expression, despite the important transitional point it marked in Pennsylvania law.[10]

The commentary to the Second Restatement and the Court's decisional law over the subsequent decade reflect early foundational debates among members of the Court concerning the tort.[11] In a series of cases, the Court addressed narrow applications of broader questions relating to burdens of proof, evidence, and jury instructions in strict

---

[10] In Webb, Chief Justice Bell dissented, premised primarily upon the argument that the majority was overruling numerous decisions *sub silentio* in favor of a "new rule . . . [that] so completely changes, not by legislative action but by judicial ukase, the law with respect to trespass actions for injuries resulting from non-inherently dangerous products that are either manufactured or bottled or sold by any vendor . . . that in [the Chief Justice's] opinion it is not only very unfair but absolutely Unjustifiable in Justice or in Law." 220 A.2d at 855 (Bell, C.J., dissenting).

[11] In the interim, the Court addressed several corollary matters, without offering any insight into foundational matters of concern here. See, e.g., Ferraro v. Ford Motor Co., 223 A.2d 746 (Pa. 1966) (reversing judgment notwithstanding verdict and remanding for new trial; in strict liability case, "if the buyer knows of the defect and Voluntarily and Unreasonably proceeds to use the product or encounter a known danger, this should preclude recovery and constitute a complete defense to the action"); Burbage v. Boiler Eng'g & Supply Co., 249 A.2d 563 (Pa. 1969) (affirming judgment in favor of consumer; manufacturer of replacement part is subject in strict liability to consumer).

liability litigation. To the extent these decisions necessitated explication of conceptual foundations, much like the Second Restatement and the commentary, the Court's efforts centered on describing in affirmative terms the theoretical basis for strict liability but lapsed, generally, into comparisons with the more familiar negligence and warranty causes of action in which strict liability was rooted. See, e.g., RESTATEMENT (2D) OF TORTS § 402A(2) & cmt. a, c & m.

For example, in Bialek v. Pittsburgh Brewing Co., 242 A.2d 231 (Pa. 1968), the Court noted and rejected a challenge to that part of a jury charge which, the plaintiff argued, imposed an unwarranted burden upon the plaintiff to prove which particular seller in the distribution chain had caused the defect in the product. The Court reasoned that for liability to attach per Section 402A, "the seller need only sell a defective product [and need not] have caused the defect." The Court added that the trial court should instruct the jury that a plaintiff "is not required to prove that the defendants were negligent, that the defendants can be held liable even if they exercised all possible care and that no consideration should be given to negligence." But, the Court explained, sellers in a distributive chain who precede a seller that caused the defect do not sell a defective product and are not liable. In this sense, according to the Court, the plaintiff's theory of the case is relevant and the trial court has discretion to tailor the charge to reflect the evidence and theories of the parties. Id. at 235-36.

In Kuisis v. Baldwin-Lima-Hamilton Corp., 319 A.2d 914 (Pa. 1974) (Opinion and Opinion Announcing Judgment of Court), the expression authored by Mr. Justice Pomeroy, in which Mr. Justice O'Brien joined, did not summon a majority of the members of the Court for disposition of the strict liability-related claims, which several Justices would not have reached on appeal. The OAJC offered an explication of the burden of proof in a strict liability case premised upon circumstantial rather than direct

evidence of a defect, *i.e.,* the so-called malfunction theory; the theory is of major importance as it was later adopted by a majority of the Court in <u>Rogers v. Johnson & Johnson Products, Inc.</u>, 565 A.2d 751 (Pa. 1989). <u>See</u> <u>also</u> <u>Barnish v. KWI Building Co.</u>, 980 A.2d 535 (Pa. 2009).

In <u>Kuisis</u>, the plaintiff alleged that he was injured when a crane's brake locking mechanism became disengaged, causing a load of steel pipe suspended on the crane to fall on him. The plaintiff proceeded on theories of negligence and strict liability in the design and manufacture of the brake locking mechanism. At the close of evidence, the trial court granted summary relief to the manufacturer on the negligence claim and submitted the strict liability claims to the jury; the jury was dismissed when it could not agree on a verdict. Subsequently, the trial court granted the manufacturer's motion for judgment on the record. On appeal, this Court reversed the trial court's judgment and awarded the plaintiff a new trial. Justice Pomeroy's OAJC reasoned that evidence relating to the accident, in addition to the occurrence of five similar malfunctions of the locking mechanism, was sufficient to show that the product was defective, even absent direct evidence of a specific defect. According to the OAJC, in the absence of other identifiable causes, the malfunction itself was evidence of a defective condition; "[t]his rule reflects the fact that liability under [Section] 402A turns on a lack of fitness in the defendant's product, as in the case of an action for breach of warranty, rather than on the breach of a particular duty of care by the defendant, as in the case of an action for negligence." The OAJC continued: "[w]hile a plaintiff's hand in a strict liability case will obviously be strengthened by evidence of a specific defect in the defendant's product such evidence is not necessary to take . . . the plaintiff's case to a jury." <u>Id.</u> at 920.

Finally, the OAJC commented upon the relevance of proof that the crane operator had left the controls while the pipe was suspended. According to the OAJC,

the operator's alleged negligence was legally significant as a potential superseding cause of the plaintiff's injuries. Kuisis, 319 A.2d at 920; see also Rogers, 565 A.2d at 755. But, the opinion continued, operator negligence was not a superseding cause of the plaintiff's injuries unless the negligent conduct was outside the manufacturer's "reasonable range of foreseeability." Justice Pomeroy opined that the principle of foreseeability "carries over from traditional negligence law to strict liability cases. . . . It makes no difference in this regard whether the operator's conduct is characterized as an intervening act of negligence or as an 'abnormal use' of the crane; where under [Section] 402A a particular use of a product is abnormal depends on whether the use was reasonably foreseeable by the seller." Kuisis, 319 A.2d at 920-21 & n.13. Other proof relevant to the question of foreseeability, the OAJC added, was the passage of twenty years since the crane had been manufactured and any interim alterations. Id. at 922 & n.15.[12]

Following the decision in Kuisis, the Court revisited questions relating both to a plaintiff's burden of proving a strict liability claim, and relevant jury instructions, in

---

[12] In parallel developments, the Court dispensed with privity prerequisites for stating a breach of an implied warranty claim, by reference to the Second Restatement. The Kassab Court reasoned that clarity in the law and consistency of results, whether one labeled a complaint in assumpsit / warranty or trespass / strict liability, counseled abandoning vertical privity requirements. See Kassab, 246 A.2d at 853-56 overruled in part on other grounds by AM/PM Franchise Ass'n v. Atl. Richfield Co., 584 A.2d 915 (Pa. 1990) (remote supplier of defective product may be sued for breach of warranty). In Salvador, the Court discarded horizontal privity stating that: "Today . . . a manufacturer by virtue of [S]ection 402A is effectively the guarantor of his products' safety. . . . [A manufacturer] may not preclude an injured plaintiff's recovery by forcing him to prove negligence in the manufacturing process. Neither may the manufacturer defeat the claim by arguing that the purchaser has no contractual relation to him." Salvador, 319 A.2d at 907 (injured user may sue for breach of warranty, even if user is not purchaser, member of purchaser's family or household, or guest in purchaser's house).

Berkebile v. Brantly Helicopter Corp., 337 A.2d 893 (Pa. 1975) (Opinion Announcing Judgment of Court). The Court affirmed by unanimous mandate the decision of the Superior Court to reverse the judgment on the verdict granted to the defendant and to award the plaintiff a new (third) trial. The decision generated several opinions, among them the OAJC of Chief Justice Jones, joined by Justice Nix, parts of which later became law in Azzarello. See 391 A.2d at 1027 and discussion infra. Justices Roberts and Pomeroy filed separate concurring opinions, while Justices Eagen, O'Brien, and Manderino concurred in the result without opinion.

The Berkebile OAJC commenced its analysis by noting the necessity "to clarify the concepts of strict liability in Pennsylvania," so as to avoid further confusion in the case upon remand for a third trial. In concurring, Justices Roberts and Pomeroy would have decided the matter on the separate issue of strict liability for a failure to warn. 337 A.2d at 903-04.

In Berkebile, following the death of her husband in a helicopter crash, the administratrix of the estate sued the manufacturer, premised upon theories of strict liability for defective design of the helicopter's rotor system, for defective manufacturing and design of the rotor blade, for inadequate warnings regarding the inherent risks and limitations of the rotor system, and for misrepresentation of the helicopter's safety in the manufacturer's advertising brochures. The defendant denied the existence of a defect and argued that the decedent's abnormal use had caused the crash.

The Berkebile OAJC reiterated that strict liability, as a cause of action, implemented a policy of consumer protection. According to the OAJC, "[t]he increasing complexity of the manufacturing and distributional process placed upon the injured plaintiff a nearly impossible burden of proving negligence where, for policy reasons, it was felt that a seller should be responsible for injuries caused by defects in his

products." Id. at 898 (citing RESTATEMENT (2D) OF TORTS § 402A cmt. c). The OAJC explained that, in a strict liability matter, proof of a seller's due care and breach of due care are unnecessary because liability attaches "without fault." Id. (citing Salvador, 319 A.2d at 907). Instead, to recover, a plaintiff must prove that the product was defective, and that the defect was a proximate cause of the plaintiff's injuries. In addition, according to the OAJC, the plaintiff has the burden to prove that the defect causing the injury existed at the time that the product left the seller's hands. The OAJC then warned of attempts by a defendant-seller at "indirectly . . . injecting negligence concepts into strict liability theory." Id. at 899.

The Berkebile OAJC also parsed the language of the Second Restatement, opining that the Restatement imposes a seemingly contradictory burden of proving that a "defect" is "unreasonably dangerous." According to the OAJC, the standards are reconcilable if the purpose of the "unreasonably dangerous" qualification is "to differentiate those products which are by their very nature unsafe but not defective from those which can truly be called defective." The OAJC rejected the notion that defect should be defined based upon the negligence-oriented reasonable man concept, which tended to dilute the strict liability concept, and offered that the "unreasonably dangerous clause" should be included in articulating the issue of proximate cause to the jury. Chief Justice Jones explained that the result of limiting the liability of a seller premised upon a "reasonable man" standard, which the clause "unreasonably dangerous" could suggest, protects the seller from becoming "an insurer of his products with respect to all harm generated by their use." But, such standard would also require an injured consumer-plaintiff to prove an element of negligence, which means in practice that, regardless of the injured consumer's expectations regarding the product, the injured consumer would be unable to recover if an "ordinary consumer" would have expected the product's

defective condition. Chief Justice Jones opined that it is unnecessary to place the additional burden upon the injured consumer to limit a seller's liability because the seller is adequately protected "by the necessity of proving that there was a defect in the manufacture or design of the product, and that such defect was a proximate cause of the injuries." Id. at 899-900 (quoting Cronin v. J.B.E. Olson Corp., 501 P.2d 1153, 1161 (Cal. 1972), whose holding we address infra). As a result, the OAJC concluded that the jury should not be instructed as to the reasonable man standard or reasonableness "in any form." Id. at 900.

Chief Justice Jones added that proof of strict liability is not premised upon whether the seller could have foreseen a particular injury, for to articulate the burden of proof in terms of foreseeability is to require the plaintiff to prove that the seller exercised due care. But, because the seller is liable in strict liability regardless of any negligence, whether the seller could have foreseen a particular injury is irrelevant. Once a product is proved defective, the seller is responsible for all the unforeseen harm it caused, no matter how remote. Moreover, Chief Justice Jones reasoned, a plaintiff's negligence does not bar recovery in strict liability, although evidence that would tend to prove such negligence may be relevant for the purpose of rebutting the plaintiff's contentions of defect and proximate cause. Id. at 901.

Finally, the Berkebile OAJC addressed the viability of the plaintiff's failure to warn claims, reasoning that the trial court had erred in failing to charge the jury on the point. Chief Justice Jones stated: "A 'defective condition' is not limited to defects in design or manufacture. **The seller must provide with the product every element necessary to make it safe for use.** One such element may be warnings and/or instructions concerning use of the product. A seller must give such warning and instructions as are required to inform the user or consumer of the possible risks and inherent limitations of

his product." Id. at 902 (emphasis added) (citing Restatement (2d) of Torts § 402A cmt. c). The portion of the Berkebile lead opinion emphasized above was quoted subsequently out of context by the majority in Azzarello as the standard of proof in a strict liability action.

Looking back, it is now apparent that the first decade of applying the doctrine of strict liability in Pennsylvania offered a series of missed opportunities to develop a vibrant and coherent body of common law on the issue. The difficulties arose from the happenstance of the idiosyncratic procedural postures of cases in which the Court nevertheless apparently sought to make conceptual advances in the arena. To start, the Webb Court "adopted" the Second Restatement and remanded the case to the trial court for application, without offering much explanation of either how Section 402A derived from or complemented existing common law, or direction concerning its application by the lower courts, including the realm of jury charges. The procedural posture of Webb -- an appeal from a trial court decision sustaining preliminary objections -- and some consensus regarding the direction of the law, perhaps explain the approach. The concurring and dissenting expressions in Miller, upon which the Webb Court relied, offered a more reasoned explanation for the availability of strict liability in tort as a separate cause of action and attenuated, to a degree, the stark approach of the summary Webb majority decision. But, the responsive expressions -- offered in the context of a breach of warranty case no less -- suggested little in terms of an explication of essential foundational concepts or practical application, which are generally the *sine qua non* of common law decisions.

And so, much like the Second Restatement articulation of strict liability, Pennsylvania decisional law did not speak affirmatively to the plaintiff's burden of proof in strict liability cases but addressed it by negation, *i.e.*, as compared to then-more

familiar theories of breach of warranty initially and, later, negligence. In the subsequent decade, foundational issues regarding the strict liability in tort cause of action did not reach the Supreme Court or, when questions were presented, expressions failed to command clear majority support. To the extent that the Court spoke to broader considerations, several trends became evident: the original prominence of warranty-related attempts to limit application of strict liability theory decreased, and the relevance of negligence-related encroachments commenced its ascent; rhetoric emerged not only to distinguish strict liability from its negligence roots, but also to excise negligence principles and terms (such as foreseeability) from strict liability theory; the reliance upon formulaic reiteration of consumer protection-related policies, offered as a bulwark against attempts to dilute the application of strict liability theory in individual cases; and then a focus in strict liability theory that ultimately turned upon a statutory construction-type of analysis of the Second Restatement. Experience suggests that these trends, and fits and starts, have proven antithetical to the orderly evolution of our decisional law, one that must be responsive to new problems, perspectives, and consequences.

### 2. Azzarello

In 1978, the Court was confronted with the question of whether the trial court had adequately charged a jury on the law of products liability in Pennsylvania. The Azzarello plaintiff had been injured when he pinched his hand between two hard rubber rolls in a coating machine manufactured by Black Brothers Company. The plaintiff proceeded on a theory of strict liability against the manufacturer, but the manufacturer also joined the plaintiff's employer as a co-defendant, asserting that the employer's negligence was the sole or contributing cause of the plaintiff's injuries. See Azzarello, 391 A.2d at 1022. In a unanimous opinion, the Court held that the jury charge issued by

the trial court was misleading and affirmed the decision of the Superior Court, which had granted the plaintiff a new trial. The Azzarello Court approved an alternative charge. Id. at 1027 n.12.

The Court addressed two related and important questions: whether a determination as to the risk of loss in a strict liability case is a decision for the judge or the jury, and whether the words "unreasonably dangerous" have any place in the strict liability jury instruction. The Court concluded that the words "unreasonably dangerous" explain the term "defective" but have "no independent significance and merely represent a label to be used where it is determined that the risk of loss should be placed upon the supplier." The words "unreasonably dangerous" limit liability and signal that a seller is not an insurer but a guarantor of the product. However, the difficulty with the use of the term in jury instructions, the Court reasoned, was that it signaled to the jury that the consumer has the burden to prove an element of negligence. According to the Court, in strict liability cases, burdening a plaintiff with proof of negligence is unwarranted; the seller's liability is limited "by the necessity of proving that there was a defect in the manufacture or design of the product, and that such defect was a (legal) cause of the injuries." Id. at 1025 (quoting Cronin, 501 P.2d at 1161-62); see also Berkebile, 337 A.2d at 899-900.

The Azzarello Court further reasoned that a change in terminology to avoid references to negligence principles would be insufficient to articulate instructions appropriate for a lay jury. Indeed, according to the Court, the formulation of the Second Restatement was not intended to articulate jury instructions but employed principles designed instead to predict responsibility and to guide the professional bench and bar. The Court then concluded that the best means to implement the principles of the Second Restatement was to direct: (1) that the phrases "defective condition" and

"unreasonably dangerous," which predict whether recovery would be justified, are issues of law and policy entrusted solely for decision to the trial court; and (2) that the inquiry into whether a plaintiff has proven the factual allegations in the complaint is a question for the jury. According to the Court, in cases of an alleged defective design, the dispositive question is whether the product is safe for its intended use. The Court emphasized that the seller is the "guarantor" of the product, and a jury could find a defect "where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." Id. at 1027 (citing Berkebile, 337 A.2d at 902). Having concluded that the jury should not be instructed on the "unreasonably dangerous" standard, the Court then affirmed the Superior Court's decision to remand the case to the trial court for a new trial.

### 3. Post-Azzarello Design Defect Jurisprudence

Following Azzarello, decisional focus in strict liability cases shifted to reflect an increasing concern with segregating strict liability and negligence concepts. The Court addressed several evidentiary questions, in the process touching upon foundational notions of strict liability relevant to a design defect claim.[13]

---

[13] The jurisprudence of strict liability for failure to warn also developed in parallel. See, e.g., Sherk v. Daisy-Heddon, 450 A.2d 615 (Pa. 1982) (where lethal propensity of toy gun was known or should have been known to user, manufacturer not strictly liable for failure to warn); Mackowick v. Westinghouse Elec. Corp., 575 A.2d 100 (Pa. 1990) (capacitor not defective for failure to warn electrician/intended user of obvious danger of live, exposed electrical wires); Coyle, 584 A.2d at 1383 (strict liability for failure to warn of prescription drug's dangerous propensities is not recognized as cause of action against pharmacist); Hahn v. Richter, 673 A.2d 888 (Pa. 1996) (where adequacy of warnings associated with prescription drugs is at issue, strict liability is not recognized as basis for liability); Davis v. Berwind Corp., 690 A.2d 186 (Pa. 1997) (notwithstanding (continued…)

In Lewis v. Coffing Hoist Division, Duff-Norton Co., 528 A.2d 590 (Pa. 1987), the Court affirmed the Superior Court's decision to uphold a jury verdict in favor of a plaintiff who alleged that the design of a control box for an overhead electric hoist was defective because it lacked a safety mechanism to prevent accidental depression of the control buttons. The plaintiff had injured his legs when he accidentally depressed the control buttons, which caused the hoist to swing its load into his body. The Court rejected the defendant's claim that the trial court erred in excluding expert testimony relating to industry standards and practices, e.g., that ninety percent of similar hoists lacked a guard around the control panel and that a nationwide trade group had certified the product design as safe.

Before addressing whether particular expert testimony was relevant to a strict liability cause of action, the Lewis Court set out its view of the applicable substantive law. The Court noted that strict liability in tort was a cause of action available when an injury is caused by a defect in design. The Second Restatement, according to the Court, does not provide a definition of the term "defect," and jurisdictions have articulated diverse formulas on the subject of design defect. The Court noted a "consumer expectations" approach, which is an inquiry into whether the product "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." Id. at 593 (citing Barker v. Lull Engineering Co., 573 P.2d 443 (Cal. 1978)). A second accepted approach, according to the Court, involves "risk-utility" balancing. Id. (citing Barker, supra, and A. Weinstein et al, PRODUCTS LIABILITY AND THE REASONABLY SAFE PRODUCT, at 43-59 (1978)). However, in

_____

(…continued)
ease of removing safety device, warning on blender sufficient to caution operator against conduct that caused injury).

Pennsylvania, the Court explained, Azzarello articulated a distinct approach: "the jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." Id. (citing Azzarello, 391 A.2d 1027).

The Lewis Court observed that jurisdictions with various approaches agreed that relevant at trial is the condition of the product rather than the reasonableness of the manufacturer's conduct. As a result, the Court concluded, a strict liability claim does not sound in negligence -- a proposition in harmony with the Azzarello decision. The Court held that, because "due care" has no bearing upon liability in a strict liability case, proof of industry standards -- which go to a negligence concept of reasonable care -- are irrelevant and "created a strong likelihood of diverting the jury's attention from [the product] to the reasonableness of the [manufacturer-defendant's] conduct in choosing its design." Id. at 593-94.

Mr. Justice Larsen concurred, adding that because of their "inherently self-serving nature," admission of industry standards evidence would be highly prejudicial to the consumer. In a dissent, Mr. Justice Flaherty criticized the majority's approach to strict liability claims, noting that evidence of injury alone is insufficient to prove a strict liability claim; rather, industry standards are relevant to the question of defect. This is so, the dissent said, because suppliers are liable only if an unsafe product is placed on the market: strict liability "does not impose liability for failing to make an already safe product somewhat safer, or for failing to utilize the safest of all possible designs. We are simply not dealing with conceptual Platonic ideals of perfection when a jury considers whether any given product is safe." Id. at 595. In a separate dissent, Mr. Justice Hutchinson, also joined by Justice Flaherty, opined that industry standards are written by specialized individuals with knowledge of product design superior to that of

courts and, as a result, evidence of such standards is relevant to the question of defect. Justices Flaherty and Hutchinson concluded that evidence of industry standards was admissible although not necessarily highly probative.

Later, in Kimco Development Corporation v. Michael D's Carpet Outlets, 637 A.2d 603 (Pa. 1993), the Court affirmed the decision of the Superior Court, and held that the comparative negligence of a co-defendant is not a basis upon which to decrease the amount of damages available premised upon a strict liability claim. In Kimco, a shopping center owner and several tenants sued the manufacturer of polyurethane foam carpet padding, which caught fire and damaged the shopping center, as well as the tenant in whose store the fire broke out; the tenant-defendant countersued the manufacturer and shopping center owner. The parties asserted claims of negligence, breach of warranty, and strict liability in tort. The jury returned a verdict in favor of the plaintiffs on theories of strict liability and negligence, apportioning negligence responsibility 80/20 to the tenant-defendant and manufacturer, respectively. In addition, the jury found in favor of the tenant-defendant and against the manufacturer on a strict liability theory. The trial court denied a motion to reduce the tenant-defendant's strict liability verdict against the manufacturer premised upon the apportionment of responsibility in negligence. The Superior Court affirmed.

On appeal, this Court rejected the manufacturer's argument that comparative negligence is a defense to a claim in strict liability. Initially, the Court noted that "[t]he law amongst the various states is in considerable disarray on the point in question." The Court then reasoned that applying contributory negligence principles to strict liability claims would cause "conceptual confusion" and would undermine the purpose of strict liability: "[t]hroughout the development of [Section] 402A liability, we have been adamant that negligence concepts have no place in a strict liability action." Id. at 605-

06 (citing Azzarello, McCown, and Berkebile).  According to the Court, in strict liability, "the focus is on the nature of the product and the consumer's reasonable expectations with regard to the product, rather than upon the conduct of either the manufacturer or the person injured."  The Court concluded that permitting recoveries to be reduced premised on negligence concepts would weaken the deterrent effect of the policy to protect the consumer and to shift the risk of loss to the supplier of the defective product "without regard to fault or privity of contract."  Id. at 605-07.[14]  Justice Flaherty dissented, premised upon the argument that strict liability without regard to proportionate faults burdened business enterprises with liabilities that worked serious detriment to the economy.

### 4.    Recent Cases and the Third Restatement

In 1998, the ALI proposed a new restatement of the law relating specifically to products liability. See RESTATEMENT (3D) OF TORTS: PRODUCTS LIABILITY §§ 1-8 (1998) (Liability Rules Applicable to Products Generally).  As is evident from the premise of this litigation, this Court has not yet determined whether to adopt the formulation of the Third Restatement as the law of Pennsylvania.  However, the suggestion for a "move" to the Third Restatement, or adoption of certain of its principles, has been made in several non-precedential opinions.

---

[14]    By comparison, doctrinal separation played a noticeably less prominent role in an earlier decision relating to whether contributory negligence was an available defense to a strict liability claim.  In McCown v. International Harvester Co., 342 A.2d 381 (Pa. 1975), the Court held that contributory negligence was not an available defense in a strict liability case because such recognition would contradict the normal expectation of product safety upon which the strict liability cause of action is premised.  "One does not inspect a product for defects or guard against the possibility of product defects when one assumes the item to be safe."  Id. at 382.

In 2003, the question before a six-Justice Court was whether a supplier was responsible in strict liability to a consumer-plaintiff other than the intended user of the product. See Phillips v. Cricket Lighters, 841 A.2d 1000 (Pa. 2003) (OAJC). The plaintiff had alleged that the butane lighter designed and manufactured by the defendant was defective because it lacked a safety device that would have prevented a two year-old from setting the tragic fire that killed the child, his sibling and his mother. In relevant part, the Court reversed the decision of the Superior Court and reinstated the trial court's summary judgment order. The Court was deeply divided in its reasoning.

The single Justice OAJC authored by Mr. Chief Justice Cappy concluded that a product is not defective if it is safe for its intended user. Id. at 1005. The OAJC rejected the plaintiff's argument that a manufacturer should be responsible for harm to a foreseeable albeit unintended user, opining that foreseeability concepts have no application in strict liability theory and foreseeable users may recover by proving negligence. Among other things, the OAJC recognized that some strict liability decisions had relied upon foreseeability principles but the opinion denounced the practice and would have reaffirmed the firm conceptual distinction between strict liability and negligence causes of action. Id. at 1007 (citing Davis v. Berwind Corp., 690 A.2d 186 (Pa. 1997)). "Recognition that strict liability is not a type of mongrel derivative of negligence is also consistent with the historical development of this cause of action. Strict liability was intended to be a cause of action separate and distinct from negligence, designed to fill a perceived gap in our tort law." Id. (citing Azzarello, 391 A.2d at 1023-24). In a footnote, the OAJC noted the supplier's alternative argument relating to the Third Restatement, but deemed it waived. Mr. Justice Nigro concurred in the result, without an opinion. Madame Justice Newman filed a concurring and dissenting opinion, in which she agreed with the OAJC that the strict liability claims

failed because the lighter was safe for its intended use by adults; Justice Newman dissented from that part of the opinion addressing the disposition of the plaintiff's negligence claim. Id. at 1024 (Newman, J., concurring and dissenting).

Mr. Justice Saylor authored a concurring opinion, which this author and Mr. Justice Eakin joined. Justice Saylor advocated taking the opportunity to address foundational matters, to reassess Pennsylvania's Second Restatement approach, and to examine the range of readily accessible, corrective measures, including adoption of the Third Restatement. In relevant part, the concurrence addressed three points: first, that strict liability doctrine is embedded with concepts central to negligence theory; second, that ambiguities and inconsistencies in prevailing strict liability jurisprudence affected the proper disposition of the appeal; and third, that the Third Restatement's approach would provide the most viable route to clarification and remediation of strict liability jurisprudence in Pennsylvania.

On the first point, Justice Saylor noted that the Second Restatement articulation for the strict liability cause of action posed difficulties in application to design defect claims. At origin, Justice Saylor explained, the standard derived from manufacturing defect cases, in which "something went wrong in the manufacturing process" and the resulting product was not as safe as intended. The core objectives of the Second Restatement had been to relieve consumer-plaintiffs of the burden of proving that the supplier had exercised due care in the manufacturing process (necessary to prove negligence), and to spread the risk of loss among consumers. But, Justice Saylor observed, courts had since recognized the "limitations of the just implementation of loss spreading via judicially crafted doctrine." Id. at 1013 n.3 (citing Duchess v. Langston Corp., 769 A.2d 1131, 1145 (Pa. 2001)). Consistent with its purposes, the Second Restatement declared a supplier liable even if it exercised all possible care in the

preparation and sale of the product. But, application of the doctrine was limited to defective products **unreasonably** dangerous to the consumer or his property. The concurrence noted that the Second Restatement formulation, as a result, contained an internal tension: the strict liability rule "was tempered by a negligence-based concept of defect." In application to design defect claims, the concurrence further observed, courts in Pennsylvania recognized "an integral role for risk-utility (or cost-benefit) balancing, derived from negligence theory." Id. at 1013-14 (citing Azzarello, 391 A.2d at 1026; Burch v. Sears, Roebuck & Co., 467 A.2d 615, 618 (Pa. Super. 1983); Dambacher v. Mallis, 485 A.2d 408, 422 (Pa. Super. 1984)). As a result, while the rhetoric of retaining a firm separation between strict liability and negligence remained pervasive in decisional law, in application, the distinction was unnecessary: "[i]n design cases the character of the product and the conduct of the manufacturer are largely inseparable." The concurrence advocated recognition of the essential role played by negligence-derived risk-utility balancing in design defect litigation. Id. at 1015-16.

Relating to the second point, the concurrence offered a critique of Azzarello, which is particularly relevant since Omega Flex echoes the analysis in this appeal. According to the concurrence, courts have implemented the Azzarello decision by: (1) assigning the risk-utility balancing to trial courts on the facts most favorable to the plaintiff; and (2) providing juries with minimalistic instructions that, in an effort to insulate the jury from negligence terminology, "lack essential guidance concerning the nature of the central conception of product defect." Because the jury is not permitted to consider the cost-benefit factors, neither judge nor jury "actually decide whether the true benefits of the proposed alternative design outweigh the true cost" and whether the product is in fact unreasonably dangerous or defective. Furthermore, the concurrence added that, by omitting the critical "unreasonably dangerous" limitation on liability or cost-benefit

instructions, the Azzarello-approved charge fails to define the term "defect" clearly, and consequently fails to guide the jury in distinguishing products safe and unsafe for their intended use. The concurrence also noted that the use of the term "guarantor" in relation to the manufacturer is not a sufficient limitation on liability, especially because the term "to a lay jury will surely seem indistinguishable from 'insurer.'" 841 A.2d at 1016-18 (citing Thomas, 71 Temp. L. Rev. at 225 & 232). The concurrence advocated correction of this jurisprudence in the interest of justice.

On the final point, the concurrence suggested the Third Restatement as a viable alternative articulation of the standard of proof, with the potential to resolve the persisting difficulties and to enhance fairness and efficacy in the liability schema. Id. at 1021. According to the concurrence, the Third Restatement's negligence-derived standard represents "the distilled expression of thirty years of design-defect litigation." The concurrence summarized the general rule of the Third Restatement as follows: "a product is deemed defective in design when the foreseeable risks could have been reduced or avoided by the use of a reasonable alternative design, and when the failure to utilize such a design has caused the product to be 'not reasonably safe.'" The concurrence explained that design defect liability under the Third Restatement is predicated upon a concept of responsibility in which the determination is made by reference to an independent assessment of advantages and disadvantages, rather than by reference to the manufacturer's own design or marketing standards, which are in fact alleged to be unreasonable by the plaintiff. Moreover, the concurrence stressed, products are not defective simply because they are dangerous. Relevant to the issue in Phillips, the concurrence added that the Third Restatement expressly incorporates notions of reasonable foreseeability that would temper the exclusive reliance on the risk-utility test. In the view of the concurrence, the Third Restatement provided the best-

balanced and reasoned approach to strict liability in Pennsylvania. On a final note, the concurrence opined that application of the strict liability doctrine should be closely limited until the existing substantial deficiencies in the strict liability schema are addressed and remedied by the Court.

In 2006, the Court decided General Services, the case upon which Omega Flex relies extensively. The Court there awarded the supplier a new trial, holding that the trial court erred in failing to instruct the jury that a supplier is liable only for harm that occurs in connection with the intended use of a product by an intended user. 898 A.2d at 600 (citing Phillips, 841 A.2d at 1007 (OAJC); id. at 1018 (Saylor, J., concurring, joined by Castille & Eakin, JJ.); id. at 1023 (Newman, J., concurring and dissenting). In General Services, a Commonwealth agency asserted claims in strict liability against, inter alia, the manufacturer of a synthetic chemical detected on surfaces and in the ambient air of the Transportation and Safety Building, an office tower in Harrisburg, following a fire that consumed building materials containing the chemical. The supplier offered proposed jury instructions, which the trial court rejected, that would have distinguished between the supplier's liability exposure for fire-related and other contamination with the synthetic chemical.

In an opinion by Justice Saylor, the General Services Court noted the consensus in Phillips, supra, against "expanding the scope of manufacturer liability without fault in a generalized fashion" pending an overhaul of strict liability doctrine by the Court. In this respect, the Court acknowledged that accidental combustion of the building materials was foreseeable and that an argument could be made for the notion that safety for an intended use of the materials should be deemed to encompass safety under such circumstances. The Court nevertheless rejected the argument that expansion of liability premised upon negligence-based foreseeability considerations was warranted,

emphasizing an incongruity with simultaneously constraining a supplier's resort to negligence-based use-related defenses. See 898 A.2d at 600-04. Absent expansion of liability, the Court explained, the Commonwealth agency could not recover damages caused by the incineration of building materials, which was not a use intended by the manufacturer. A cause of action in strict liability remained viable for harm caused by contamination of the Commonwealth agency's office building through off-gassing of the chemical. Id. at 604.[15]

Poised to address foundational questions relating to the application of the strict liability doctrine in Pennsylvania, in 2008, the Court granted allowance of appeal in Bugosh v. I.U. North Am., Inc., 942 A.2d 897 (Pa. 2008) (*per curiam*). In 2009, however, the Court dismissed the ensuing appeal as improvidently granted; Justice Saylor, joined by this author, dissented from the summary disposition. See Bugosh, 971 A.2d at 1228; id. at 1229-44 (Saylor J., dissenting, joined by Castille, C.J.).

In a dissenting statement, Justice Saylor reiterated that foundational concerns persisted in the area of strict liability and, by way of background, recapitulated the main

---

[15] Also of note, in General Services, Justice Newman dissented in part, and Mr. Justice Baer joined Justice Newman's expression. The dissent argued that the matter implicated not a misuse of the product by a user, as Phillips had, but a situation in which during an intended use by an intended user, the product was exposed to easily anticipated conditions. Justice Newman would have found the doctrine of strict liability applicable, on a theory akin to the "crashworthiness exception," and would have denied the manufacturer's request for a new trial. Id. at 619. Omega Flex argues that the Tinchers relied upon the theory described by the dissent and rejected by the General Services majority. But, the General Services majority noted that its "discussion [did] not address a situation in which a defect in the building materials is the cause of combustion occurring during their ordinary use." 898 A.2d at 601 n.11. The Tinchers' allegations are precisely that a defect in the CSST was a cause of the fire occurring during the CSST's ordinary use. The decision in General Services is, as a result, distinguishable on its face, notwithstanding Omega Flex's arguments to the contrary.

points of the <u>Phillips</u> concurrence. The dissent also noted that the categorical divide between strict liability and negligence principles, articulated in the cases, is most readily justified in manufacturing defect cases; claims implicating design or warning defect, however, are far more problematic. Relevant to design defect claims, the dissent explained that doctrinal limiting principles evolved to contain the liability of product suppliers because traditional notions of strict liability were ill-suited to a tort regime with a largely open-ended damages scheme and the reality that all product designs are capable of contributing to human injury. According to the dissent, the alternative of a judicially imposed mandatory insurance scheme upon the business community is unpalatable and incongruent with the general rejection of a pure loss-spreading tort system. <u>Id.</u> at 1234-35 & n.10 (citing <u>Cafazzo v. Central Med. Health Servs., Inc.</u>, 668 A.2d 521, 526 (Pa. 1995); <u>Coyle</u>, 584 A.2d at 1387). The dissent suggested a negligence-derived risk-utility approach to limiting supplier liability, aimed at establishing liability boundaries and reconciling strict liability doctrine with the historical grounding of tort law in notions of corrective justice. In this regard, the dissent noted with approval decisional law regarding policy justifications for limiting supplier liability: "incentivizing safer design by rewarding careful manufacturers; the recognition that a verdict for a plaintiff in a product liability case is tantamount to a determination that an entire product line is defective, and therefore, the higher threshold of fault is justified; a fault system incorporates greater intrinsic fairness by not burdening manufacturers and their customers with the cost of insuring against all possible losses; and liberalized modern discovery rules should enable plaintiffs to learn the facts surrounding manufacturers' deliberate design decisions." <u>Id.</u> at 1235 & n.9 (citing <u>Prentis v. Yale Mfg. Co.</u>, 365 N.W.2d 176, 185 (Mich. 1984)); <u>see</u> <u>also</u> <u>id.</u> at 1239-40; 1235 n.11 (quoting Wm. A.

Worthington, THE "CITADEL" REVISITED: STRICT TORT LIABILITY AND THE POLICY OF LAW, 36 S. Tex. L. Rev. 227, 250-52 (1995)).

Going forward, the dissent advocated moving beyond the doctrinal divide between strict liability and negligence principles that was articulated by Azzarello. Azzarello, according to the dissent, was not reasoned well in its time and has not withstood the test of time. Id. at 1236-37 (criticizing, *inter alia*, Azzarello Court's reliance on Cronin, 501 P.2d 1153, and Glass v. Ford Motor Co., 304 A.2d 562 (N.J. Super. Ct. Law Div. 1973)). The dissent suggested that existing jurisprudence attempting to justify the doctrinal divide upon loss-spreading and deterrence-based rationales was stated in "too conclusory terms" and "too powerful" language to be well-reasoned. "Courts are not experts in manufacturer behavior, and there are equally reasonable arguments to be made that a negligence-based standard does more to encourage safer products than an absolute liability scheme. Moreover, courts and commentators have noted that these types of unsupported social policy judgments can have tremendous social consequences." Id. at 1239 (citing Prentis, supra; David G. Owen, SYMPOSIUM: A TRIBUTE TO PROFESSOR DAVID FISCHER: DESIGN DEFECTS, 73 Mo. L. Rev. 291, 296 (2008)). Among the consequences, the dissent noted that when a verdict for the plaintiff in a design defect case effectively suggests that an entire product line is defective, the consequence may involve a significant portion of a supplier's assets and deprive the public of the product. On a broader scale, such a liability scheme has the potential to unduly disrupt product investment and innovation. Id.; see also Beard, 41 A.3d at 837 (same). According to the dissent, these potential effects are relevant in any viable strict liability scheme.

The dissent recognized some force in the argument that the General Assembly is best positioned to alter the existing product liability schema. But, the dissent noted,

because the Legislature had not occupied the arena, which remained in a state of substantial disrepair that had "taken our jurisprudence too far from the legitimate home of tort law in the concept of corrective justice," action by the Court was permissible and necessary. "To the degree a distinct category of 'strict' product liability doctrine is necessary, at most, it always has been, and rationally should be, one of quasi-strict liability, tempered, in design and warning cases, with the legitimate involvement of notions of foreseeability and reasonableness within the purview of the fact finder." Id. at 1240. The dissent then suggested filling the "substantial void" that would be left by disapproval of Azzarello with a prospective movement to the Third Restatement position.

Importantly, as an alternative, the dissent suggested that, while continuing the search for the perfect vehicle by which to devise a replacement strict liability scheme, the Court could "at least depart from Azzarello prospectively, thus clearing a path for our common pleas and intermediate appellate courts to consider the reasoned recommendations of the Third Restatement, as well as other reasoned alternatives and/or refinements." Bugosh, 942 A.2d at 1241. This latter approach would be adequate because the difficulties described by the dissent are with Azzarello rather than the Second Restatement itself. In the dissent's view, the Court should start by reaffirming the understanding that "modern products liability law rests fundamentally on the premise that manufacturers are fairly held to answer in the courts for the basic safety of their products' designs." Id. at 1242 (citing Owen, 73 Mo. L. Rev. at 291). The dissent suggested that, in that scenario, the Legislature could appropriately undertake timely, comprehensive reform in light of the broader tools that it has available for weighing competing interests.

In 2008, in parallel to the proceedings in <u>Bugosh</u>, the Court denied the request of the U.S. Court of Appeals for the Third Circuit for certification of a question of law relating to the application under Pennsylvania law of the intended use doctrine to prevent recovery in strict liability by innocent bystanders. <u>See</u> <u>Berrier</u>, 959 A.2d at 901 (*per curiam*). In a concurring statement, Justice Saylor noted his preference for addressing the global issues pervading strict liability doctrine, before engaging in the collateral effects implicated by the certified question. Relating to the application of the intended user doctrine to limit liability, the concurrence observed that fair compensation to bystanders was not precluded but, rather, it was channeled into negligence theory, where claims would rise or fall on their merits. <u>Id.</u> (Saylor, J., concurring, joined by Castille, C.J.).[16]

In other relevant developments, the U.S. Court of Appeals for the Third Circuit has predicted that, if this Court were to directly confront the issue, we would adopt the Third Restatement's formulation of the strict liability doctrine. <u>See</u> <u>Berrier</u>, 563 F.3d at 40. The Third Circuit reasoned that Justice Saylor's concurring opinion in <u>Phillips</u> foreshadowed this Court's adoption of Sections 1 and 2 of the Third Restatement's definition of the strict liability cause of action. <u>Id.</u> at 53. The <u>Berrier</u> Court went on to apply Third Restatement principles to permit a bystander, as distinguished from a user

---

[16] In several recent cases, the Court resolved other claims tangential to fundamental concepts of strict liability. <u>See</u> <u>Schmidt</u>, 11 A.3d at 939-41 (implicating issues relating to product-line exception to general rule of successor non-liability, and to whether plaintiff must show physical injury as threshold for recovery in strict liability); <u>Beard</u>, 41 A.3d 823 (trial courts not restricted to considering single use of multi-use product in design defect, threshold, risk-utility balancing); <u>Reott v. Asia Trend, Inc.</u>, 55 A.3d 1088 (Pa. 2012) (supplier asserting that injured plaintiff's "highly reckless conduct" is sole and superseding cause of injury must plead and prove claim as affirmative defense); <u>Lance v. Wyeth</u>, 85 A.3d 434 (Pa. 2014) (drug manufacturer subject to liability in negligence for design defect).

or consumer, to state a cause of action in strict liability.  Id. at 61 (intended user doctrine does not bar strict liability claim; vacating trial court's decision to grant summary judgment).  See also Covell v. Bell Sports, Inc., 651 F.3d 357 (3d Cir. 2011) (Third Circuit applies Third Restatement, in accordance with which evidence of industry standards is admissible because such evidence is relevant to question of whether product is defective).[17]

### C.     The Continuing Viability of Azzarello and Its Progeny

In this case, the question is posed of whether the rationale of Azzarello, and its progeny, should retain viability.  Precedent, of course, is not infallible; if we are to ensure both the perception and the reality of justice, we must be willing to reexamine precedent if it is demonstrated that a prior rule does not serve, or no longer adequately serves, the interests of justice.  See Ayala, 305 A.2d at 888; Carney, 79 A.3d at 505.

Here, the parties agree that the decision in Azzarello articulates governing legal concepts which fail to reflect the realities of strict liability practice and to serve the interests of justice.  Several members of this Court have suggested in the past this very assessment of Azzarello.  See, e.g., Phillips, 841 A.2d at 1016-18 (Saylor, J., concurring, joined by Castille and Eakin, JJ.); Berrier, 959 A.2d at 901 (Saylor, J.,

---

[17]     Until Berrier, in diversity jurisdiction matters, the Third Circuit applied Pennsylvania law as articulated in Azzarello.  The Third Circuit predicted that this Court would utilize a risk-utility analysis in making the Azzarello threshold determination of whether the risk of loss should be placed on the supplier.  The Circuit recognized that this Court had not expressly approved of risk-utility approach in design defect matters; the Third Circuit relied instead upon Superior Court precedent and inquired into consistency with this Court's pronouncements in existing decisional law.  Surace v. Caterpillar, Inc., 111 F.3d 1039, 1043-47 (3d Cir. 1997) (citing Lewis, supra, and Dambacher v. Mallis, 485 A.2d 408, 423 n.5 (Pa. Super. 1984)).

concurring, joined by Castille, C.J.); Bugosh, 971 A.2d at 1236-37 (Saylor, J., dissenting, joined by Castille, C.J.). We agree that reconsideration of Azzarello is necessary and appropriate and, to the extent that the pronouncements in Azzarello are in tension with the principles articulated in this Opinion, the decision in Azzarello is overruled. We add the following observations.

As we have noted, Azzarello held that the phrase "unreasonably dangerous" is *per se* misleading to lay jurors and, as a result, the Court dictated that any questions relating to the risks and utilities of a product are to be decided by the trial court as a matter of law and policy. Moreover, Azzarello approved, and thereby essentially required, instructions which informed the jury that, for the purposes of a supplier's strict liability in tort, "the product must, therefore, be provided with every element necessary to make it safe for its intended) use." 391 A.2d at 1025 & 1027 n.12. Subsequent decisional law has applied Azzarello broadly, to the point of directing that negligence concepts have no place in Pennsylvania strict liability doctrine; and, as we explain, those decisions essentially led to puzzling trial directives that the bench and bar understandably have had difficulty following in practice, including in the present matter. Cf. Phillips, supra.

The Azzarello Court premised its broad holding on the assumption that the term "unreasonably dangerous" is misleading to jurors because it "tends to suggest considerations which are usually identified with the law of negligence." 391 A.2d at 1025. Although that general notion had some support in prior observations in Pennsylvania cases, see Berkebile, 337 A.2d at 899-900 (Jones, C.J.), the Azzarello Court cemented the notion by focusing on the expression "unreasonably dangerous" out of the context of the jury charge in which it appeared and pressing upon it a deceptively simple, and indeed dogmatic, significance. See Commonwealth v. Murphy, 739 A.2d

141, 146 (Pa. 1999) (Court evaluates jury charge to determine whether it is accurate and clear statement of law; charge is read and considered in its entirety, and its general effect controls); accord Commonwealth v. Sepulveda, 55 A.3d 1108, 1142 (Pa. 2012); Commonwealth v. Lesher, 373 A.2d 1088, 1091 (Pa. 1977).

That the Azzarello Court keyed into a negligence-strict liability dichotomy may be explained by the Second Restatement's explicit reference to negligence in the negative, *i.e.*, that compensation under Section 402A does not require proof of due care. The Court parsed the language of the Second Restatement, particularly the terms "defective condition" and "unreasonably dangerous," for a precise meaning and the reporter's intent in the utilization of those terms. See 391 A.2d at 1024-25 ("We must focus upon two **requirements** set forth in Section 402A for liability (physical injury) that the product be 'in defective condition' and that it be 'unreasonably dangerous.'") (emphasis added). But, Section 402A does not articulate legal "requirements" as a statute may; and, moreover, the "intent" of the reporter is, of course, not due the same weight as a pronouncement of legislative intent in statutory construction. Any given restatement section simply states, or restates, principles of the common law, general rules reflecting a purported consensus, whose validity ultimately depends on the reasoning that supports them. Coyle, 584 A.2d at 1385. Yet, the Azzarello Court seemed to engage in a statutory-type construction of Section 402A, including by proceeding to presume every part of Section 402A effective. The rule derived by Azzarello premised upon this type of analysis is that negligence concepts and rhetoric -- although addressed in the negative by the Restatement -- somehow affected a plaintiff's burden of proof in all strict liability cases, regardless of the pertinent facts.

Speaking in generalities, the Azzarello Court concluded that negligence-related rhetoric saddles a plaintiff in a strict liability case with an additional and unwarranted

burden of proof in every case. 391 A.2d at 1025 (quoting <u>Cronin v. J.B.E. Olson Corp.</u>, 501 P.2d 1153, 1161-62 (Cal. 1972)). The facts of <u>Azzarello</u>, when viewed with the appropriate judicial modesty, did not require such a broad pronouncement. The issue of "jury confusion" there arose in a distinct, fact-bound context of a jury trial in which claims of strict liability and counter-claims of negligence were asserted against distinct parties. The <u>Azzarello</u> Court offered no explanation of either the nature of the perceived unwarranted additional burden nor how that burden altered the liability calculus for the <u>Azzarello</u> jury. Nor did the <u>Azzarello</u> Court explain the leap in logic necessary to extrapolate that every lay jury would relate reasonableness and other negligence terminology, when offered in a strict liability charge, to a "heavier," negligence-based burden of proof. Jury charges are generally delivered orally to ordinary citizens, and not by written transmission to be pored over by scholars or lawyers aware of other forms of liability not always at issue. <u>See</u> <u>Sepulveda</u>, 55 A.3d at 1142. The concern with across-the-board jury confusion, especially where counsel is there to suggest adaptation of standard charges and to hear the charge as a whole, is simply overstated. <u>See</u> <u>id.</u> Distinctions in theories of products liability are no more or less confusing than in other difficult areas of law -- note, as but one example, the shifting burdens, levels of proof, and consensus requirements in the penalty phase of a capital case. It is generally "incumbent upon the parties, through their attorneys, to aid courts in narrowing issues and formulating appropriate instructions to guide juries in their factual determinations . . . ." <u>Scampone</u>, 57 A.3d at 598. Yet, the <u>Azzarello</u> Court issued a decision that conflated a determination of the facts and its related yet distinct conceptual underpinnings, which essentially perpetuated jury confusion in future strict liability cases, rather than dissipating it.

The Azzarello Court found support for its holding not in the Restatement itself, or in any source of Pennsylvania law, but in the decisions of the Supreme Court of California in Cronin, 501 P.2d 1153, and of the New Jersey Superior Court in Glass, 304 A.2d 562. While a broad application of Cronin could support the Azzarello Court's formulation, it is notable that the rationale of the decision was explained as significantly narrower by latter California Supreme Court decisional law. See Barker, 573 P.2d at 446. Meanwhile, Glass was actually disapproved by the New Jersey Supreme Court in Cepeda v. Cumberland Engineering Co., 386 A.2d 816, 829 (N.J. 1978), overruled on other grounds by Suter v. San Angelo Foundry & Mach. Co., 406 A.2d 140 (N.J. 1979) (superseded in part by statute). Pennsylvania, unfortunately, did not adjust its jurisprudence in light of these developments that eroded Azzarello's underpinnings.

It is also worth noting that Azzarello was distinguishable from Cronin on the facts. In Cronin, the defendant challenged on appeal the trial court's decision to deny an instruction to the jury, which provided in pertinent part that, in addition to adducing proof of a defect, the plaintiff had the burden of proving "[t]hat the defective condition made it unreasonably dangerous to the user or consumer." 501 P.2d at 1158 n.6. The defendant suggested a distinction between the two elements of proof, reminiscent of liability for an abnormally dangerous activity, such as blasting. See RESTATEMENT (2D) OF TORTS § 519(1) ("One who carries on an **abnormally dangerous activity** is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.") (emphasis added); see also id. §§ 520-524A. The Cronin Court rejected the defendant's challenge to the jury instructions, on the ground that it placed an unwarranted burden of proof on the plaintiff.

Importantly, decisional law eschews the Cronin defendant's application of Section 402A, and the causes of action in strict liability for products and for an abnormally dangerous activity are recognized as carrying distinct burdens for the plaintiff. By comparison, in Azzarello, the error of which the plaintiff complained on appeal was that speaking of reasonableness in a jury instruction issued in a case in which only negligence allegations were made against a cross-defendant/employer tended to mislead the jury as to the plaintiff's burden of proof in its own distinct strict liability case against the defendant/manufacturer. While similar considerations may have been pertinent, certainly a nuanced analysis of the Cronin decision in the context of the Azzarello arguments would have served for better generalized guidance to the bench and bar.

This case speaks volumes to the necessity of reading legal rules -- especially broad rules -- against their facts and the corollary that judicial pronouncements should employ due modesty. See Maloney, 984 A.2d at 489–90 ("For one thing, it is very difficult for courts to determine the range of factual circumstances to which a particular rule should apply in light of the often myriad possibilities"; of particular concern is "the possibility that words or phrases or sentences may be taken out of context and treated as doctrines."). As courts have struggled with the application of the deceptively simple Azzarello rule that a jury must be insulated from negligence concepts and rhetoric in strict liability cases, decisional law has lapsed into an arguably unprincipled formulaic application of rhetoric, threatening to render the strict liability cause of action hopelessly unmoored in modern circumstances.

Compounding the problem of extrapolating broad lessons from very particular circumstances, the Azzarello Court accomplished its goal of insulating juries from negligence concepts and rhetoric by: (1) holding that the determination "as to the risk of

loss" is a decision to be made by the trial court rather than the jury; and (2) "approving" jury instructions in strict liability cases generally. The Court explained this decision by saying that: "While a lay finder of fact is obviously competent in resolving a dispute as to the condition of a product, an entirely different question is presented where a decision as to whether that condition justifies placing liability upon the supplier must be made." The Court then suggested that it is within the trial court's bailiwick to answer questions of law whose resolution "depends upon social policy" such as: "Should an ill-conceived design which exposes the user to the risk of harm entitle one injured by the product to recover? Should adequate warnings of the dangerous propensities of an article insulate one who suffers injuries from those propensities? When does the utility of a product outweigh the unavoidable danger it may pose?" According to the Court, "[i]t is a judicial function to decide whether, under plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint. They do not fall within the orbit of a factual dispute which is properly assigned to the jury for resolution." Without further explanation of these broad assumptions, bottomed on notions of social policy, the Court concluded that "[a] standard suggesting the existence of a 'defect' if the article is unreasonably dangerous or not duly safe is inadequate to guide a lay jury" and adopted in its stead a formulation by which the seller would be held liable unless the seller "provide[d] with the product every element necessary to make it safe for use." 391 A.2d at 1025-27 (quoting Berkebile, 337 A.2d at 902 (Jones, C.J.)). The 1987 decision in Lewis acknowledged Azzarello's innovation, noting that it offered a distinct standard from either a risk-utility test or a consumer expectation test. 528 A.2d at 593.

The Azzarello Court attributed the new standard of proof to the one-justice lead opinion of Chief Justice Jones in Berkebile, which the Court quoted out of context. Additionally, the endorsed jury charge significantly altered the import of the Berkebile passage. Compare Berkebile, 337 A.2d at 902 (Jones, C.J.) (emphasis added) ("seller must **provide with the product every element** necessary to make it safe for use"; notion of defect includes claim for failure to warn, in addition to claims for manufacturing and design defects) (emphasis added) with Azzarello, 391 A.2d at 1027 n.12 ("**product must**, therefore, **be provided with every element** necessary to make it safe for (its intended) use, and without any condition that makes it unsafe for (its intended) use") (emphasis added). Predictably, the "approval" of such jury instructions operated to discourage the exercise of judicial discretion in charging the jury, including in the Tinchers' case, and likely stunted the development of the common law in this area from proceeding in a more logical, experience-based and reason-bound fashion. See, e.g., N.T., 10/20/2010, at 825 (emphasis added).

The greater difficulty is that the Azzarello standard is impracticable. As an illustration of its new standard's application, the Azzarello Court offered that a supplier is not an insurer of a product, although it is a guarantor; these terms of art, with no further explanation of their practical import, also mirrored the standard jury charge approved by Azzarello. The Court did not purport to articulate a departure from the Second Restatement formulation, nor did it discuss the reasoning for or implications of doing so. Yet, the Azzarello Court chose this iteration of the law to fill the legal void caused by its bright-line rule that any negligence rhetoric carries an undue risk of misleading lay jurors in strict liability cases.

Omega Flex, subscribing to existing criticism of this scheme, faults Azzarello for (1) removing from the jury the risk-utility calculus implicated in what Azzarello called "the

risk of loss" determination; and (2) requiring the trial court to make the determination before the facts even are in evidence, premised merely upon the plaintiff's allegations and with all inferences benefitting the plaintiff. Although the argument is not explicitly made to this Court, the obvious suggestion is that the scheme burdens the defendant's right to a fair jury trial. Setting aside any potential, but here unpreserved, due process or right to a jury claims, the unsupported assumptions and conclusory statements upon which Azzarello's directives are built are problematic on their face.

First, the notion that a legal inquiry into "whether that condition justifies placing liability upon the supplier" (product is unreasonably dangerous) is, albeit distinguishable, entirely separable from a factual inquiry into the predicate "condition of a product" (defective condition of product) when determining whether to affix liability upon a supplier is incompatible with basic principles of strict liability. Thus, in a jurisdiction following the Second Restatement formulation of strict liability in tort, the critical inquiry in affixing liability is whether a product is "defective"; in the context of a strict liability claim, whether a product is defective depends upon whether that product is "unreasonably dangerous." Yet, Azzarello divorced one inquiry from the other: under the Azzarello scheme, the trial court serves as the gate-keeper of one question with the apparent task of deciding as a matter of law and policy whether a product is one even susceptible to a strict liability claim. As a practical matter, the Azzarello decision did not indicate at which point of the trial the court should consider the question, nor what pleadings or evidence would be relevant to the inquiry; the Court did suggest, however, that the matter "d[id] not fall within the orbit of a factual dispute." 391 A.2d at 1026.

Second, the practical reality, as exemplified by the matter before us, is that trial courts simply do not necessarily have the expertise to conduct the social policy inquiry into the risks and utilities of a plethora of products and to decide, as a matter of law,

whether a product is unreasonably dangerous except perhaps in the most obvious of cases (*e.g.*, where injury is caused by a knife), where a gate-keeper's function is hardly necessary. In this case, Omega Flex moved for summary judgment before trial, a nonsuit after the close of the Tinchers' case, and then renewed the motion for a nonsuit after both parties rested, asking the court to determine whether the TracPipe System was unreasonably dangerous. Although the trial court denied all motions, the court addressed the merits of the risk-utility calculus on the record only in the context of the motions for nonsuit. See N.T., 10/18/2010, at 514-15 ("The [trial c]ourt had denied the [summary judgment] motion, presumably, although I don't know for sure, because it thought this might be an issue of fact that needed to be heard at trial."). Given the opportunity to rule on Omega Flex's motions for nonsuit, the trial court reviewed the evidence introduced at trial before denying the motions, in addition to evidence deemed inadmissible at trial -- *i.e.*, proof of a redesigned TracPipe System, marketed as "Counterstrike," that was resistant to lightning strikes. See id. at 514-26 & 721-41; Tr. Ct. Op., 8/5/2011, at 11-20. This matter illustrates that the assumptions upon which the Azzarello Court assigned the task of determining whether a product is unreasonably dangerous are impractical. In the alternative, a strict reading of Azzarello is undesirable because it would encourage trial courts to make either uninformed or unfounded decisions of social policy that then substantially determine the course and outcome of the trial.

Subsequent application of Azzarello elevated the notion that negligence concepts create confusion in strict liability cases to a doctrinal imperative, whose merits were not examined to determine whether such a bright-line rule was consistent with reason in light of the considerations pertaining to the case. Beyond the merits of the narrow holdings in the several cases, the effect of the *per se* rule that negligence rhetoric and

concepts were to be eliminated from strict liability law was to validate the suggestion that the cause of action, so shaped, was not viable, and to invite calls for reform. In 2009, the Third Circuit predicted that this Court would simply adopt the Third Restatement approach to the strict liability doctrine; this Court has not taken that decisional leap.

### D. The Strict Product Liability Cause of Action in Pennsylvania

Overruling Azzarello leaves a gap, going forward, in our strict liability jurisprudence. The preferable solution may be to have the General Assembly address this arena of substantive law. But, so long as the possibility of comprehensive legislative reform remains unlikely or uncertain, this Court retains the authority and duty at common law to take necessary action to avoid injustice, uncertainty, delay, and the possibility of different standards and procedures being employed in different courtrooms throughout the Commonwealth. Accord Commonwealth v. Sanchez, 36 A.3d 24, 52 (Pa. 2011); see also Bugosh, 971 A.2d at 1240 & n.19 (Saylor, J., dissenting, joined by Castille, C.J.) (addressing legislative and judicial roles in strict liability arena). This is particularly so when the underlying problem derives from our own decisional law. The Court is positioned to take the necessary corrective action in this matter and offer guidance. See, e.g., Ayala, 305 A.2d at 883 (doctrine of immunity judicially imposed may be judicially terminated) (quoting Molitor v. Kaneland Community Unit Dist. No. 302, 163 N.E.2d 89, 96 (Ill. 1959) ("'Having found that doctrine to be unsound and unjust under present conditions, we consider that we have not only the power, but the duty, to abolish that immunity. We closed our courtroom doors without legislative help, and we can likewise open them.'")); see also Mayle v. Pa. Dep't of Highways, 388 A.2d

709, 720 (Pa. 1978) (Court may abolish judicial doctrine of sovereign immunity, which is manifestly unfair and non-constitutional in origin).

Strict liability in tort for product defects is a cause of action which implicates the social and economic policy of this Commonwealth. See Ash v. Continental Ins. Co., 932 A.2d 877, 884 (Pa. 2007) ("Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals.").[18] The policy was articulated by the concurring and dissenting opinion of Justice Jones in Miller, upon which the Webb Court relied in "adopting" the strict liability theory as a distinct cause of action in tort: those who sell a product (i.e., profit from making and putting a product in the stream of commerce) are held responsible for damage caused to a consumer by the reasonable use of the product. See Miller, 221 A.2d at 334-35 (Jones, J., concurring and dissenting). The risk of injury is placed, therefore, upon the supplier of products. Azzarello, 391 A.2d at 1023-24; accord Ellen Wertheimer, UNKNOWABLE DANGERS AND THE DEATH OF STRICT PRODUCTS LIABILITY: THE EMPIRE STRIKES BACK, 60 U. Cin. L. Rev. 1183, 1184-85 (1992). No product is expressly exempt and, as a result, the presumption is that strict liability may be available with respect to any product, provided

---

[18] Because the strict liability cause of action developed at common law, relevant policy justifications are derived from decisional law and scholarly commentary. As noted, the General Assembly has not spoken affirmatively in relation to the strict liability cause of action, although the Commonwealth has expressed its interest in protecting consumers in several arenas by statute. See, e.g., Act 387 of 1968, P.L. 1224 (reenacted as Act 260 of 1976, P.L. 1166) (the "Unfair Trade Practices and Consumer Protection Law"). The fair presumption arising from the General Assembly refraining for 50 years from acting otherwise is that the General Assembly has at least acquiesced in the existence of the common law strict liability cause of action. See Everhart, 938 A.2d at 307; compare Phoenixville Hosp. v. Workers' Comp. Appeal Bd. (Shoap), 81 A.3d 830, 834-35 (Pa. 2013) (General Assembly amended statute to address gap which, in interim nine years, had been governed by common law).

that the evidence is sufficient to prove a defect.  See RESTATEMENT (2D) OF TORTS §
402A cmt. b (cause of action in strict liability "cover[s] the sale of **any product** which, if
it should prove to be defective, may be expected to cause physical harm to the
consumer or his property") (emphasis added); accord Prosser, 69 Yale L. J. 1103-04;
but see Hahn v. Richter, 673 A.2d 888 (Pa. 1996) (manufacturer immune from strict
liability defective design claim premised upon sale of prescription drugs without
adequate warning).

A broad reading of this policy statement suggests that liability would attach
absolutely, once the consumer or user suffers harm; indeed, early proponents
supported such an application.  See, e.g., Escola v. Coca Cola Bottling Co. of Fresno,
150 P.2d 436, 440 (Cal. 1944) (Traynor, J., concurring) ("In my opinion it should now be
recognized that a manufacturer incurs an absolute liability when an article that he has
placed on the market, knowing that it is to be used without inspection, proves to have a
defect that causes injury to human beings.").  But, experience has taught otherwise and,
in modern application, strict liability doctrine is a substantially narrower theory.  Prosser,
69 Yale L. J. at 1143-46 ("Few products can ever be made entirely safe, and the
producer cannot be made an insurer of every one who may possibly be hurt.").

To explain its proper boundaries post-Azzarello, we address the fundamental
underpinnings of the cause of action: the duty imposed by law and what constitutes a
breach of the duty; and we also advert to additional matters such as causation,
damages, defenses, and effects on other doctrines where necessary.


### 1.    The Duty

"Tort actions lie for breaches of duties imposed by law as a matter of social policy
. . . ."  Ash, 932 A.2d at 884.  Since the tide turned with New York's 1916 MacPherson

decision,[19] all American jurisdictions have accepted the existence of a duty in tort arising from the supplier-consumer relationship. Disagreement among jurisdictions remains in defining the nature of that duty. Thus, the policy of some jurisdictions is that those who engage in the business of selling a product are subject to a duty of due care in manufacturing and selling the product. See, e.g., Prentis, 365 N.W.2d at 186 (Michigan).[20] By comparison, the policy of those jurisdictions that have incorporated the Second Restatement into their common law is that those who engage in the business of selling a product are subject to both a duty of care in manufacturing and selling the product and a duty to sell a product free from a "defective condition." The duty spoken of in strict liability is intended to be distinct from the duty of due care in negligence. RESTATEMENT (2D) OF TORTS § 402A(2).

The duty in strict liability pertains to the duty of a manufacturer and of suppliers in the chain of distribution to the ultimate consumer. The Restatement offers a functional shorthand for the balancing of interests implicit in assessing the existence of the strict liability duty in tort between those in a consumer/user-supplier relationship. See Scampone, 57 A.3d at 606; cf. Althaus v. Cohen, 756 A.2d 1166, 1169 (Pa. 2000) (recognizing balancing calculus implicit in determining whether therapist owed parents

---

[19] MacPherson, supra, 217 N.Y. at 389 ("[i]f the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger"; discarding requirement to prove that product was inherently dangerous (e.g., "poisons, explosives, and things of like nature") to obtain compensation for harm caused by negligent conduct).

[20] But, even the development of the proper bounds of the duty of care was not without decades-long growing pains. See generally Martin v. Herzog, 126 N.E. 814 (N.Y. 1920); Palsgraf v. Long Island R. Co., 162 N.E. 99 (N.Y. 1928); The No. 1 of New York, 61 F.2d 783 (2d Cir. 1932); Sinram v. Pennsylvania R. Co., 61 F.2d 767 (2d Cir. 1932); U.S. v. Carroll Towing Co., 159 F.2d 169 (2d Cir. 1947).

of patient alleged duty of care (negligence)).  In incorporating the strict liability cause of action into Pennsylvania common law, the Webb Court expressly relied upon the Second Restatement and relevant scholarly commentary to supply its justification.  220 A.2d at 854.  Indeed, comments b, c, g, and m to Section 402A of the Second Restatement offer reasoned consideration of factors relevant in Pennsylvania to explain the existence and nature of a seller's duty in tort to a consumer.  In part, comment c explains that:

> [A] seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that public has a right to and does expect, in [the] case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that consumer of such products is entitled to the maximum of protection at the hands of someone, and proper persons to afford it are those who market the products.

RESTATEMENT (2D) OF TORTS § 402A cmt. c.

This reasoning explains the nature of the non-delegable duty articulated by the Second Restatement and recognized in Webb.  Stated affirmatively, a person or entity engaged in the business of selling a product has a duty to make and/or market the product -- which "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold" -- free from "a defective condition unreasonably dangerous to the consumer or [the consumer's] property."  Accord RESTATEMENT (2D) OF TORTS § 402A(1).

## 2.	Breach of Duty

Where a duty exists and, in the absence of a recognized immunity, the duty is breached, and the breach of the duty is causally connected to a compensable injury results, a tortious act results, regardless of whether the tortious act is construed colloquially as fault.  Compare Welch v. Outboard Marine Corp., 481 F.2d 252, 256 (5th Cir. 1973) ("Fault as the violation of a duty -- even in the absence of negligence -- agrees with civilian principles generally . . . .") with Putman, 338 F.2d at 913 n.8 ("[W]arranty (unlike negligence which is a tort concept based on fault) is not a concept based on fault or on the failure to exercise reasonable care.  But this does not mean that warranty is necessarily contractual or non-tortious in nature.").  To demonstrate a breach of duty in a strict liability matter, a plaintiff must prove that a seller (manufacturer or distributor) placed on the market a product in a "defective condition."

In this context, the concept of defective condition is a legal term of art, which denotes neither its colloquial import nor a scientifically immutable fact.  "The term 'defect' in design cases is 'an epithet -- an expression for the legal conclusion rather than a test for reaching that conclusion.'"  Prentis, 365 N.W.2d at 182 (quoting John W. Wade, ON PRODUCT "DESIGN DEFECTS" AND THEIR ACTIONABILITY, 33 Van. L. Rev. 551, 552 (1980)); accord John W. Wade, ON THE NATURE OF STRICT TORT LIABILITY FOR PRODUCTS, 44 Miss. L.J. 825, 831-32 (1973) (see infra n.21).  Stated otherwise, evidentiary considerations (e.g., what evidence tends to prove the existence of a legal defect) should not be mistaken for the question of whether a substantive duty in strict liability exists or should exist, or what constitutes a breach of that duty.  Accord Scampone, 57 A.3d at 606 (evidence of whether nursing home was similar to hospital not dispositive of whether nursing home owed patient substantive duty in tort); Gilbert v. Korvette, Inc., 327 A.2d 94, 96-97 (Pa. 1974) (correcting confusion regarding *res ipsa*

*loquitur* doctrine, which was "conceived as a shorthand statement of the evidentiary rule allowing negligence to be established by circumstantial proof" but erroneously developed into heightened burden of proving duty of care).  In Pennsylvania, the question of whether those who make or market products have duties in strict liability (in addition to negligence) has been answered in the affirmative by the 1966 decision in Webb.  The question which has proven substantially more difficult has been one of proof: what evidence is relevant to prove a "defective condition" and how should that evidence be weighed.

### 3.    The Standard of Proving "Defective Condition"
### In the Context of a Design-Related Claim[21]

Not least because of its colloquial use and attendant implications of a scientific level of certainty, courts across jurisdictions have struggled to articulate the legal notion of "defect" in a way that would account for such an alleged condition, encompassing the myriad products on the market, in a way that can effectively resonate with a jury.  The difficulty persists particularly with respect to defects in design.  See Bugosh, 971 A.2d at 1234 (Saylor, J., dissenting); see also Owen, 73 Mo. L. Rev. at 291-92 & n.2 (citing cases from other jurisdictions).  Dean John W. Wade[22] explained the difficulty as follows:

---

[21]    Our decision is limited to the context of a "design defect" claim by the facts of this matter, albeit the foundational principles upon which we touch may ultimately have broader implications by analogy.

[22]    John W. Wade was dean of Vanderbilt University's law school from 1952 to 1971, and a senior authority in the publication of the case law book "Prosser, Wade and Schwartz's Torts, Cases and Materials."

> [T]he term "defective" raises many difficulties. Its natural application would be limited to the situation in which something went wrong in the manufacturing process, so that the article was defective in the sense that the manufacturer had not intended it to be in that condition. To apply it also to the case in which a warning is not attached to the chattel or the design turns out to be a bad one or the product is likely to be injurious in its normal condition, is to use the term in a Pickwickian sense, with a special, esoteric meaning of its own. It is not without reason that some people, in writing about it, speak of the requirement of being "legally defective," including the quotation marks. To have to define the term to the jury, with a meaning completely different from the one they would normally give to it, is to create the chance that they will be misled. To use it without defining it to the jury is almost to ensure that they will be misled. . . . Finally, the term "defective" gives an illusion of certainty by suggesting a word with a purported specific meaning rather than a term connoting a standard involving the weighing of factors.

Phillips, 841 A.2d 1017-18 (Saylor, J., concurring) (quoting Wade, 44 Miss. L. J. at 831-32) (footnote omitted).

In addressing the disputed notion of "defective condition," we start with the assumption that, as with any other tort relationship, the supplier and the consumer are protecting legitimate but conflicting interests; the purpose of the court at common law is to evaluate the interests and articulate the principles based upon where the line is drawn in individual cases. See Glenn v. Point Park Coll., 272 A.2d 895, 899 (Pa. 1971). In any particular case, argumentation by a party -- with whatever creative flair is offered -- seeks to give ascendancy to that party's interests; the most persuasive arguments advance the interests of all parties, preferably in actuality but often simply in appearance. The role of the court in deciding questions of law, and dispositive motions, is to assess the validity of the argumentation and test it against the facts, the governing law, policy, and reason. The court's process "results in according or denying a privilege

which, in turn, determines liability." Id. In articulating rules at common law in this area, then, we also outline the socially acceptable bounds of a product's danger that form the predicate for conduct which the law regards as privileged. See id. This function helps to ensure regularity and predictability in the processes of law.

In the products liability arena, the individual consumer or user of the product retains primary interests in the safe continued use of a product and, relatedly, in the cost of any injury caused by the product. See Coyle, 584 A.2d at 1387 (quoting RESTATEMENT (2D) OF TORTS § 402A cmt. c). The consumer has additional economic, moral, and visceral interests in the sales price of the product, the availability of new or innovative products, and in any spillover effects (e.g., increased social welfare and reduced strain on public resources related to fewer injuries and improved health; increased employment, investment opportunities, value of shareholder equity). Accord, e.g., Tooey v. AK Steel Corp., 81 A.3d 851, 857 (Pa. 2013) (cost of workers' compensation scheme is paid by employer but, ultimately, passed on to consuming public). These interests are also shared by members of the public generally, albeit more diffusely. For the individual supplier, the assumed primary interest is to generate a sustained profit, above the cost of doing business. Accord Wertheimer, 60 U. Cin. L. Rev. at 1185. A supplier also retains complementary economic interests in maintaining a reputable name and in providing new or innovative products, which requires, among other things, financial flexibility beyond mere profitability. See Beard, 41 A.3d at 837 & n.16; Miller, 221 A.2d at 334-35 (Second Restatement reflects expectation that manufacturers and sellers will stand behind their products). Another motivating factor may be a moral interest in providing a safe product with minimal negative externalities or spillover effects (e.g., environmental impact). Concomitantly, suppliers across the

same and/or related industries may share similar, albeit diluted, interests regarding profitability and reputability on industry-wide bases.[23]

As they have been passed down to the present, the common law principles that delineate the strict liability cause of action, and the limits upon strict liability, reflect a balance of interests respecting what is socially or economically desirable. Accord Whitner v. Von Hintz, 263 A.2d 889, 893 (Pa. 1970) (common law notion of "proximate cause" allows periodic adjustment between recovery for wrong and limits upon liability to advance desirable policy outcomes). The calculus is sensitive to the varying magnitude of the interests and, sometimes perversely, to the force with which each interest is asserted from time to time. Compare Escola, 150 P.2d at 441 (Traynor, J., concurring) ("The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business."); Prosser, 69 Yale L. J. at 1119-22 (rejecting idea that "liability should **never** rest upon anything but fault," as "a position certainly out of date in this day and generation") with Bugosh, 971 A.2d at 1235 & n.9 (Saylor, J., dissenting) (citing Prentis, 365 N.W.2d at 185) (justifications for limiting liability include: "incentivizing safer design by rewarding careful manufacturers; the recognition that a verdict for a plaintiff in a

---

[23]    The more diffuse industry-wide and public interests are represented by the several *amici curiae* filing briefs in this matter. The following entities have filed briefs: (1) in support of Omega Flex: Crane Company, the Atlantic Legal Foundation, the Pacific Legal Foundation, the Pennsylvania Business Council et al., the Product Liability Advisory Council, Inc., and Sherwin-Williams et al.; and (2) in support of the Tinchers: the Pennsylvania Association for Justice. The *amici* offer essentially the same legal and policy arguments as those parties in support of whom their briefs were filed. We note that, although *amicus* arguments and interests will not be dispositive as a general proposition, their representation often affects the scope of the principle articulated (for example, *amicus*'s interests often offer the court a broader perspective on the relevant issues to appropriately narrow the holding).

product liability case is tantamount to a determination that an entire product line is defective. . . ; a fault system incorporates greater intrinsic fairness by not burdening manufacturers and their customers with the cost of insuring against all possible losses"); Worthington, 36 S. Tex. L. Rev. at 250-52 (addressing increase in cost of product liability insurance premiums)); accord Prosser, 69 Yale L. J. at 1104-06 (relating ascent of strict liability to "pitch of hysteria" following Department of Agriculture investigations into unsanitary and dangerously unsafe supply of food, and publication of "sensational novel" by Upton Sinclair); John F. Vargo, THE EMPEROR'S NEW CLOTHES: THE AMERICAN LAW INSTITUTE ADORNS A "NEW CLOTH" FOR SECTION 402A PRODUCTS LIABILITY DESIGN DEFECTS--A SURVEY OF THE STATES REVEALS A DIFFERENT WEAVE, 26 U. Mem. L. Rev. 493, 515-36 (1996) (describing internal criticism that membership of American Law Institute drafting Third Restatement "[wa]s largely comprised of those who represent[ed] corporate interests" and who "fail[ed] to leave the client at the door").

Against this background, two standards have emerged, that purport to reflect the competing interests of consumers and sellers, upon which all American jurisdictions judge the adequacy of a product's design: one measures "consumer expectations," and articulates the standard more from the perspective of the reasonable consumer; the second balances "risk" and "utility," and articulates the standard more from the perspective of the reasonable seller. Other jurisdictions and the Third Restatement have combined the two standards. See generally Owen, 73 Mo. L. Rev. at 299-300. We describe the alternatives.

**Consumer Expectations Standard**

The consumer expectations test defines a "defective condition" as a condition, upon normal use, dangerous beyond the reasonable consumer's contemplations. See,

e.g., Welch, 481 F.2d at 254; see also David G. Owen, PRODUCTS LIABILITY LAW, at § 5.6 (Hornbook Series) (2d ed. 2008) (hereinafter referred to as "Owen, HORNBOOK") (describing provenance and alternative formulations). The test offers a standard of consumer expectations which, in typical common law terms, states that: the product is in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer. See Welch, 481 F.2d at 254 ("A product is defective and unreasonably dangerous[, *inter alia*,] if the risks are greater than a reasonable buyer would expect."). The test has been described as reflecting the "surprise element of danger." Owen, HORNBOOK, at 303 n.12 (quoting Hon. Roger Traynor, THE WAYS AND MEANINGS OF DEFECTIVE PRODUCTS AND STRICT LIABILITY, 32 Tenn. L. Rev. 363, 370 (1965)). The product is not defective if the ordinary consumer would reasonably anticipate and appreciate the dangerous condition of the product and the attendant risk of injury of which the plaintiff complains (*e.g.*, a knife). See Vincer v. Esther Williams All-Aluminum Swimming Pool Co., 230 N.W.2d 794, 798 (Wis. 1975); see also RESTATEMENT (2D) OF TORTS § 402A cmt. i ("The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."). The nature of the product, the identity of the user, the product's intended use and intended user, and any express or implied representations by a manufacturer or other seller are among considerations relevant to assessing the reasonable consumer's expectations. See, e.g., Mikolajczyk, 901 N.E.2d at 336; Jarke v. Jackson Prods., 631 N.E.2d 233, 238-40 (Ill. App. 1st Dist. 1994); Owen, HORNBOOK, at 303, 307-09; see also RESTATEMENT (2D) OF TORTS § 402A cmt. i ("Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in

the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.").

The language of the consumer expectations test derives from the Second Restatement's commentary on the principles designated to limit liability, *i.e.*, "defective condition" and "unreasonably dangerous." RESTATEMENT (2D) OF TORTS § 402A cmts. g & i. Several commentators have suggested that this test reflects the warranty law roots of strict liability in tort, and serves to vindicate significant interests central to the public policy justifying the strict liability cause of action in the first place:

> Powerful reasons support protections of a consumer's expectations of product safety that arise from the safety representations of a manufacturer or other seller, whether those representations be express or implied. When making safety "promises" in an effort to sell its products, a manufacturer seeks to convince potential buyers that its affirmations are both valuable and true. Safety information is valuable to users because it provides a "frame of reference" that permits a user to shift his or her limited cognitive and other resources away from self-protection toward the pursuit of other goals -- which in turn shifts responsibility for protecting the user to the manufacturer. In this manner, true safety information adds value to the product by enhancing the user's autonomy, for which value the consumer fairly pays a price. So, if the information is not true but false, the purchaser loses significant autonomy, as well as the benefit of the bargain. Since an important purpose of the law is to promote autonomy, and the equality of the buyer to the seller as reflected in their deal, the law fairly may demand that the seller rectify the underlying falsity and resulting inequality in the exchange transaction if harm results.

Owen, HORNBOOK, at 303 (footnote omitted); compare Putman, 338 F.2d at 913 n.8 ("Liability in warranty arises where damage is caused by the failure of a product to measure up to express or implied representations on the part of the manufacturer or other supplier.").

Application of the consumer expectations test in its purest form, however, has theoretical and practical limitations. First, products whose danger is obvious or within the ordinary consumer's contemplation would be exempt from strict liability; some therefore have said that related consumer safety expectations regarding the presence of the danger are too low. See, e.g., Ahrens v. Ford Motor Co., 340 F.3d 1142 (10th Cir. 2003) (affirming district court decision that manufacturer not liable for defective design of tractor without seatbelt or for failing to warn of danger because plaintiff failed to adduce sufficient evidence that risk of danger was beyond contemplation of ordinary consumer). Second, a product whose danger is vague or outside the ordinary consumer's contemplation runs the risk of being subjected to arbitrary application of the strict liability doctrine; jury determinations of consumer expectations regarding the presence of danger are unpredictable. This difficulty is characteristic of products of relatively complex design. See, e.g., Heaton v. Ford Motor Co., 435 P.2d 806 (Or. 1967). The Heaton Court explained:

> [A product] should be strong enough to perform as the ordinary consumer expects. . . . The jury is supposed to determine the basically factual question of what reasonable consumers do expect from the product. Where the jury has no experiential basis for knowing this, the record must supply such a basis. In the absence of either common experience or evidence, any verdict would, in effect, be the jury's opinion of how strong the product [s]hould be. Such an opinion by the jury would be formed without the benefit of data concerning the cost or feasibility of designing and building stronger products. Without reference to relevant factual data, the jury has no special qualifications for deciding what is reasonable.

Id. at 809; see also Soule v. Gen. Motors Corp., 882 P.2d 298, 308 (Cal. 1994) ("[A] complex product, even when it is being used as intended, may often cause injury in a way that does not engage its ordinary consumers' reasonable minimum assumptions

about safe performance. For example, the ordinary consumer of an automobile simply has 'no idea' how it should perform in all foreseeable situations, or how safe it should be made against all foreseeable hazards.").

The consumer expectations test, because of the "obvious defect" exception and vagueness concerns, has practical limitations in vindicating the basic public policy undergirding strict liability, *i.e.*, that those who sell a product are held responsible for damage caused to a consumer despite the reasonable use of the product and that any product is, presumptively, subject to liability on a theory of strict liability premised upon this policy. See Miller, 221 A.2d at 334-35 (Jones, J., concurring and dissenting).

### Risk-Utility Standard

The difficulty related to vindicating the salient public policy in cases in which the alleged defective condition is premised upon either an obvious danger or a danger outside the ordinary consumer's contemplation suggests that a different approach is necessary and appropriate for judging the reasonableness of danger, at least respecting some products. American jurisdictions, including Pennsylvania, apply a test balancing risks and utilities or, stated in economic terms, a cost-benefit analysis. See Owen, HORNBOOK, at § 5.7; Azzarello, 391 A.2d at 1026. The test offers a standard which, in typical common law terms, states that: a product is in a defective condition if a "reasonable person" would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions. See, e.g., Denny v. Ford Motor Co., 662 N.E.2d 730, 735 (N.Y. 1995); Barker, 573 P.2d at 456; accord Welch, 481 F.2d at 256 (product is defective if reasonable seller would not sell product knowing of risks involved). Stated otherwise, a seller's precautions to advert the danger should anticipate and reflect the type and magnitude of the risk posed by the

sale and use of the product.  See Owen, HORNBOOK, at 315 (risk-utility standard "demands that manufacturers adopt precautions proportionate to the magnitude of the expected risk").

The risk-utility test offers courts an opportunity to analyze *post hoc* whether a manufacturer's conduct in manufacturing or designing a product was reasonable, which obviously reflects the negligence roots of strict liability.  See Blue v. Envt'l Eng'g, Inc., 828 N.E.2d 1128, 1140-41 (Ill. 2005) ("[I]t has been observed that the kind of hindsight analysis inherent in the risk-utility test, which requires juries to weigh the risk inherent in the product's design, has all the earmarks of determining negligence."); see also U.S. v. Carroll Towing Co., 159 F.2d at 174 (Judge Learned Hand's formula).  Other jurisdictions have generally cited favorably the works of Dean Wade, which articulated factors relevant to the manufacturer's risk-utility calculus implicated in manufacturing or designing a product.  See, e.g., Calles v. Scripto-Tokai Corp., 864 N.E.2d 249, 260-61 (Ill. 2007) (citing cases from multiple jurisdictions).  The factors are:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
> (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
> (6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
> (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

Id. (quoting Wade, 44 Miss. L. J. at 837–38). But, while these considerations may provide a holistic perspective on a manufacturer's choice to bring a product to market, they may not be immediately responsive in the (typical) case implicating allegations relating to a particular design feature. See Owen, HORNBOOK, at 315 ("[T]he issue properly litigated almost always concerns the narrow "micro-balance" of pros and cons of a manufacturer's failure to adopt some particular design feature that would have prevented the plaintiff's harm. . . ."); but see Beard, 41 A.3d at 838 (trial courts not restricted to considering single use of multi-use product in design defect, threshold, risk-utility balancing). The difficulty in presenting the issue to the jury, Professor Owen suggests, is resolved by reference to Judge Learned Hand's formula, which "succinctly captures the common sense idea that products are unacceptably dangerous if they contain dangers that might cost-effectively (and practicably) be removed." Owen, HORNBOOK, at 315 (applying Hand formula in strict liability means that jury will decide whether seller "fails to adopt a burden of precaution of less magnitude than the harm it is likely to prevent").

Application of a risk-utility balancing test in its purest form likewise has theoretical and practical shortcomings. The goal and strength of a pure risk-utility test is to achieve efficiency or "to maximize the common good"; yet, this is also its perceived weakness. See Owen, HORNBOOK, at 316. For, while efficiency is certainly a salutary goal of the law, it is not its only purpose and, in some respects, it conflicts with bedrock moral intuitions regarding justice in determining proper compensation for injury to persons or property in individual cases. Compare id. at 318 ("manufacturer applying cost-benefit analysis to safety decision-making in good faith thereby necessarily respects the equality and safety rights of consumers as a group") with William E. Nelson, THE MORAL PERVERSITY OF THE HAND CALCULUS, 45 St. Louis U. L. J. 759, 761 (2001) (describing

limitations of risk-utility analysis in negligence context; "[U]ltimately the Hand calculus is not about social efficiency, love, friendship or moral arrogance. It is only about compensation. The Hand calculus does not tell an entrepreneur whether or not to engage in conduct that will hurt one person and help another. . . . The Hand calculus serves a much narrower function. It tells an entrepreneur only that, if she engages in conduct that causes others to lose more than she gains, she will have to compensate them for their losses, but that, if she gains more than they lose, no duty of compensation will arise. . . . It is this very narrowness of the Hand calculus that makes it so morally perverse. . . . "). We should be mindful that public policy adjusts expectations of efficiency and intuitions of justice considerations, informing a seller's conduct toward consumers as a group, and ensuring proper compensation in individual cases by judicial application of the strict liability cause of action.

Of course, several other causes of action in tort incorporate a risk-utility hindsight analysis: for example, negligence and strict liability for abnormally dangerous activities (*i.e.*, the use of product in manner and context where danger is substantial, unavoidable, and dissonant among neighboring uses, see Owen, HORNBOOK, at 328). Neither of those actions involves a pure application of the risk-utility calculus. Accord Nelson, 45 St. Louis U. L. J. at 767 ("In sum, it might be right to understand the Hand calculus as a device for articulating our moral intuitions rather than a device for superceding them."); accord Blue, 828 N.E.2d at 1140-41 (hindsight analysis inherent in risk-utility test has earmarks of determining negligence). Nor are these causes of action the same, albeit when they define the scope of compensation, they use similar rhetoric implicating danger / risk and reasonableness. See generally, supra, n.18 (explaining Cronin). The distinction draws upon the public policy that each cause of action vindicates, which incorporates moral intuitions drawn from communal social experience

for the purposes of modifying (most often attenuating) the effect of a risk-utility application to ascertain appropriate compensation.  Ultimately, distinct duties (whether statutory or common law) and related causes of action develop to reflect determinations regarding a desirable allocation of risk.  Cf. Kernan v. Am. Dredging Co., 355 U.S. 426, 438 (1958) (Federal Employers' Liability Act aimed at "adjusting equitably between the worker and his corporate employer the risks inherent in the railroad industry . . . plainly rejected many of the refined distinctions necessary in common-law tort doctrine for the purpose of allocating risks between persons who are more nearly on an equal footing as to financial capacity and ability to avoid the hazards involved.").

### Combined Tests

A number of jurisdictions have expressly or implicitly combined the consumer expectations and risk-utility standards.  One approach is to state the two standards in the alternative; a plaintiff's injury is compensable whether either test is met.  See, e.g., Barker, 573 P.2d at 457-58 (discussed infra); Calles, 864 N.E.2d at 257; Welch, 481 F.2d at 254 ("A product is defective and unreasonably dangerous when a reasonable seller would not sell the product if he knew of the risks involved or if the risks are greater than a reasonable buyer would expect.").  The combined standard, which states consumer expectations and risk-utility tests in the alternative, retains the features of each test, in practice, offering the parties a composite of the most workable features of both tests.  See Caterpillar Tractor Co. v. Beck, 593 P.2d 871, 884-85 (Alaska 1979) superseded in part by Alaska Stat. § 09.17.060 (1986); accord Soule, supra.

A second approach is to incorporate the risk calculus into a test of consumer expectations or, vice versa, to incorporate consumer expectations into the risk-utility determination.  See, e.g., Vautour, 784 A.2d at 1182 (internal citations omitted)

("[P]roduct 'must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' . . . [W]hether a product is unreasonably dangerous to an extent beyond that which would be contemplated by the ordinary consumer is determined by the jury using a risk-utility balancing test."); RESTATEMENT (3D) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f ("A broad range of factors may be considered in determining whether an alternative design is reasonable and whether its omission renders a product not reasonably safe. The factors include . . . the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing."); id. § 2 cmt. g ("consumer expectations do not constitute an independent standard for judging the defectiveness of product designs").

Courts, moreover, have offered some variations on each of these approaches. In California, for example, the Barker court allocated to the supplier the burden to prove the adequacy of a product's design under the "risk-benefit" standard (*i.e.*, to disprove a plaintiff's *prima facie* case that a product is defective). The Court reasoned that most of the evidentiary matters which may be relevant in a typical case involve technical issues peculiarly within the knowledge of the manufacturer. 573 P.2d at 455. Commentators have suggested that another California case, see Soule, supra, offered yet another variation by which the applicability of either prong of the combined Barker test depends upon the complexity of the product. See Owen, HORNBOOK, at 325; Henderson, 83 Cornell L. Rev. at 899 (Soule "found the test unsuitable for cases involving product designs of any complexity. The court in Soule held that it would thereafter countenance use of a limited consumer expectations test in cases 'in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions.'") (footnotes omitted).

It is questionable, however, that the <u>Soule</u> court sought to foreclose strict liability claims premised upon a simple / complex classification, as the commentators have suggested. Such a standard begs -- or shifts -- the question of which designs are complex enough for application of the preferred test. Moreover, the implication that a distinct class of "simple" products is subject to a consumer expectations standard of liability which is relatively unsuccessful at producing fair results is contradicted by <u>Soule</u>'s continued adherence to that standard. <u>See</u> Henderson, 83 Cornell L. Rev. at 879-82 (disappointment of consumer expectations is inappropriate standard for defectiveness in classic design cases). Ourselves having had the experience of attempting to bring various principles to bear upon a single complex case, we believe that, placed into its proper context, <u>Soule</u> may be read as simply commenting upon the court's experience with analogous matters and offering guidance to aid trial courts in properly guiding the parties and the jury through the litigation process:

> As we have seen, the consumer expectations test is reserved for cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions, and is thus defective regardless of expert opinion about the merits of the design. It follows that where the minimum safety of a product is within the common knowledge of lay jurors, expert witnesses may not be used to demonstrate what an ordinary consumer would or should expect. Use of expert testimony for that purpose would invade the jury's function (<u>see</u> Evid. Code, § 801, subd. (a)), and would invite circumvention of the rule that the risks and benefits of a challenged design must be carefully balanced whenever the issue of design defect goes beyond the common experience of the product's users.

> By the same token, the jury may not be left free to find a violation of ordinary consumer expectations whenever it chooses. Unless the facts actually permit an inference that the product's performance did not meet the minimum safety

> expectations of its ordinary users, the jury must engage in the balancing of risks and benefits required by the second prong of <u>Barker</u>.

882 P.2d at 308-09 (emphasis and footnote omitted).  The <u>Soule</u> court concluded that, in light of precedent, the evidence offered by the plaintiff was not probative of the issue placed in dispute (there, ordinary consumer expectations regarding excessive weakness or porosity in a bracket weld); but, the evidence offered raised an inference of defect under the risk-benefit analysis and, therefore, the trial court should have properly limited its instructions to the jury to that test.  The all-too-common difficulty with the commentators' interpretation of <u>Soule</u> is that the court's fact-bound evidentiary holding is taken out of its context, mistaken for establishment of a distinct burden of proof, and treated as doctrine.  <u>Compare</u> <u>Scampone</u>, 57 A.3d at 606; <u>Gilbert</u>, 327 A.2d at 96-97.

The Third Restatement also offers a variation upon those tests primarily based upon a risk-utility determination by requiring proof of a reasonable alternative design. <u>See</u> Henderson, 83 Cornell L. Rev. at 884-87 (explaining standard of proof premised upon risk-utility balancing and proof of alternative design).  The Third Restatement states, in illustrative part:

> *§ 1 Liability of Commercial Seller or Distributor for Harm Caused by Defective Products*
> One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect.
>
> *§ 2 Categories of Product Defect*
> A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:
> (a) contains a manufacturing defect when the product departs from its intended design even though all possible

care was exercised in the preparation and marketing of the product;

(b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;

(c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.

*§ 3 Circumstantial Evidence Supporting Inference of Product Defect*

It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:

(a) was of a kind that ordinarily occurs as a result of product defect; and

(b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

\*     \*     \*     \*

RESTATEMENT (3D) OF TORTS: PRODUCTS LIABILITY §§ 1-3 (1998) (Liability Rules Applicable to Products Generally).

Section 1 of the Third Restatement articulates the general policy of strict liability. Sections 2 through 4, as well as Sections 6 and 7, address evidentiary questions. Notably, Section 2 identifies three types of defects and, at least with respect to "design" defect (subsection (b)), states a general rule, which defines a defect by reference to the relative risk-utility calculi for the allegedly defective product and an alternatively

designed product. See also Henderson, 83 Cornell L. Rev. at 888-89 (alternative design is proof of technological feasibility, "an empirical factor for courts to consider in the normative process of risk-utility balancing"). Application of this general rule is, as a result, limited -- and compensation is available -- only for those products for which an alternative design can be shown to exist. The Restatement illustrates its view that other evidence may be probative in a design defect case by articulating special rules. Thus, Sections 3, 4, and comment e to Section 2 of the Third Restatement establish alternative means for proving a design defect "in circumstances in which common experience teaches that an inference of defect may be warranted under the specific facts," where the seller or distributor violates statutory and regulatory norms, and "when the product design is manifestly unreasonable." Meanwhile, Sections 6 and 7 address special rules of liability for specific products: prescription drugs and medical devices, and food products. See id. at §§ 6-7; see also § 6 cmt. f (Section 6 principle articulates judgment that liability attaches only when certain type and quantum of evidence is adduced by plaintiff; noting expectation that, under "this very demanding objective standard, liability is likely to be imposed only under unusual circumstances"). In relation to prescription drugs, for example, the special rule reflects in part an understanding that, for some products, there is no alternative design.

### 4. The Appropriate Post-Azzarello Strict Liability Construct

#### a. The "Move" to the Third Restatement

Guided by this decisional and doctrinal universe, we address the parties' competing arguments, which rely, to a great extent, upon jurisprudential and policy assertions. Initially, from a jurisprudential perspective, Omega Flex argues that the Third Restatement offers a clearer and more precise articulation of strict liability doctrine

than does the Second Restatement, and adoption of the new formulation would return Pennsylvania into the mainstream in this arena. Omega Flex adds that a move to the Third Restatement is also the next logical step in the evolution of the law given that several Justices of this Court and members of the U.S. Court of Appeals for the Third Circuit, in Berrier, have articulated its merits and supported its application. The Tinchers respond that the Court has yet to "adopt" the Third Restatement and non-precedential opinions are not a basis upon which to do so. Of course, non-precedential expressions from this Court do not bind us to a course of action, nor do precedential expressions of non-binding courts -- what matters is the persuasiveness of the reasoning and the current decisional context. In particular, the separate expressions of Justice Saylor have proven invaluable in crystallizing awareness of the difficulties in this area of law.

Omega Flex also argues that the Third Restatement is the better articulation of the law, one specifically intended to address design defects and representing the mainstream view on the topic. According to Omega Flex, the present iteration of Pennsylvania law improperly lowers the burden of proof upon plaintiffs generally. Omega Flex posits that the Third Restatement, in contrast, is a "closely reasoned and balanced approach" that enhances the fairness and efficacy of the liability scheme. Appellant's Brief at 48 (citing Phillips, 841 A.2d at 1021 (Saylor, J., concurring); Bugosh, 971 A.2d at 1231 (Saylor, J., dissenting); General Services, 898 A.2d at 616 (Newman, J., concurring and dissenting)). According to Omega Flex, the Third Restatement is already widely accepted and, as illustrated by this case, does not place an overly onerous burden of proof upon plaintiffs. Finally, Omega Flex claims that the Third Restatement is not a departure from but a refinement of the Second Restatement, which "simply elevates the availability of a safer alternative design from a factor to be

considered in the risk-utility analysis to a requisite element of a cause of action for defective design." Appellant's Reply Brief at 17, 21. According to Omega Flex, the Second Restatement did not specifically articulate the alternative design requirement because that Restatement "was focused on manufacturing, not design, defects." Id. at 20.

The Tinchers respond that the Third Restatement replaces the Second Restatement liability scheme with a negligence standard, which heightens the plaintiff's burden of proof and, as a result, "compromises the deeply-rooted social policy of protecting citizens through the imposition of strict liability under [the Second] Restatement." Appellees' Brief at 23. The Tinchers do not share Omega Flex's "refinement" view of the Third Restatement, but instead describe the iteration as a "radical departure from established precedent [that] is not prudent or necessary." Id. at 26. The Tinchers also assert that the Third Restatement has limited support in other jurisdictions. Moreover, the Tinchers claim that the Third Restatement standard will result in a denial of compensation for meritorious claims by raising the cost of pursuing the claims: "[t]he plaintiff will have to become an expert in the technology that caused the plaintiff's injury, and will need to re-design the product himself." Id. at 34.

In essential part, both parties ask this Court to engage questions of whether their preferred iteration of the Restatement embodies a good, better, or more desirable public policy. As we have explained, as an adjudicative body, this Court is not particularly well-suited to such a broad task. The appropriate question is which, if either, Restatement articulates the standard of proof in terms that effectuate the public policy of this Commonwealth.

For the reasons that follow, we conclude that "adoption" of the Third Restatement approach is problematic. For one thing, articulating the burden of proof in terms of

evidence (alternative design) deemed probative of the general principle of strict liability proscriptively limits the applicability of the cause of action to certain products as to which that sort of evidence is available. The approach suggests *a priori* categorical exemptions for some products -- such as novel products with no alternative design -- but not others. The Connecticut Supreme Court suggested a similar insight: "in some instances, a product may be in a defective condition unreasonably dangerous to the user even though no feasible alternative design is available." Potter, 694 A.2d at 1332.

Of course, the courts, legislatures, and the American Law Institute cannot foresee all the myriad products and circumstances that may arise. The alternative means of proving liability in special cases recognized in the Third Restatement are designed to alleviate some of the harsh results of the general rule which are currently foreseeable, suggesting some limited liability in circumstances in which the special rules of Sections 2 -- comment e, 3, 4, 6, or 7 apply. Nevertheless, a question remains whether the general and special rules taken together state a general principle of liability consistent with the public policy that compensation is available for an injury caused by **any** type of defective product. Compare Scampone, 57 A.3d at 606 (rejecting as inconsistent with negligence public policy nursing home's argument that nursing home lacked duty of care to patients because prior decisional law had addressed only negligence liability of hospitals and plaintiff had not adduced proof that nursing home offered same healthcare services as hospital). In either case, this jurisdiction's experience with the repercussions of attempting to articulate specific principles of liability of broad application in implementing the strict liability cause of action make us reticent to go far beyond the necessities of an individual case and embrace a broad new approach premised upon what may prove to be procrustean categorical restrictions.

Our reticence respecting the Third Restatement scheme is not a judgment on our part that, as a matter of policy, articulating categorical exemptions from strict liability is not a viable or desirable alternative. Courts, which address evidence and arguments in individual cases, are neither positioned, nor resourced, to make the kind of policy judgments required to arrive at an *a priori* decision as to which individual products, or categories and types of products, should be exempt. Neither courts, nor the American Law Institute for that matter, are in the business of articulating general principles tailored to anoint special "winners" and "losers" among those who engage in the same type of conduct. In our view, the question of "special tort-insulated status" for certain suppliers - - for example, manufacturers of innovative products with no comparable alternative design -- optimally "requires an assessment and balancing of policies best left to the General Assembly." Scampone, 57 A.3d at 599; Ayala, supra; but see, e.g., Hahn, 673 A.2d 888 (where adequacy of warnings associated with prescription drugs is at issue, strict liability is not recognized as basis for liability). As we explained in Scampone:

> Immunity or exemption from liability is the exception to the general rule that an entity must meet the obligations it incurs in functioning. . . . [A]ny other cause of action at common law. . . evolves through either directly applicable decisional law or by analogy, meaning that a defendant is not categorically exempt from liability simply because appellate decisional law has not specifically addressed a theory of liability in a particular context. Categorical exemptions from liability exist (following the dismantling by this Court of judicial immunities in the 1960s and 1970s) only where the General Assembly has acted to create explicit policy-based immunities, *e.g.*, to protect the public purse. Where either no immunity exists, or the legislative branch created exceptions to an immunity legislatively conferred, the default general rule of possible liability operates.

<u>Scampone</u>, 57 A.3d at 599 (also explaining, *inter alia*, that from judicial perspective, duty at law is independent of financial status of individual defendants or of particular industries).

The methodology employed by the reporters suggests additional potential weaknesses in the strict liability schemata of the Third Restatement that should caution courts against categorical pronouncements. Citing representative cases from several jurisdictions, the reporters offer that an alternative-design driven risk-utility general rule -- with a special consumer expectations rule for cases in which the design defect is demonstrable -- reflects the consensus among American jurisdictions as to the applicable liability construct in "classic design cases." <u>See</u> Henderson, 83 Cornell L. Rev. at 887-901. Notably, while recognizing that "tort cases are particularly fact-sensitive," the reporters purported to undertake an "empirical study of case law" to determine whether the alternative-design driven risk-utility general rule has support in the decisional law in a majority of jurisdictions. The reporters commented that: "[t]ort cases are particularly fact-sensitive and courts are consequently prone to pepper their decisions with dicta and footnotes to allow 'wiggle room' for cases that may arise in the future. In contrast to legal treatise writers and restaters who, in synthesizing the law, tend to speak precisely and categorically, courts in their published opinions are more likely to be open-textured and indecisive." <u>Id.</u> at 888. This approach no doubt fulfills the role of the American Law Institute in its own salutary task of restating and clarifying a view of strict liability that can be reduced to decisive terms. We also respect the effort of the Third Restatement reporters in approaching that non-judicial task practically and with humility. But, what drives the Institute and treatise writers does not make comparative modesty, nuance, and reticence in the judiciary mistaken (much less

indecisive) in a jurisdiction, like Pennsylvania, where the area, to date, has been the exclusive province of the common law.

That evidence of the existence and specifications of an alternative design is relevant and even highly probative to prove disputed issues in a products liability case, such as technological feasibility, cost, etc., is certainly true. That the more typical case implicates the type of products and circumstances in which evidence of an alternative product design is the most persuasive and efficient means of convincing the trier of fact may also be true. That offering evidence of an alternative product design may be the preferred legal strategy of the plaintiff's bar in certain cases -- or may be a strategy the defense bar would like to impose on the plaintiff's bar in certain cases -- again may also be true. But, while the reporters' intuition that meritorious cases are premised upon certain types of evidence may have some general validity and support in practice (and may prove helpful to litigants in articulating claims and preparing defenses), the reporters' commentary candidly betrays a problem -- for the judiciary at least -- of perspective. Principally, at least in a climate where suggestions are made along the lines of simply "adopting" or "moving to" a Restatement construct, it is our view that the reporters' "precise and categorical" perspective insufficiently accounts for the imperatives of the courts' more modest decisional role, by, for example, describing the reasoned and purposeful articulation of general principles as "dicta."

As a jurisprudential matter, articulating common law principles in terms of extrapolations from evidence relevant in the typical case is problematic for good reasons. It is worth reiterating that:

> [T]his Court's decisions are read against the facts because "our decisional law generally develops incrementally, within the confines of the circumstances of cases as they come before the Court. For one thing, it is very difficult for courts to determine the range of factual

circumstances to which a particular rule should apply in light of the often myriad possibilities." [Maloney, 984 A.2d at 489-90.] Depending on the perspective of the Court, prospective or retrospective, this insight has separate but related implications. Prospectively, we endeavor to render determinations that "spring [ ] from the facts before us in th[e] appeal, while recognizing that our task is not simply to decide this case, but also to provide guidance upon the broader legal issue," especially where the issue is one of first impression. "By necessity, this undertaking requires breadth of vision and consideration of both sides of the coin: the facts of a given case on one side, and the law, which will almost always be more conceptual, on the other." [Thierfelder v. Wolfert, 52 A.3d 1251, 1264 n.9 (Pa. 2012)]. On the other hand, recognizing the necessary narrowness of the individual decisional task and the limitations of imperfect foresight, we aspire to embrace precision and avoid "the possibility that words or phrases or sentences may be taken out of context and treated as doctrines." Maloney, 984 A.2d at 490 (quoting Northwestern Nat'l Ins. Co. v. Maggio, 976 F.2d 320, 323 (7th Cir. 1992)).

Scampone, 57 A.3d at 604-05. Particularly relevant here, we added: "In considering decisions retrospectively, when called upon to apply them, the law does not lose its precedential mantle based simply on formulaic reading; the intent of the principle that decisions are to be read against their facts is simply to prevent 'wooden application of abstract principles to circumstances in which different considerations may pertain.'" Id. at 605 (quoting Maloney, 984 A.2d at 485-86). As a practical matter, courts articulate general principles -- what the Restatement reporters may in some instances call "dicta" -- before applying them to the facts in order to place a set a facts in perspective, to explain and ground the disposition. This is because, at its best, decisional law is principle-driven and not result-driven (although just results are certainly the overarching goal). And, a reasoned decision will always permit easy or intuitive drafting and explication of the relevant principles. Candid decision-making articulates governing,

and occasionally competing principles, and has the flexibility to reassess a prior principle upon confrontation with nuance, better or different advocacy, or articulation of a previously unperceived principle of salutary value.

Insight into the reporters' perspective on how the nature of decisions at common law informs their consensus effort to speak otherwise, *i.e.*, to "speak precisely and categorically" by classifying defect claims (*i.e.*, classic design cases, prescription drugs cases, etc.) and inserting evidentiary prerequisites into general and special rules applicable to the distinct categories to which they pertain, should serve as a reminder of comparative judicial modesty. The Third Restatement approach presumes too much certainty about the range of circumstances, factual or otherwise, to which the "general rule" articulated should apply.

Indeed, relying upon a confined universe of reported appellate cases to draw evidence-based (versus principle-based) rules is problematic as a general matter in our mature legal system. This is so because the small class of cases posing issues of sufficient consequence to result in reported, precedential decisions naturally tends to raise narrow unsettled issues and / or fact-sensitive applications, rather than to provide vehicles to illustrate those parts of the law that are so "well accepted" as to reflect emergent general rules. Of course, these cases may, by analogy and distinction, illuminate general principles at issue; but, purporting to limit the general rule to the facts of those cases is anathema to the common law. Stated otherwise, simply because in cases of factually-marginal applications courts have found evidence relating to alternative designs to be particularly probative and persuasive, in our minds, does not necessarily support a thesis that adducing such evidence is dispositive of whether a plaintiff has carried his / her burden of proof. See, e.g., Soule, 882 P.2d at 308. The principal point is that a jurisdiction is free to adopt a policy that reduces a supplier's

exposure to strict liability for a product.  But, it would either be naïve or inaccurate to declare that existing decisional law in Pennsylvania expressly articulates, or contemplates, only the general principle in the terms of the Third Restatement.  And, if adopted as a broadly applicable legal regime, the Third Restatement would engender a self-fulfilling prophecy by providing for a future restatement, going forward, of only those cases that meet the evidentiary threshold the regime permits.

Additionally, the Third Restatement construct, because unmoored from guidance upon the broader legal issue, would likely impede the principled development of the law in this arena.  Although "[b]right lines and broad rules always offer a superficially enticing option," they also risk elevating the lull of simplicity to doctrine.  See, e.g., Scampone, 57 A.3d at 598; Azzarello.  And, finally, our reticence respecting broad approval of the Third Restatement is separately explainable by looking no further than to the aftermath of Azzarello, whose negligence rhetoric-related doctrinal proscription arising from a peculiar set of circumstances had long-term deleterious effects on the development of strict liability law in Pennsylvania.  Azzarello and Scampone illustrate, in different ways, how dogmatic pronouncements are difficult to apply in individual cases without guidance upon the broader legal issue and the result is often that litigation will derail into irrelevant, unreasoned, or unprincipled factual disputes (an issue to which we also adverted in our discussion of Soule, supra).  As a Court, in this dynamic area, we must settle for the incremental approach.[24]

---

[24]    Commentary by Dean Wade and Dean W. Page Keeton of the University of Texas offered related approaches to the standard of proof in design defect cases premised upon imputation of knowledge of risks when such knowledge was unavailable prior to marketing.  Although offering invaluable insight, an imputation of knowledge approach has not gained substantial traction because of difficulties identified by the authors themselves.  See generally John W. Wade, THE PASSAGE OF TIME: THE IMPLICATIONS FOR PRODUCT LIABILITY: ON THE EFFECT IN PRODUCT LIABILITY OF KNOWLEDGE UNAVAILABLE PRIOR TO MARKETING, 58 N.Y.U. L. Rev. 734 (1983).

Our previous analysis illustrates that the Third Restatement does not offer an articulation of the law sufficient to persuade us to simply abandon the Second Restatement formulation of the strict products liability cause of action and "move" to the Third Restatement. Unlike the Third Restatement, we believe that the Second Restatement already adopted, and properly calibrated, permits the plaintiffs to tailor their factual allegations and legal argumentation to the circumstances as they present themselves in the real-world crucible of litigation, rather than relying upon an evidence-bound standard of proof.

### b. Prevailing Standard of Proof

Having overruled <u>Azzarello</u> and declined the invitation to fill the void by simply "adopting" the Third Restatement formulation, we proceed to address the appropriate standard of proof of a strict liability claim in Pennsylvania.

Initially, we note that, although Pennsylvania remains a Second Restatement jurisdiction, "adoption" of its principles into our common law is distinct in concept and application from the adoption of a statute by the General Assembly. Although the reporter's words have intrinsic significance because their purpose is to explain the legal principle clearly, they are not entitled to the fidelity due a legislative body's expression of policy, whose judgment and intent, wise or unwise, a court generally is obligated to effectuate, absent constitutional infirmity. The language of a restatement, as a result, is not necessarily susceptible to "statutory"-type construction or parsing. An effective and valuable restatement of the law offers instead a pithy articulation of a principle of law which, in many cases, including novel or difficult ones, represents a starting template for members of the judiciary, whose duty is then to employ an educated, candid, and common-sense approach to ensure dispensation of justice to the citizenry. The

common law relies in individual cases upon clear iterations of the facts and skillful advocacy, and evolves in principle by analogy, distinction, and reasoned explication. Accord Scampone, 57 A.3d at 605. This is the essence of justice at common law.

With this qualification in mind, we explain: (1) that the strict liability cause of action sounds in tort; (2) that the notion of "defective condition unreasonably dangerous" is the normative principle of the strict liability cause of action, which reflects the standard of review or application of the tort, and its history; and (3) the appropriate interplay of principle and evidence.[25]

It is important to remember that the action sounds in tort, *i.e.* the cause involves breach of duties "imposed by law as a matter of social policy," rather than contract, *i.e.*, the cause involves breach of duties "imposed by mutual consensus agreements between particular individuals." Ash, 932 A.2d at 884; see RESTATEMENT (2D) OF TORTS § 402A(2). Nevertheless, the tortious conduct at issue is not the same as that found in traditional claims of negligence and commonly associated with the more colloquial notion of "fault." In this sense, introducing a colloquial notion of "fault" into the conversation relating to strict product liability in tort detracts from the precision required to keep this legal proposition within rational bounds.[26]

---

[25] While the Second Restatement formulation of the principles governing the strict liability cause of action in tort may have proven substantially less than clear, the policy that formulation embodies has not been challenged here and has largely remained uncontroverted. Accord Henderson, 83 Cornell L. Rev. at 868 (premised upon survey of decisional law, noting rejection of "extreme positions that question the need to develop a general standard for defective design," such as absolute liability and no strict liability ("defer[ing] responsibility for design choices exclusively to the market"), as unnecessary "tilting at windmills").

[26] But see Sherk, 450 A.2d at 621 (equating liability without proof of negligence, *i.e.*, breach of duty of care, to liability without fault). Consider a counterexample of tort liability without fault and its reasoned justification. We have explained that:

(continued…)

As we explain, after reviewing the provenance of the cause of action, the Second Restatement reporter's choice of words, and the evolution of the cause of action in application, we hold that, in Pennsylvania, the cause of action in strict products liability requires proof, in the alternative, either of the ordinary consumer's expectations or of the risk-utility of a product. To maintain the integrity and fairness of the strict products liability cause of action, each part of this standard of proof remains subject to its theoretical limitations, as explained above. We believe that the demands of strict liability policy are met because the composite standard retains the best functioning features of each test, when applied in the appropriate factual context. See Caterpillar, supra.

Decisional law and commentary from the 1960s that expressly endorsed a separate tort in strict liability illustrate that the cause of action streamlined access to

---

(…continued)

> [V]icarious liability is a policy-based allocation of risk. Crowell v. City of Philadelphia, 613 A.2d 1178, 1181 (Pa. 1992). "Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it." Id. (quoting Prosser and Keeton on Torts § 69, at 499 (5th ed. 1984)). Once the requisite relationship (i.e., employment, agency) is demonstrated, "the innocent victim has recourse against the principal," even if "the ultimately responsible agent is unavailable or lacks the ability to pay." Mamalis v. Atlas Van Lines, Inc., 560 A.2d 1380, 1383 (Pa. 1989); accord Crowell, 613 A.2d at 1182 (vicarious liability is policy response to 'specific need' of how to fully compensate victim).

Scampone, 57 A.3d at 597.

compensation already available, at least in some cases, under either negligence or breach of warranty theories. In other cases, however, the substantive or procedural conventions appurtenant to theories of negligence (*e.g.*, requirement to join all potential tortfeasors) and breach of warranty (*e.g.*, requirement of privity), deemed at the time necessary to vindicate interests that underpinned the respective theories, failed to generate fair, coherent results and doctrine, in the face of evolving or newly-revealed circumstances (*i.e.*, an increasingly vibrant market for products) and an evolving interest in protecting consumers. See, e.g., Webb, 220 A.2d at 854 (trial court dismissed negligence claim, reasoning that plaintiff had not joined all parties against whom inference of negligence could be drawn); Miller, 221 A.2d at 324 (trial court dismissed breach of warranty claim, reasoning that infant-plaintiff was not in privity with manufacturer, distributor, or retailer). Although courts subsequently abandoned some narrow pleading and proof conventions (in the case of privity, for example) or justified results on equitable bases in other cases, the doctrinal strain opened the possibility of a separate tort that tailored itself to the articulated policy goals. See, e.g., Salvador, 319 A.2d at 907 (discarded burden to prove horizontal privity); Henningsen v. Bloomfield Motors, Inc., 161 A.2d 69 (N.J. 1960) (disclaimer of implied warranty of merchantability by dealer and attempted elimination of all obligations other than replacement of defective parts violate public policy and are void).[27]

---

[27] In 1960, Dean Prosser also explained the systemic efficiency benefits deriving from a single cause of action in strict liability. According to Dean Prosser:

> It [wa]s already possible to enforce strict liability by resort to a series of actions, in which the retailer is first held liable on a warranty to his purchaser, and indemnity on a warranty is then sought successively from other suppliers, until the manufacturer finally pays the damages, with the added costs of repeated litigation. This is an expensive,

(continued…)

The emergent single cause of action in tort -- strict liability -- retained, nevertheless, those aspects of negligence **and** breach of warranty liability theories from which it evolved. Stated otherwise, the theory of strict liability as it evolved overlaps in effect with the theories of negligence **and** breach of warranty. (Parenthetically, this places into context Section 402A(2), which states that the rule of strict liability "applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."). As we explained above, this is not an unusual development in the common law: for example, negligence and strict liability for abnormally dangerous activities also overlap in the sense that they both are premised upon a risk-utility hindsight analysis with different public policy overlays to modify their application to distinct conduct. Relevant here, public policy also adjusts expectations of efficiency and intuitions of justice considerations in the context of products liability, informing a seller's conduct toward consumers as a group and ensuring compensation in individual cases by judicial application of the strict liability cause of action. Essentially, strict liability is a theory that effectuates a further shift of the risk of harm onto the supplier than either negligence or breach of warranty theory by combining the balancing of interests inherent in those two causes of action.

---

(…continued)

> time-consuming, and wasteful process, and it may be interrupted by insolvency, lack of jurisdiction, disclaimers, or the statute of limitations, anywhere along the line. What is needed is a blanket rule which makes any supplier in the chain liable directly to the ultimate user, and so short-circuits the whole unwieldy process. This is in the interest, not only of the consumer, but of the courts, and even on occasion of the suppliers themselves.

69 Yale L. J. at 1123-24 (footnote omitted).

The core insight, which the Supreme Court of California pioneered in the 1978 Barker decision, is that the standard of proof in a strict liability cause of action properly reflects this duality of purpose. The Barker Court thus articulated a standard of proof which stated the consumer expectations test and the risk-utility test in the alternative. The alternative test standard of proof is a "composite" that retains "the most workable features of each of the other tests." Caterpillar, 593 P.2d at 884-85.

One other insight completes the picture: a duality in the strict liability cause of action is evident in the expectation that all sellers in the distributive chain are legally responsible for the product in strict liability. Dean Prosser explained the expected results of applying strict liability:

> Where the action is against the manufacturer of the product, an honest estimate might very well be that there is not one case in a hundred in which strict liability would result in recovery where negligence does not. . . . All this, however, is but half of the picture. There are other sellers than the manufacturer of the product. It will pass through the hands of a whole line of other dealers, and the plaintiff may have good reason to sue any or all of them. . . . It is here that negligence liability breaks down. The wholesaler, the jobber, and the retailer normally are simply not negligent. They are under no duty to test or inspect the chattel, and they do not do so; and when, as is usually the case today, it comes to them in a sealed container, examination becomes impossible without destroying marketability. No inference of negligence can arise against these sellers, and *res ipsa loquitur* is of no use at all.

Prosser, 69 Yale L. J. at 1116-17 (footnote omitted).

Thus, in placing a product on the market, a manufacturer acts to design (and manufacture) the product and, along with other distributors, to sell the product, including making the product attractive for sale by making implicit representations of the product's safety. See Knitz v. Minster Mach. Co., 432 N.E.2d 814, 818 (Ohio 1982) (quoting

Greenman v. Yuba Power Prods., 377 P.2d 897 (Cal. 1963)) (Second Restatement standard "followed as a logical development from commercial warranty origins of strict liability in tort" and reflected "the commercial reality that '(i)mplicit in . . . (a product's) presence on the market . . . (is) a representation that it (will) safely do the jobs for which it was built.'"); accord Owen, HORNBOOK, at 303. A manufacturer, in designing the product, engages in a risk-utility calculus; the policy-driven *post hoc* risk-utility calculus necessary to determine whether the design choice thus made may justly require compensation for injury explains the relevance of that standard of proof in strict liability. Meanwhile, a seller of the product -- whether the manufacturer or the supplier in the chain of distribution -- implicitly represents by placing a product on the market that the product is not in a defective condition unreasonably dangerous. Accord Markle v. Mulholland's Inc., 509 P.2d 529, 532 (Or. 1973) (implied representation of merchantable quality accounts for Restatement formulation, whose "language is consistent only with something conceptually similar to an expectation by the consumer of merchantable quality. It is an expectation which is the result of the manufacturer's or seller's placing the article in the stream of commerce with the intention that it be purchased. This expectation is given legal sanction by the law through an assumption that the seller, by so placing the article in the stream of commerce, has represented that the article is not unreasonably dangerous if put to its intended use."). Express and implied representations by the manufacturer and other suppliers in the distributive chain, contextualized by common human experience to evolve the notion of fault in strict liability, explain the relevance of evidence regarding consumer expectations, both as an independent source of liability (*e.g.*, expectations created by advertising or warnings) and as part of the calculus of risk (*e.g.*, expectations that drive product design choices).

The dual analytical structure also explains the historical ebb and flow of consumer expectations / risk-utility and warranty / negligence rhetoric that pervades decisional law. Essentially, given that a term like "defective condition unreasonably dangerous" is not self-defining, courts have offered multiple definitions applicable in the several contexts in which a definitional issue has arisen, all effectuating the single policy that those who sell a product are held responsible for damages caused to a consumer by the reasonable use of the product. See, e.g., Miller, 221 A.2d at 334-35 (Jones, J., concurring and dissenting); accord Barker, 573 P.2d at 453 ("term defect as utilized in the strict liability context is neither self-defining nor susceptible to a single definition applicable in all contexts"). The exposition of strict liability in Pennsylvania and in other jurisdictions illustrates that the original disputes implicated tensions over how warranty principles limited liability on a strict liability in tort theory. Decisional law that derived from the tension reflected a period of expanding liability (because plaintiffs were not required to prove privity as in a breach of warranty action, see, e.g., Miller). These types of disputes waned as the law settled in, both by way of decisional law discarding privity in breach of warranty cases and by clarification of this part of the law in the late 1960s and early 1970s, which may have aided suppliers to internalize the effects of warranty-type strict liability into their conduct and to pass the attendant costs on to consumers. In a sense, then, the consumer expectations gauge for strict liability has had some apparent success in vindicating the policy of strict liability.

Modern decisional law reflects that the focus of disputes -- or at least those disputes making their way into the appellate courts -- has increasingly been upon the negligence-derived risk-utility alternative formulation of the standard. The prominence of the legal issue in decisional law coincides with the advent of design defect claims, in which issues of proof tend to more complexity than where a manufacturing defect is in

dispute.  This development reflected the complex litigation calculus implicated in a strict liability claim premised upon this type of defect resulting from either lack of proof (for example in the case of known or foreseeable risks for which an available cure may or may not have been available at the time of design) or the relative deterrent inefficacy of a theory of liability for unknowable risks, short of exiting the market.  Accord Prosser, 69 Yale L. J. at 1116 ("So long as there is the possibility that negligence may not be found, the defendant is encouraged by vain hopes, and the plaintiff gnawed by lingering doubts; and a case which can be decided for the defendant is worth less, in terms of settlement, than one which can not.  And so long as the defendant can introduce evidence of his own due care, the possibility remains that it may influence the size of the verdict, as jurymen impressed with it stubbornly hold out for no liability, or a smaller sum.") (emphasis omitted).  Yet, some types of disputes are absent from the decisional law and may, indeed, provide rather strong evidence of strict liability as a deterrent by preventing bringing a product to market or encouraging settlement of claims -- it must be remembered that an appellate expression is not necessary to illustrate the point that designers are properly deterred by strict liability from using consumers as guinea pigs. See Henderson, 83 Cornell L. Rev. at 901 ("Some courts, in *dicta*, hold out the possibility that the risk-utility imbalance might be so egregious that the product should not be marketed at all.  Actual holdings to this effect, however, are non-existent.") (footnote omitted).[28]

---

[28]    Parenthetically, the number of manufacturing claims is significantly lower than that of design defect claims.  Dean Prosser explained: "It is true also that [the plaintiff] seldom, if ever, has any direct evidence of what went on in the defendant's plant.  But in every jurisdiction, he is aided by the doctrine of *res ipsa loquitur*, or by its practical equivalent."  Prosser, 69 Yale L. J. at 1114 (footnote omitted).  In a design defect case, the doctrine of *res ipsa loquitur* is generally of little help in light of the complexities of conduct involved.

In either case, that the theory of strict liability -- like all other tort causes of action -- is not fully capable of providing a sufficient deterrent incentive to achieve perfect safety goals is not a justification for jettisoning or restricting the duty in strict liability, whose compensatory objective remains part of the public policy of this Commonwealth. See Ash, 932 A.2d at 882 (purpose of torts law is to "put an injured person in a position as near as possible to his position prior to the tort"); accord Scampone, 57 A.3d at 596; Excavation Tech., Inc. v. Columbia Gas Co. of Pa., 985 A.2d 840, 844 (Pa. 2009) ("object of tort law is to modify behavior through allocation of financial risk on party best positioned to prevent harm") (citation omitted); Trosky v. Civil Serv. Comm'n, 652 A.2d 813, 817 (Pa. 1995) (quoting RESTATEMENT (2D) OF TORTS § 901, cmt. a (1979)); Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 275 n.20 (1989) ("Damages are designed not only as a satisfaction to the injured person, but likewise as punishment to the guilty, to deter from any such proceeding for the future and as a proof of the detestation of the jury to the action itself."); Gary T. Schwartz, MIXED THEORIES OF TORT LAW: AFFIRMING BOTH DETERRENCE AND CORRECTIVE JUSTICE, 75 Tex. L. Rev. 1801 (1997).

Finally, we remark upon evidentiary issues necessarily implicated by the standard of proof we have articulated. Derived from its negligence-warranty dichotomy, the strict liability cause of action theoretically permits compensation where harm results from risks that are known or foreseeable (although proof of either may be unavailable) -- a circumstance similar to cases in which traditional negligence theory is implicated -- and also where harm results from risks unknowable at the time of manufacture or sale -- a circumstance similar to cases in which traditional implied warranty theory is implicated. The difficulty is in cabining liability premised upon a risk unknowable at the time of manufacture / sale, which was logically unavoidable, in circumstances in which

liability and attendant compensation was potentially limitless (in other words, 100 percent of risk would be shifted to suppliers). Imputing knowledge, and assessing the avoidability of risk -- was theoretically counterintuitive and offered practical difficulties, as illustrated by the Wade-Keeton debate. See generally John W. Wade, THE PASSAGE OF TIME: THE IMPLICATIONS FOR PRODUCT LIABILITY: ON THE EFFECT IN PRODUCT LIABILITY OF KNOWLEDGE UNAVAILABLE PRIOR TO MARKETING, 58 N.Y.U. L. Rev. 734 (1983). Both rationing and policy -- as expressed in the qualification "unreasonably dangerous" -- supported limitations. The risk-utility calculus has been suggested as a normative solution to cabin liability exposure regardless of the type of claim asserted (*i.e.*, of either a known / foreseeable or an unknown risk). Accord Beard, 41 A.3d at 838 (meaningful risk-utility evaluation is effort to implement rational limits on strict liability in tort). Because the circumstance is not before us, and in light of the complexities and dearth of persuasive authority, we will await the appropriate case to speak definitively to this issue.

By comparison, the Tinchers' claim was essentially premised upon the allegation that the risk of harm related to TracPipe's thickness was both foreseeable and avoidable, as illustrated by the resistance to lightning of black iron pipe. These allegations, at least, bear the indicia of negligence. Indeed, in some respects this is the "typical" case, which explains both the insight that in design cases, the character of the product and the conduct of the manufacturer are largely inseparable, and the Third Restatement's approach of requiring an alternative design as part of the standard of proof. See, e.g., Phillips, 841 A.2d at 1013-14 (Saylor, J., concurring); Henderson, 83 Cornell L. Rev. at 876-87 ("Developing a General Defectiveness Standard for Classic Design Cases"). Indeed, the Tinchers themselves sought summary relief and dismissal

of this case premised upon the argument that the same result would have obtained under either the Second or the Third Restatement iteration of the law.

But, the point that we have stressed repeatedly in this Opinion, is that courts do not try the "typical" products case exclusively and a principle of the common law must permit just application to myriad factual circumstances that are beyond our power to conceive. Circumstances like product diversity, general uncertainties inherent in the creative process, difficulties in recreating the design process, difficulties in the discovery process, to name just a few, may contribute to whether cases other than the typical case will generate a dispute and resulting decisional precedent. Nevertheless, in many circumstances, courts may be called upon to examine whether the rule has outrun the reason. Self-selection of cases (consumers and manufacturers internalizing the policy vindicated by the strict liability theory and modifying conduct as a result), variations in the quality and nuance in competing argumentation from counsel, including in the fashioning of suggested jury charges applicable to a particular case, courts' articulation of relevant normative principles as they pertain to specific factual scenarios, and scholarly commentary will likely contribute to the continually developing decisional law.

The delivery of justice in this area requires a recognition and appreciation of the appropriate and significant roles played by advocates, trial judges, and the appellate judiciary. Particularly relevant here, we note that the area of strict liability law remains complex and our decision here does not purport to foresee and account for the myriad implications or potential pitfalls as yet unarticulated or unappreciated. Thus, at the trial level, and as with other legal concepts, "it is incumbent upon the parties, through their attorneys, to aid courts in narrowing issues and formulating appropriate instructions to guide juries in their factual determinations. . . ." It is worth reiterating that "[b]right lines and broad rules always offer a superficially enticing option. However, we cannot

elevate the lull of simplicity over the balancing of interests embodied by the principles underpinning [the jurisprudence of the relevant area of law]." <u>Scampone</u>, 57 A.3d at 598. The principal point is that judicial modesty counsels that we be content to permit the common law to develop incrementally, as we provide reasoned explications of principles pertinent to factual circumstances of the cases that come before the Court. <u>See</u> <u>Scampone</u>, 57 A.3d at 605; <u>Barker</u>, 573 P.2d at 453 (difficulties inherent in giving content to defectiveness standard "could best be resolved by resort to the 'cluster of useful precedents' which have been developed in the product liability field. . . .").

**5.      Litigation Considerations Deriving from the**

**New Strict Liability Construct**

**a.      Judge and Jury; Jury Instructions**

Having outlined these principles of strict liability law, we next offer the following guidance relating to the appropriate provinces of the judge and jury, and to adequate, targeted jury instructions in a strict liability case. As noted, the <u>Azzarello</u> Court held that, as a gauge for whether a product is unreasonably dangerous, the balancing of risks and utilities, when implicated, was an issue of law dependent upon social policy to be decided by the trial court. The jury would then simply resolve any "dispute as to the condition of a product," as a separate question. 391 A.2d at 1025-27. We have explained why we believe that severing findings relating to the risk-utility calculus from findings related to the condition of the product is impracticable and inconsistent with the theory of strict liability. We offer additional guidance to confirm our departure from that aspect of <u>Azzarello</u> that assigned these roles to the judge and jury in a strict liability case.

As is generally the case, the plaintiff is the master of the claim in the first instance. The immediate implication is that counsel must articulate the plaintiff's strict liability claim by alleging sufficient facts to make a *prima facie* case premised upon either a "consumer expectations" or "risk-utility" theory, or both. The calculus for a plaintiff and a plaintiff's advocate in choosing to pursue either theory or both will likely account, among other things, for the nature of the product, for the theoretical limitations of either alternative standard of proof, for whether pursuing both theories simultaneously is likely to confuse the finder of fact and, most importantly, for the evidence available or likely to become available for trial. As discovery and case preparation proceed, and the evidentiary record evolves, the plaintiff may choose to pursue or abandon either theory, or pursue both, if the evidence so warrants. A defendant may also seek to have dismissed any overreaching by the plaintiff via appropriate motion and objection. The trial court is to act in its ordinary gate-keeper role, *e.g.*, monitoring litigation, mediating or adjudicating any subsidiary differences, and pending objections and motions, including those seeking to narrow, or expand, the theories of litigation to be pursued at trial. See, e.g., Soule, 882 P.2d at 303, 309.[29]

---

[29] For example, in Soule, the trial court gave the standard two-prong Barker instruction for design defect without modification, over the defendant-manufacturer's objection. The defendant argued that, given the nature of the product, instructing the jury on the consumer expectations standard was error. On appeal, the Supreme Court of California agreed:

> [T]he jury may not be left free to find a violation of ordinary consumer expectations whenever it chooses. Unless the facts actually permit an inference that the product's performance did not meet the minimum safety expectations of its ordinary users, the jury must engage in the balancing of risks and benefits required by the second prong of Barker. Accordingly, as Barker indicated, instructions are misleading and incorrect if they allow a jury

(continued…)

One crucial aspect of the trial court's role is, of course, the task of defining the strict liability legal universe within which a particular jury operates for purposes of discharging its function.  See Commonwealth v. Graham, 9 A.3d 196, 201-02 & n.9 (Pa. 2010); see, e.g., Soule, supra.  To reiterate, a jury charge is adequate "unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error."  Chambers, 980 A.2d at 49-50; see also Price v. Guy, 735 A.2d 668, 670 (Pa. 1999).

In this case, in critical part, the trial court instructed the jury in accordance with the law as articulated in Azzarello and its progeny.  See N.T., 10/19/2010, at 794-98. We have now overruled Azzarello and we have additionally explained foundational issues related to the strict liability cause of action in Pennsylvania -- the public policy which the cause of action vindicates, the duty recognized by the public policy, and the standard and burden of proof necessary to prove breach that duty.  Going forward, consistent with this decision, when a plaintiff proceeds on a theory that implicates a risk-utility calculus, proof of risks and utilities are part of the burden to prove that the harm suffered was due to the defective condition of the product.  The credibility of witnesses and testimony offered, the weight of evidence relevant to the risk-utility calculus, and whether a party has met the burden to prove the elements of the strict liability cause of

---

(…continued)

> to avoid this risk-benefit analysis in a case where it is required.  Instructions based on the ordinary consumer expectations prong of Barker are not appropriate where, as a matter of law, the evidence would not support a jury verdict on that theory.  Whenever that is so, the jury must be instructed solely on the alternative risk-benefit theory of design defect announced in Barker.

882 P.2d at 303, 309.

action are issues for the finder of fact, whether that finder of fact is judge or jury. A question of whether the party has met its burden of proof is properly "removed" -- for example, via adjudication of a dispositive motion -- "from the jury's consideration only where it is clear that reasonable minds [cannot] differ on the issue." Hamil v. Bashline, 392 A.2d 1280, 1284-85 (Pa. 1978). Thus, the strict liability construct we articulate today comfortably accommodates the gate-keeping role ordinarily relegated to the trial court in tort actions.

Our decision today allows for application of standards of proof in the alternative. Obviously, other examples of such decisional paradigms exist. See, e.g., 18 Pa.C.S. § 2503 (describing offense of voluntary manslaughter as action under heat of passion **or** premised upon imperfect belief of self-defense). In charging the jury, the trial court's objective is "to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict." Chambers, 980 A.2d at 49 (quoting Commonwealth v. Hartman, 638 A.2d 968, 971 (Pa. 1994)). Where evidence supports a party-requested instruction on a theory or defense, a charge on the theory or defense is warranted. Id. At that point, "[t]he trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." Sepulveda, 55 A.3d at 1141.

It is essential for the bench and bar to recognize that the test we articulate today is not intended as a rigid formula to be offered to the jury in all situations. The alternate theories of proof contour the notion of "defective condition" in principled terms intended as comprehensive guidelines that are sufficiently malleable to account for product diversity and a variety of legal claims, products, and applications of theory. The crucial role of the trial court is to prepare a jury charge that explicates the meaning of "defective

condition" within the boundaries of the law, *i.e.*, the alternative test standard, and the facts that pertain. Cf. Soule, 882 P.2d at 308-11.

### b.     The Burden of Proof

Another consideration derived from existing precedent implicates the burden of proof in a strict liability case. As we have noted, California pioneered the alternate consumer expectations / risk-utility balancing test as a prevailing standard of proof in strict liability cases. See Barker, 573 P.2d at 457-58. The Barker court also concluded that it was appropriate, when proceeding upon a risk-utility theory, to shift to the defendant the burden of production and persuasion to demonstrate that an injury-producing product is not defective in design. Id. at 455. Other jurisdictions have subscribed to the Barker standard of proof, although only some of those courts have also shifted the burden of proof to the defendant. Compare, e.g., Lamkin v. Towner, 563 N.E.2d 449, 457 (Ill. 1990) with Knitz, 432 N.E.2d at 818. The similarity of the approach we have approved to the Barker standard of proof may raise a question of whether Pennsylvania should also require a shifting of the burden of proof to the defendant when the plaintiff proceeds upon a risk-utility theory.

Recently, in a case involving criminal law, this Court explained that: "[t]he function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. While the risk of error in a particular adjudication does not vary depending on the standard of proof adopted, the burden allocates that risk between the parties." Sanchez, 36 A.3d at 65 (citations omitted). In strict liability cases, as ordinarily in other civil actions, the burden of proof is sustained by a

preponderance of the evidence. See, e.g., Summers v. Certainteed Corp., 997 A.2d 1152, 1163-64 (Pa. 2010) (quoting Hamil, 392 A.2d at 1284-85). A more stringent burden of production and persuasion imposes a higher risk of an erroneous decision on the party upon which the burden rests. Thus, shifting the burden of proof onto a defendant places the risk of an erroneous decision upon the defendant. The determination of whether such a shift is suitable rests, as the Barker court also noted, primarily on considerations of whether the shift vindicates the public policy at issue. In addition, we consider difficulties of adducing evidence to prove a negative, the parties' relative access to evidence, and whether placing the burden of proof on one party is necessary to help enforce a further right, constitutional or otherwise. See Sanchez, 36 A.3d at 67.

Applying similar criteria, the Barker court reasoned that placing the burden on the defendant was appropriate "[b]ecause most of the evidentiary matters which may be relevant to the determination of the adequacy of a product's design under the 'risk-benefit' standard *e.g.*, the feasibility and cost of alternative designs are similar to issues typically presented in a negligent design case and involve technical matters peculiarly within the knowledge of the manufacturer." According to Barker, the shift in the burden of proof reflected the policy judgment that "one of the principal purposes behind the strict product liability doctrine is to relieve an injured plaintiff of many of the onerous evidentiary burdens inherent in a negligence cause of action." 573 P.2d at 455.

The parties obviously have not briefed the question of burden-shifting in risk-utility cases -- they had no reason to -- and we need not decide it to resolve this appeal, nor is it apparent that it will matter upon remand. We note, however, that whatever may be the merit of the Barker court's concerns, countervailing considerations may also be relevant. For example, it is consistent with the treatment of tort causes of action

generally, and the notion that Pennsylvania does not presume a product to be defective until proven otherwise, to assign the burden of proof in a strict liability case to the plaintiff. Moreover, proving a negative is generally not desirable as a jurisprudential matter because of fairness concerns related to anticipating and rebutting allegations, and because of the encumbrances placed upon the judicial system by an open-ended approach to pleading and trying a case. Finally, evidence relevant to a risk-utility test, including the feasibility and cost of alternative designs, while involving technical matters, would seem to be within the knowledge of expert witnesses available to either plaintiff or defendant in many cases; and liberal discovery may also aid the plaintiff.

These interests, and others that we may not perceive, are implicated in answering the question of whether the burden should be on the plaintiff or on the defendant, generally or in particular cases involving a risk-utility theory. The ultimate answer to the question best awaits balancing in an appropriate case, specifically raising the question, with attendant briefing from parties.

### c. Related Legal Issues

We recognize – and the bench and bar should recognize -- that the decision to overrule Azzarello and articulate a standard of proof premised upon alternative tests in relation to claims of a product defective in design may have an impact upon other foundational issues regarding manufacturing or warning claims, and upon subsidiary issues constructed from Azzarello, such as the availability of negligence-derived defenses, bystander compensation, or the proper application of the intended use doctrine. Accord Bugosh, 971 A.2d at 1244-45 & 1248-49. These considerations and effects are outside the scope of the facts of this dispute and, understandably, have not been briefed by the Tinchers or Omega Flex.

This Opinion does not purport to either approve or disapprove prior decisional law, or available alternatives suggested by commentators or the Restatements, relating to foundational or subsidiary considerations and consequences of our explicit holdings. In light of our prior discussion, the difficulties that justify our restraint should be readily apparent. The common law regarding these related considerations should develop within the proper factual contexts against the background of targeted advocacy.

### IV.    Conclusion / Mandate

At the Court's request, the parties briefed a question concerning whether adoption of the Third Restatement, if such a decision were to be made, would have retroactive or prospective effect. Having declined to "adopt" the Third Restatement, we need not reach the question of retroactive or prospective application of the ruling. Nevertheless, in light of the decision to overrule Azzarello, questions remain regarding whether Omega Flex should benefit from the application of our Opinion upon remand and, moreover, whether Omega Flex is entitled to a new trial. Here, Omega Flex preserved and presented its claim that Azzarello should be overruled to the trial court and on appeal; as a result, we hold that Omega Flex is entitled to the benefit of our decision in this regard. Whether Omega Flex is entitled to additional relief, including a new trial or judgment notwithstanding the verdict is not apparent upon the record before us. See Price, 735 A.2d at 672 (new trial appropriate if erroneous jury instruction amounts to fundamental error or the record is insufficient to determine whether error affected verdict); Degenhardt, 669 A.2d at 950 (judgment notwithstanding verdict is appropriate only if no two reasonable minds could disagree that verdict should be in favor of movant).

For these reasons, we reverse in part the decision of the Superior Court in this matter, and remand to the trial court for further action upon post-trial motions. Upon remand, the trial court may direct the parties to file supplemental post-verdict motions or briefs articulating their positions regarding the proper disposition of the matter in light of our decision to overrule Azzarello and the further guidance articulated in this Opinion.

Jurisdiction relinquished.

Former Justice McCaffery did not participate in the decision of this case.

Mr. Justice Baer, Madame Justice Todd and Mr. Justice Stevens join the opinion.

Mr. Justice Saylor files a concurring and dissenting opinion in which Mr. Justice Eakin joins.